# IN THE UNITED STATES DISTRICT
# COURT FOR THE EASTERN DISTRICT
# OF TEXAS SHERMAN DIVISION

UNITED STATES OF AMERICA
*ex rel.* and Andrew Mitchell, and Andrew
Mitchell, Individually,

                    Plaintiff,

vs.

CIT Bank, N.A., d/b/a OneWest Bank, and CIT
Group, Inc.,

                    Defendants.

**QUI TAM PLAINTIFF/RELATOR'S
SECOND AMENDED COMPLAINT
PURSUANT TO 31 U.S.C. §§ 3729-
3732 (FEDERAL FALSE CLAIMS
ACT)**

CIVIL ACTION NO. 4:14-cv-833

**JURY TRIAL DEMANDED**

## QUI TAM PLAINTIFF/RELATOR'S SECOND AMENDED COMPLAINT
## PURSUANT TO 31 U.S.C. §§ 3729-3732(FEDERAL FALSE CLAIMS ACT)

Dated: October 11, 2019

**BRAGALONE CONROY PC**

Jeffrey R. Bragalone
Texas Bar No. 02855775
Patrick J. Conroy
Texas Bar No. 24012448
Stephanie R. Wood
Texas Bar No. 24057928

2200 Ross Avenue
Suite 4500W
Dallas, TX 75201
Tel: (214) 785-6670
Fax: (214) 785-6680
jbragalone@bcpc-law.com
pconroy@bcpc-law.com
swood@bcpc-law.com

**GEORGE BROTHERS KINCAID & HORTON,
L.L.P.**

B. Russell Horton (*admission pending*)
Texas Bar No. 10014450

114 W. 7th St., Ste 1100
Suite 4500W
Austin, TX 78701
Tel: (512) 495-1482
rhorton@gbkh.com


**SANDERS, O'HANLON, MOTLEY, YOUNG &
GALLARDO, P.L.L.C.**

Roger D. Sanders
Texas Bar No. 17604700
J. Michael Young
Texas Bar No. 00786465

111 South Travis Street
Sherman, Texas 75090
Tel: (903) 892-9133
Fax: (903) 892-4302
roger.sanders@somlaw.net
michael.young@somlaw.net

***Counsel for Relator/Qui Tam Plaintiff
Andrew Mitchell***

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................... 4

III.  PARTIES ............................................................................................ 5

      A.    Relator ..................................................................................... 5

      B.    Defendants .............................................................................. 5

IV.   LEGAL BACKGROUND .................................................................. 6

      A.    FHA and the Single-Family Mortgage Market ....................... 7

      B.    HAMP .................................................................................... 16

      C.    VA Mortgage Relief .............................................................. 25

V.    FACTUAL ALLEGATIONS ............................................................ 26

      A.    OneWest's longstanding failure to implement a loss mitigation
            program. ................................................................................ 26

      B.    OneWest's HAMP violations ................................................ 41

      C.    Insurance and incentive payments to OneWest ..................... 46

VI.   CLAIMS FOR RELIEF .................................................................... 48

VII.  PRAYER FOR RELIEF ................................................................... 50

I.     **INTRODUCTION**

1.      At the height of the foreclosure crisis, the federal government created the Home Affordable Modification Program ("HAMP") in order to incentivize mortgage lenders and servicers to initiate mortgage modifications to keep homeowners in their homes and avoid foreclosure. Soon, realizing more needed to be done for struggling homeowners with federally insured mortgages, including veterans, the Government created HAMP equivalents for Federal Housing Administration (FHA) and Veterans Administration (VA) mortgages, known respectively as FHA-HAMP and VA-HAMP.

2.      Adding FHA-HAMP and VA-HAMP was essential because FHA and VA homeowners, many of whom are first-time and low-credit homebuyers, are among the most vulnerable homeowners: only through federal government guarantees does home ownership become a reality for these Americans. Such guarantees take the form of insurance provided to mortgage lenders and servicers limiting the risk associated with extending credit to these borrowers. If the homeowner defaults, FHA insurance will pay the mortgage servicer's valid claim. By providing this taxpayer-funded insurance, the Government has afforded the possibility of homeownership to millions of Americans who could not otherwise afford a down-payment.

3.      FHA-HAMP supplemented existing requirements that servicers avoid foreclosing on homes by implementing certain federal regulations designed to help homeowners retain their homes and minimize financial losses to the FHA insurance fund.[1] Specifically, these lenders and servicers must take prescribed "loss mitigation" steps to solve delinquent homeowners' payment problems while avoiding foreclosure. After following the federally mandated loss mitigation evaluation steps—and only after following these steps—can an FHA-

---

[1] VA-HAMP modifications, which operate similarly, are omitted here for simplicity but discussed below. *See* § IV.C., *supra*.

HAMP participant evaluate a homeowner for an FHA-HAMP modification. After evaluating a homeowner for an FHA- HAMP modification—and only after doing so—can a lender proceed with foreclosure. VA- HAMP played a similar role for VA loans.

4.       Amid the foreclosure crisis, HAMP, FHA-HAMP, and VA-HAMP were designed to be a win for all parties.  Distressed homeowners who qualified for loan modifications stayed in their homes for a lower monthly payment that was a reasonable percentage of their income and, in some cases, received government assistance in making their payments. Investors received payments and a guarantee that no modification would result in a mortgage worth less than the net present value of the property. And mortgage servicers, in addition to the payments they received from the investor, received HAMP incentive payments for successful modifications. In the case of FHA loans, they also retained the right to submit insurance claims to the Government for their losses when homeowners defaulted.

5.       OneWest Bank ("OneWest") signed up for the HAMP, FHA-HAMP, and VA-HAMP programs and, in its initial and amended agreements, promised to comply with the terms of the program and other relevant laws, promised to create and maintain a professional, effective modification program, and promised to report any credible evidence of material violations of those promises to the Government. In annual re-certifications, it also represented each year that it had met these requirements in the time since its last certification. Compliance with those promises and the truthfulness of those representations was a precondition for HAMP, FHA- HAMP, and VA-HAMP payments.

6.       But despite receiving hundreds of millions of taxpayer dollars in insurance claims for defaulted FHA and VA loans, and in incentive payments under HAMP, FHA-HAMP, and VA-HAMP, OneWest implemented mortgage servicing policies and practices that hurt the

very homeowners that these programs were designed to help. OneWest knowingly violated the repeated promises and representations that it made in order to secure HAMP, FHA-HAMP, and VA-HAMP payments. And throughout this time, OneWest falsely certified to the Government, over and over again, that it had been complying with FHA mortgage insurance program rules, HAMP rules, and FHA-HAMP and VA-HAMP rules and policies and relevant state and federal laws and continued to do so. OneWest also continuously failed to disclose its known violations and misrepresentations, despite representations that it would do so. These repeated false certifications, misrepresentations, and omissions, had they been known to the Government, would have been material to the Government's decision to pay OneWest hundreds of millions of dollars in federal insurance claims and incentive payments.

7.      **First**, OneWest knowingly failed to implement any loss mitigation evaluation system whatsoever, despite its affirmative obligation to do so. Both when using a subservicer and when purporting to perform loss mitigation evaluations itself, OneWest knowingly failed to perform the required loss mitigation analysis on homeowners' loans while certifying to the Government that it had done so, resulting in needless and illegal foreclosures and FHA insurance payments to OneWest.

8.      **Second**, OneWest knowingly failed to evaluate homeowners for the FHA-HAMP program itself, despite its affirmative obligation to do so as part of its loss mitigation evaluation, and despite certifying and representing to the Government that it was complying with the program. This similarly resulted in unnecessary, illegal foreclosures and ill-gotten insurance payments to OneWest. Any incentive payments received by OneWest, meanwhile, were paid based on material misrepresentations about the nature of its mortgage modifications.

9.      **Third**, OneWest deliberately ignored its VA loan portfolio, making no effort to evaluate and modify these loans despite its explicit undertakings to the contrary. As a result of this willful conduct, veterans lost their homes to foreclosure while OneWest received federal insurance payments.

10.      **Fourth**, OneWest violated the material terms of its eligibility for payments under HAMP by, among other things, failing to suspend foreclosure proceedings for loss mitigation evaluations, improperly capitalizing principal and unaccrued escrow payments, and running a program that lacked basic systems and processes to ensure that homeowners' mortgage documents were received, tracked, and considered for modifications – all while falsely certifying to the Government, over and over, that it was and had been complying with the material terms.

11.      The Government would not have paid hundreds of millions of dollars of FHA insurance claims, and FHA-HAMP, VA-HAMP and HAMP incentive payments to OneWest had it known that, instead of helping homeowners, OneWest stole money from them by failing to evaluate their mortgages for loss mitigation, double-capitalizing unpaid principal, capitalizing anticipated escrow shortfalls (and then charging for those amounts anyway), and wrongfully subjecting them to the foreclosure process by dual tracking in direct contravention of federal rules and guidelines. The Government would also not have paid hundreds of millions of dollars of payments to OneWest had it known that OneWest utterly failed to administer a modification program in an effective way. In any case, this information would have been material to the Government's decision to pay.

## II.    **JURISDICTION AND VENUE**

12.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the False Claims Act, a federal law.

13.     Relator has direct and independent knowledge of the information upon which these allegations are based and voluntarily provided the information underlying their allegations to the United States before filing these claims. The allegations upon which this action is based were not previously publicly disclosed.

14.     Venue is proper in this District under 31 U.S.C. § 3732(a) because Defendants transact business in this District.

## III.   PARTIES

### A.   Relator

15.     Relator Andrew Mitchell is a resident of Austin, Texas. From approximately late 2009 until mid-2011, Mitchell was employed by OneWest as a loss mitigation specialist dealing with FHA loans. In that capacity, Mitchell reviewed hundreds of distressed FHA mortgages for OneWest. From mid-2011 until early 2012, he was employed by OneWest in an unrelated position dealing with real-estate owned (REO) properties.

### B.   Defendants

16.     Defendant CIT Bank, N.A., d/b/a/ OneWest Bank ("CIT Bank"), is a wholly owned subsidiary of CIT Group, Inc., after a 2015 merger in which CIT Group, Inc. acquired IMB Holdco LLC, the parent company of OneWest Bank N.A. OneWest Bank ("OneWest") is a division of CIT Bank, N.A., and is headquartered at 888 East Walnut Street, Pasadena, CA 91101. CIT Bank is a national bank and its principal place of business is Pasadena, CA.

17.     CIT Group, Inc. ("CIT Group") is a U.S. financial holding company incorporated in Delaware with a principal place of business in New York, New York.

IV.    **LEGAL BACKGROUND**

18.    The single-family mortgage industry consists of financial services and other firms that originate, underwrite, securitize, and service mortgages for residential properties. Mortgage originators are lenders who loan money to homeowners and receive a security interest in property, through a mortgage that secures the loan.

19.    In the modern mortgage market, mortgages typically are "pooled" to create an investment vehicle, often denominated as a trust, and interests in the trusts are sold to investors that own interests in payment streams generated by principal and interest payments by the homeowners.

20.    After origination, a "servicer" is responsible for mortgage administration activities, known as servicing activities, which generally include collecting payments from mortgagors; applying payments made in an agreed-upon order to the mortgagor's indebtedness; distributing payments after allowable deductions to the investment trust entities for distribution to investors; making advances to cover delinquent mortgage payments and other costs, such as the costs of protecting and maintaining properties that collateralize mortgage loans when mortgagors fail to do so; pursuing collections from delinquent mortgagors; and pursuing either loss mitigation or foreclosure, as appropriate, to minimize the loss to investors and others when mortgagors become delinquent on mortgage payments.

21.    The facts of this case took place against the backdrop of the mortgage crisis in the late 2000s. The inflation and bursting of one of the largest asset bubbles in United States history—securitized home mortgages—produced the most significant economic downturn in recent memory in this country. After U.S. home prices increased by 132% from the first quarter of 1997 to the second quarter of 2006 (an average annual increase of 9.5%), those home prices

decreased by 35% from the second quarter of 2006 to the first quarter of 2012 (an average annual decrease of 7.1%). Over the same time period of the home price collapse, national unemployment increased from 4.6% at the end of the second quarter of 2006 to 9.9% at the end of the first quarter of 2010.

22.      During the housing bubble, many mortgages were originated with features that made them vulnerable to default should the economy deteriorate in conjunction with decreasing home values. Some of these loan features included prepayment penalties and balloon clauses. Other loans featured non-amortizing payments (specifically, interest-only loans and option payment mortgages) and/or adjustable rate terms with low introductory "teaser" rates that resulted in significantly higher monthly payments once the rates recast or reset.

23.      Once the bubble burst, foreclosures skyrocketed as economic conditions created difficulty for many homeowners in meeting their mortgage obligations. Falling home prices left many homeowners "underwater," that is, with negative equity in their homes, and made it difficult for distressed homeowners to sell or refinance their homes for enough money to repay their mortgages.

24.      In response to this housing and foreclosure crisis, the federal government created HAMP, part of the Making Home Affordable Program ("MHA"). HAMP, administered by the Treasury Department and its agents, is a program designed to stem the crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible homeowners.

A.      **FHA and the Single-Family Mortgage Market**

25.      OneWest serviced a number of mortgages insured by the federal government, commonly referred to as "FHA loans" or "FHA-insured loans." FHA provides mortgage insurance

on, among other things, single-family residential loans designated as FHA loans and made by FHA-approved lenders throughout the United States. *See*, *e.g.*, 12 U.S.C. § 1709; *see* generally 24 C.F.R. Part 203.

26.     FHA mortgage insurance provides lenders with protection against losses when mortgage loans insured by FHA are foreclosed upon. The FHA insurance program, by reducing the risk borne by approved lenders, is designed to stimulate lending to underserved but creditworthy borrowers.

27.     Because foreclosures on FHA loans trigger expensive financial consequences for the federal government, it endeavors to protect the integrity of its insurance funds by minimizing foreclosures. For example, it mandates that the loans be originated using strict underwriting standards, which are meant to ensure that the homeowner can manage the mortgage payments, thus reducing the risk of default and foreclosure.

28.     Equally important, the Government requires that, should an FHA loan become distressed, the servicer take certain specific actions to prevent the loan from proceeding to foreclosure. This is referred to broadly as "FHA Loss Mitigation."

### 1.     FHA Loss Mitigation Requirements

29.     The U.S. Department of Housing and Urban Development ("HUD") is an executive department that oversees housing programs, including FHA. HUD regulations require servicers to evaluate delinquent FHA loans for loss mitigation options, a policy that is designed to help homeowners retain their homes and minimize financial losses to the Mutual Mortgage Insurance Fund, FHA's funding source for its mortgage insurance program. *See* 12 U.S.C. § 1715u (requiring that "mortgagees shall engage in loss mitigation actions for the purpose of providing an alternative to foreclosure . . .").

30.     FHA-approved mortgage lenders and servicers are thus required to engage in loss mitigation efforts to avoid the foreclosure of FHA-insured single-family residential mortgages. *E.g.*, 24 C.F.R. § 203.500 *et seq.*; Mortgagee Letter 2008-27 ("Treble Damages for Failure to Engage in Loss Mitigation") (Sept. 26, 2008); Mortgagee Letter 1996-25 ("Existing Alternatives to Foreclosure -- Loss Mitigation") (May 8, 1996). Mortgagees may not foreclose on any FHA-insured mortgage where a default could be addressed by modifying the terms of the mortgage or other less-costly alternatives to foreclosure were available.

31.     The loss mitigation actions include a series of measures to be taken according a specific hierarchy expressly prescribed by HUD: (1) Informal Forbearance Plans; (2) Formal Forbearance Plans; (3) Special Forbearances; (4) Loan Modifications; (5) Partial Claims (after 2013); and finally, (6) as of 2009, FHA-HAMP. The servicer is required to select the most appropriate option based on HUD's loss mitigation hierarchy and the homeowner's circumstances. As the final option in HUD's hierarchy of loss mitigation options, FHA-HAMP can only be used if the mortgagor does not qualify for the other loss mitigation home retention options (Informal Forbearance Plans, Formal Forbearance Plans, Special Forbearances, Loan Modifications, and (after 2013) Partial Claims). *See* Attachment A to Mortgagee Letter 2013-32 (FHA Loss Mitigation Home Retention Option Priority Order (Waterfall)); *see also* Mortgagee Letters 2008-21, 2003-19, 2002-17, 2000-05.[2]

32.     Compliance with FHA loss mitigation requirements is a material condition of payment for FHA insurance claims, as set out in a series of HUD regulations. 24 C.F.R. §§ 203.361, 203.500, 203.501, 203.605, and 203.606. In addition, HUD Mortgagee Letter 2008-27

---

[2] FHA defines "mortgagees" to include nonsupervised mortgagees like OneWest who function as loan servicers. *See* FHA Housing Policy Handbook (4000.1) at I.A.1-2 & n. 1, http://portal.hud.gov/hudportal/documents/huddoc? id=sfh_draft_db_mortgagees.pdf.

describes "three key actions" that mortgagees "must take" in order to avoid the assessment of treble damages for failure to engage in loss mitigation:

> First, mortgagees must ensure that the loss mitigation evaluations are completed for all delinquent mortgages before four full monthly installments are due and unpaid. Second, mortgagees must ensure that the appropriate action is taken based on these evaluations. Third, mortgagees must maintain documentation of all initial and subsequent loss mitigation evaluations and actions taken.

33.      This "four-payment" timing rule is critical to reducing the likelihood of foreclosure, which is both undesirable as a policy matter and more expensive to taxpayers. The four-payment requirement—which in practice means evaluations must be done within 90 days of delinquency—is the foundation of HUD's loss mitigation policy. It is grounded in common- sense practical and mathematical considerations: the further behind a homeowner falls on mortgage payments, the less likely loss mitigation will be successful. *See* Goodman, Laurie S., Roger Ashworth, Brian Landy, and Lidan Yang, "Modification Success—What Have We Learned?" *Journal of Fixed Income* 21, no. 2 (2011): 57-67 (distressed homeowners re-default at significantly lower rates when they receive loan modifications earlier in the delinquency process).

34.      "Failure to engage in loss mitigation" is officially defined by FHA as:

> (a)      A mortgagee's failure to evaluate a loan for loss mitigation before four full monthly mortgage installments are due and unpaid to determine which, if any, loss mitigation techniques are appropriate (*see* 24 CFR § 203.605); and/or

> (b)      A subsequent failure to take appropriate loss mitigation action(s).

HUD Mortgagee Letter 2008-27 at 2.

**2.      <u>FHA-HAMP</u>**

35.      As noted above, the final retention step in the FHA loss mitigation hierarchy is FHA-HAMP; it is also the most robust loss mitigation measure, representing homeowners' last, best chance of keeping their homes. FHA launched FHA-HAMP in July 2009 to provide additional

assistance to homeowners with FHA-insured loans who were unable to meet their mortgage payments. *See* FHA Mortgagee Letter 2009-23; U.S. Treasury Supplemental Directive 10-03. The effective date of FHA-HAMP was August 15, 2009. It was based in part on the Home Affordable Mortgage Program ("HAMP" or "traditional HAMP"), a parallel program for non-FHA loans. *See* § IV.B., *infra*.

36.     Generally, FHA-HAMP combines a loan modification over a 360-month term with a partial claim, which is an advance (in the form of a non-interest-bearing promissory note assigned to HUD) that allows the homeowner to defer a portion of the unpaid principal loan balance. A partial claim can equal no more than 30 percent of the principal balance as of the date of default. Arrearages for unpaid accrued interest, mortgagee advances for escrowed items, and reasonable and customary legal fees and costs can be capitalized in a loan modification or partial claim, but late fees and property repair costs cannot. Mortgagee Letter 2008-21; FHA Single Family Housing Policy Handbook 4000.1 ("FHA Handbook 4000.1") at III.A.2.k.vi(E).

37.     Much like traditional HAMP (described below), FHA-HAMP is intended to provide homeowners with an affordable monthly payment equal to 31 percent of their gross monthly income and requires the homeowner to complete a three-month trial payment plan before the loan can be permanently modified. FHA-HAMP follows a detailed procedure for determining a homeowner's modified monthly mortgage payment (the "waterfall" calculation). *See* Attachment A to Mortgagee Letter 2013-32 (FHA Loss Mitigation Home Retention Option Priority Order (Waterfall)). These mortgage servicing rules are found in the Code of Federal Regulations, *e.g.* 24 C.F.R.        §        203.606,        HUD        Handbook        4330.1,        REV-5, http://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/handbooks/hsgh/4330.1, and FAQs and mortgagee letters, which are published and regularly updated on the

Department of Housing and Urban Development's (HUD) website, http://portal.hud.gov/

hudportal/HUD?src=/program_offices/administration/hudclips/letters/mortgagee.  Some of the

more relevant mortgagee letters issued since the creation of FHA-HAMP include: Mortgagee

Letter 2009-23, Mortgagee Letter 2010-04, Mortgagee Letter 2012-22, and Mortgagee Letter

2013-32.

38.     Until February 2013, for a homeowner to be eligible for an FHA-HAMP

mortgage modification, the homeowner could not be more than 12 months delinquent in paying

the mortgage. HUD Mortgagee Letter 2009-23 and Accompanying Guidance; *see also* HUD

Mortgagee Letter 2012-22 (eliminating this requirement as of February 14, 2013).

39.     FHA-HAMP also attempted to incentivize loan modifications through direct

payments to the relevant parties. A servicer can submit a loss mitigation incentive claim for up to

$1,250 for every mortgage permanently modified under the terms of FHA-HAMP. *See* HUD

Mortgagee Letters 2010-11 and 2009-23. This total includes $500 for the partial claim and $750

for the loan modification. A servicer can also claim up to $250 for reimbursement of title search

and/or recording fees. To receive the incentive payments, the Partial Claim and Loan Modification

must meet the requirements of Mortgagee Letters 2008-21, 2003-19, 2002-17, 2000-05, and

comply with instructions and requirements in Mortgagee Letter 2009-23 and the accompanying

Attachment.

40.     Additionally, a servicer is eligible to receive annual "Pay for Success"

compensation from the U.S. Department of Treasury for each homeowner whose monthly

mortgage payment is reduced through FHA-HAMP by 6% or more. Under such circumstances,

the servicer that provides this permanent modification is eligible to receive an annual pay-for-

success fee—the lesser of $1,000 or one-half of the reduction in the homeowner's annualized monthly payment—for three years.

41.     Pay for Success payments are disbursed automatically based upon data submitted by the servicer through an online portal, accompanied by certifications under penalty of civil and/or criminal jeopardy. Other requests for incentive payments are submitted through a HUD online portal, accompanied by certifications under penalty of civil and/or criminal jeopardy.

### 3.     OneWest's Participation in FHA-HAMP

42.     OneWest was required to register and execute a Commitment to Purchase Financial Instrument and Servicer Participation Agreement ("SPA") on or before October 3, 2010.[3] Any servicer that had previously executed a HAMP SPA was required to execute an Amended and Restated SPA or an additional Service Schedule that included FHA-HAMP, as applicable. The SPA and its attached exhibits (including the Financial Instrument itself and Service Schedules) set out some of the terms and conditions under which servicers could receive incentive payments under FHA-HAMP.

43.     On August 18, 2009, OneWest Executive Vice President and Chief Operating Officer Tony Ebers signed a Servicer Participation Agreement (SPA) on behalf of OneWest with Fannie Mae, as financial agent of the United States.

44.     On September 24, 2010, Ebers signed an amended SPA on behalf of OneWest with Fannie Mae, as financial agent of the United States.

45.     Upon information and belief, and as mandated by the program, Ebers or another OneWest officer signed one or more additional Service Schedules that specifically included FHA-HAMP, substantially in the form of those cited above and the template Treasury FHA- HAMP

---

[3] Any references to SPA mean the SPA and exhibits, including the Financial Instrument

Service Schedule that is available at https://www.hmpadmin.com/portal/programs/docs/

hamp_servicer/servicerparticipationagreement.pdf.

46.     The SPA required OneWest to provide annual certifications of compliance with the specified terms and conditions. In addition to the other certifications of compliance discussed above, the form of the annual certification is included with the SPA.

**4.     Loss Mitigation Certifications**

47.     Beyond the obligation to comply with statutory and regulatory authorities governing the FHA single family insurance program, mortgagees must also expressly certify that they will comply with HUD regulations, which include the loss mitigation measures outlined above.

48.     Thus, a servicer like OneWest must, with respect to every mortgage loan it insures through the FHA program, enter into a binding contract with HUD, in which the servicer agrees to comply with HUD's regulations:

> [Upon initiation of insurance on each mortgage,] [t]he Commissioner and the mortgagee are thereafter bound by the regulations in this subpart with the same force and to the same extent as if a separate contract had been executed relating to the insured mortgage, including the provisions of the regulations in this subpart and of the Act.

24 C.F.R. § 203.257.

49.     To remain eligible to participate in the FHA-insured mortgage program and receive payments, a mortgagee must submit a detailed annual certification to HUD on each anniversary following the date of initial approval. *See* 24 C.F.R. § 202.3(b). Among other statements, the mortgagee's representative must certify that "the Mortgagee does now, and did at all times throughout the Certification Period, comply with all HUD regulations and requirements necessary to maintain the Mortgagee's FHA approval . . . to continue with the certification process." FHA Lender Annual Certifications – Supervised and Nonsupervised Mortgagees

14

(current), available at http://portal.hud.gov/hudportal/documents/huddoc?id=

sfh_recert_certs.pdf.

50.     Upon information and belief, in order to begin participating in the FHA-insured

mortgage program, and continue its annual participation in it, OneWest made these or substantially

similar certifications to the Government, which constituted conditions of payment under the

program. Had OneWest failed to make its initial or annual certifications, it would not have received

compensation under the FHA program.

## 5.     FHA Insurance Payments

51.     Under the FHA mortgage insurance program, when homeowners default on their

mortgages and the property is conveyed through foreclosure, servicers can file an insurance claim

with HUD to receive compensation for 100 percent of the unpaid principal balance, plus allowable

costs and fees and debenture interest. Servicers cannot file a claim for reimbursement for late fees

and/or interest penalties on escrowed items. *See* FHA Handbook 4000.1 § IV.A.2.a.ii.

(Computation of Claim Amount).

52.     To file an FHA insurance claim, loan servicers submit an "Application for

Insurance Benefits – Form HUD-27011." The handbook "FHA Single Family Insurance Claims

REV-1 (4330.4)" ("HUD Handbook 4330.4"), describes Form 27011 and its certification :

> When submitting claims for benefits, HUD requires that an official of the mortgagee sign the claim certifying that all information and statements contained in the claim are true and correct. Mortgagees must ensure that all staff involved in the preparation of the claim understand the importance of that certification. The claim payment process relies on the accuracy of the claim application; any inaccurate information entered for the purpose of * * * obtaining unauthorized insurance benefits is considered a serious breach of the contract of insurance.
>
> *     *     *     *
>
> Certification of Claim Accuracy.
>
> *     *     *     *

The mortgagee official signing the Form HUD-27011 is certifying that all information and statements contained in the claim are true and correct.

Entering information that is inaccurate for the purpose of avoiding an interest curtailment or obtaining unauthorized insurance benefits is in direct conflict with the certification that statements and information on the claim are true and correct.

HUD Handbook 4330.4, Foreword & Chapter 1, Section 1-3.

53.     Further, on each form HUD-27011, OneWest expressly agreed that if it "does not comply with HUD regulations, [OneWest] remains responsible for the property, and any loss or damage thereto, notwithstanding the filing of the deed to the Secretary for record, and such responsibility is retained by [OneWest] until HUD regulations have been fully complied with."

**B.    HAMP**

54.     For homeowners with FHA-insured loans, mortgagees have long been required to pursue the "loss mitigation" procedures described above. HAMP aimed to create a corresponding mechanism to assist homeowners with conventional loans in order to keep people in their homes and avoid foreclosure.

55.     When President Obama announced HAMP on February 18, 2009, he described it as a plan to eliminate a "maze of rules and regulations" in which homeowners rarely find answers, and in which "your ability to restructure your loan depends on where you live, the company that owns or manages your loan, or even the agent who happens to answer the phone on the day that you call." The President announced that HAMP "establishes clear guidelines for the entire mortgage industry that will encourage lenders to modify mortgages on primary residences. This will enable as many as 3 to 4 million homeowners to modify the terms of their mortgages to avoid foreclosure."[4]

---

[4] The White House, Remarks by the President on the mortgage crisis, Feb. 18, 2009,

56.      HAMP provided financial incentives to three groups: homeowners, the investors that bought large bundles of home loans, and mortgage servicers. For homeowners, these incentives involved reducing the monthly payment by reducing the interest rate, reducing the total amount due on the loan, or extending the maturity date and/or amortization period of the loan. For investors, the Government shouldered a share of the payment reduction and guaranteed that the net present value of the modification would exceed the net present value of the unmodified loan. And for servicers, the Government provided substantial cash payments for every successful modification.

### 1.      **HAMP Modifications**

57.      The HAMP modification process consists of two stages. In the first stage, the servicer collects and evaluates information from the homeowner and from its own records. If the homeowner meets specific eligibility guidelines for a HAMP modification, the servicer is required to offer the homeowner a Trial Period Plan.[5]

58.      During this first stage, before offering the Trial Period Plan, the servicer must evaluate whether the homeowner meets the eligibility guidelines for a HAMP modification:[6]

(a)      The homeowner must have taken out the loan as a first-lien mortgage before 2009.

(b)      The property must not be condemned.

---

https://www.whitehouse.gov/the-press-office/remarks-president-mortgage-crisis.
[5] Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages, Version 5.1 § 1.1 (May 26, 2015), *available at* https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_43.pdf ("Handbook"); U.S. Dep't of Treasury, *Making Home Affordable, Supplemental Directi*ve 09-01 at 2 (Apr. 6, 2009), *available at* https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd0901.pdf ("SD 09-01").
[6] Handbook at § 1.1.1.

(c)     The homeowner must have a financial hardship and either be delinquent or in danger of falling behind on his or her mortgage payments.

(d)     The homeowner must agree to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist.

(e)     The outstanding loan amount must be less than $729,750 on a primary residence or single unit rental property, less than $934,200 on a two-unit rental, less than $1,129,250 on a three-unit rental, or less than $1,403,400 on a four-unit rental.

(f)     The property can have no more than four units.

59.     In Stage 2, assuming that the homeowner qualifies for a HAMP modification, the servicer takes a series of successive steps (called the "waterfall") designed to reduce the homeowner's monthly payment to 31% or less of the homeowner's gross monthly income. Handbook at § 6.3.1.

**2.      Dual Tracking**

60.     Dual tracking is the practice of pursuing foreclosure and loan modification simultaneously. At one time prior to the implementation of HAMP, it was common practice in the mortgage industry to initiate the foreclosure process as soon as the 60th day of delinquency and then, while the loan was in foreclosure, determine if loan modification was possible. The purpose of dual tracking was to ensure that servicers and investors could hedge their bets and minimize the "risk" that a homeowner might fail to complete a modification yet remain in his or her home for additional time.

61.     One of the key purposes of HAMP was to eliminate dual tracking for distressed homeowners. When designing HAMP, the Department of the Treasury was anxious to ease homeowners' fears and concerns about losing their homes by offering a fair opportunity to be

considered for a loan modification prior to initiating foreclosure. Handbook at § 6.3.1. Some of the earliest HAMP guidelines required that foreclosure proceedings not be initiated for homeowners pursuing a HAMP modification, or suspended if they had already been initiated:

> To ensure that a borrower currently at risk of foreclosure has the opportunity to apply for the HAMP, servicers should not proceed with a foreclosure sale until the borrower has been evaluated for the program, and, if eligible, an offer to participate in the HAMP has been made. Servicers must use reasonable efforts to contact borrowers facing foreclosure to determine their eligibility for the HAMP, including in-person contacts at the servicer's discretion. Servicers must not conduct foreclosure sales on loans previously referred to foreclosure or refer new loans to foreclosure during the 30-day period that the borrower has to submit documents evidencing an intent to accept the Trial Period Plan offer. Except as noted herein, any foreclosure sale will be suspended for the duration of the Trial Period Plan, including any period of time between the borrower's execution of the Trial Period Plan and the Trial Period Plan effective date.[7]

62.     Compliance with SD 09-01 was expressly required in the Amended SPA.

63.     Several months later (August 2010), Treasury issued additional guidelines that further restricted foreclosures. At that point Treasury disallowed servicers from referring a homeowner's loan to foreclosure until the homeowner had an adequate opportunity to be evaluated for HAMP or other loss mitigation alternatives.[8]

64.     Dual tracking can be incredibly harmful even where the homeowner does not ultimately lose his or her home. Desperate homeowners, with mortgage modifications pending but also nearing foreclosure, have no way to know whether, in a matter of days or weeks, they will lose their home or get a reprieve through a modification. This can cause extreme stress, fear, and emotional distress and is exactly what HAMP was meant to prevent.

---

[7] SD 09-01 at 14.
[8] MHA Handbook for Servicers of Non-GSE Mortgages, Version 1.0, as of August 19, 2010; Protections Against Unnecessary Foreclosure, page 26. CFPB incorporated similar changes to Regulation X's mortgage servicing standards in January 2013.

65.     Because the elimination of dual tracking was a critical piece of HAMP's earliest guidelines and central to its purpose, violation of the prohibition against dual tracking would have been material to the Government decision to pay HAMP funds.

### 3.      Capitalization of Unpaid Principal and Unaccrued Escrow

66.     Under HAMP, servicers are not permitted to double-count unpaid principal or escrow amounts that are not yet due.

67.     In the first step of the HAMP waterfall, the servicer calculates the total amount that the homeowner owes. This is accomplished by starting with the balance of the mortgage— the unpaid principal balance—and adding other amounts that the homeowner is obligated to pay.

68.     HAMP is expressly clear on what servicers are permitted to add onto the unpaid principal balance:

> In the first step, the servicer capitalizes accrued interest, out-of-pocket escrow advances to third parties, and any required escrow advances that will be paid to third parties by the servicer during the [trial period].[9]

69.     The guidelines therefore told OneWest how to account for the fact that many or most eligible homeowners will have missed one or more monthly payments. HAMP told OneWest that it should capitalize accrued interest, i.e., the interest portion of the missed payments.

70.     The guidelines do *not* permit the servicer to capitalize the *principal* portion of any missed payments. It would make no sense to do so. Missed principal payments are *already counted* in the outstanding unpaid principal balance. If a servicer adds those amounts on to the unpaid principal balance, the homeowner is charged twice for the same amount.

71.     As with missed principal-and-interest payments, the HAMP guidelines tell servicers when to capitalize anticipated escrow payments. Servicers may capitalize "out-of- pocket

---

[9] Handbook at § 6.3.1.1.

escrow advances to third parties," i.e., any payments that actually become due during the time the homeowner was in arrears and are not fully covered by the existing escrow account, as well as "any required escrow advances that will be paid" during the trial period.

      4.     **Servicer Incentive Payments**

72.    In addition to annual servicing fees, servicers are eligible to earn two types of servicer incentive payments under the HAMP program: completed modification incentives and "pay for success" incentives. Handbook at § 13.1.

73.    Initially, the HAMP program set the completed modification incentive at $1,000 for each modification, which was earned and payable once the homeowner successfully completed the trial payment period. The program increased the incentives periodically.

74.    Currently, the servicer is entitled to a completed modification incentive of $2,000 for a modification of a mortgage less than or equal to 120 days delinquent at the effective date of the trial payment plan, $1,600 for a modification of a mortgage delinquent between 121 and  210 days, and $1,200 for a modification of a loan greater than 210 days delinquent. Handbook at § 13.1.1.  These completed modification incentives are payable once the homeowner enters into  a permanent modification. Handbook at § 13.1.

75.    If a HAMP Tier 1 homeowner's monthly mortgage payment is reduced by six percent or more, a servicer will also receive an annual "pay for success" payment for a period of three years. The payment will be equal to the lesser of $1,000 or one-half of the reduction in the homeowner's annualized monthly payment, and will be payable annually after the anniversary of the month in which the trial plan payment effective date occurred. Handbook at § 13.1.3.

76.    From the program's start through the second quarter of 2016, HAMP has generated more than 2.4 million trial modifications and 1.6 million permanent modifications (not including

FHA-HAMP modifications),[10] costing the Government billions of dollars in incentives paid to servicers and lenders.

77.    Fannie Mae disbursed HAMP payments to servicers as the agent of the Treasury Department.

   **5.    HAMP SPA Certifications**

78.    Without signing the SPAs and the annual certifications, OneWest could not have received any HAMP payments, and the representations contained in the Financial Instrument and subsequent annual certifications were express conditions of payment.

79.    In the SPAs[11] and annual certifications, OneWest expressly and repeatedly certified, in summary, four different types of compliance: (1) that OneWest was in compliance with the terms and guidelines of the HAMP program; (2) that OneWest was in compliance with all applicable laws and requirements; (3) that OneWest would create and maintain an effective HAMP program and commit the resources needed to employ enough trained, experienced personnel with tools and technology necessary to provide quality service to homeowners; and (4) that OneWest would adequately document and monitor its compliance and immediately report to the Government any credible evidence of material violations of these certifications.

80.    By executing the Amended SPA,[12] OneWest expressly certified that

>   Servicer is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, code and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § [sic] et

---

[10] Making Home Affordable, Program Performance Report Through the Second Quarter of 2016 (Sept. 9, 2016), at 5, https://www.treasury.gov/initiatives/financial-stability/reports/Documents/2Q16%20MHA%20Report%20Final.pdf

[11] The SPAs attached and incorporated the Financial Instrument containing the initial representations.

[12] The SPA and the Amended SPA are not materially different with respect to the certifications.

> seq., the Home Ownership and Equity Protection Act, 15 USC 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq, the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights.

81.     Each annual certification included an express statement certifying that OneWest continued to meet the terms and conditions of the SPA, including the representation of compliance with applicable laws:

> Servicer is in compliance with, and covenants that all Services have been performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, code and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § [sic] et seq., the Home Ownership and Equity Protection Act, 15 USC 1639, the Federal Trade Commission act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq, the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights.

82.     At some point, the annual certifications were amended to add the word "material", i.e., OneWest expressly re-certified that it was "in material compliance with, and . . . all Services have been materially performed in compliance with" those same laws.

83.     In the Amended SPA, OneWest represented that it would administer its HAMP modification program in a responsible, professional, and careful manner, and commit the resources necessary to do so:

> Servicer covenants that it will: (i) perform the Services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Service exercises for itself under similar circumstances; and (ii) use qualified individuals with suitable training, education, experience and skills to perform the Services. Service[r] acknowledges that Program participation may require changes to, or the augmentation of, its systems, staffing, and procedures, and covenants and agrees to take all actions necessary to ensure it has the capacity to implement the Programs in which it participates in accordance with the Agreement.

84.     Correspondingly, in each annual recertification, OneWest certified that it had administered its modification program in a responsible, professional, and careful manner and had committed the resources necessary to do so:

> Servicer has: (i) performed the Services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-manage operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) used qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation required changes to, or the augmentation of, its systems, staffing and procedures; Servicer took all actions necessary to ensure that it had the capacity to implement the Programs in which it participated in accordance with the Agreement.

85.     OneWest specifically represented that it would "develop, enforce and review on a quarterly basis an internal control program designed to: (i) ensure effective delivery of Services in connection with the Programs in which Servicer participates and compliance with applicable Program Documentation; (ii) effectively monitor and detect loan modification fraud; and (iii) effectively monitor compliance with applicable consumer protection and fair lending laws."

86.     Correspondingly, OneWest annually recertified that it had "developed and implemented an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws     "

87.     Finally, OneWest annually re-certified that it had disclosed any "credible evidence" that any of its agents "has committed, or may have committed, a violation of the referenced statutes," as well as "other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Programs."

88.     These forms of compliance, as represented in the SPA and in the required annual certifications, were conditions of payment under the HAMP program:

> The conditions precedent to the payment by Fannie Mae of the Purchase Price with respect to the Services described on the Initial Service Schedules are . . . (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.
>
> . . . .
>
> The conditions precedent to the payment by Fannie Mae of the Purchase Price with respect to the Services described on the Additional Service Schedules (if any) are: (a) the execution and delivery of the Additional Service Schedules and Certification by Servicer to Fannie Mae . . . (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfactions by Servicer of such other obligations as are set forth in the Agreement.

89.     The representations in Paragraph 5 of the Financial Instrument appended to the SPA, and the similar representations in the annual certifications, were false when made.

**C.      VA Mortgage Relief**

90.     Similar mortgage relief is available to veterans under the Department of Veterans' Affairs' (VA) Making Home Affordable relief program, VA-HAMP, which was implemented in 2010 to stem the tide of foreclosures among veterans who purchased homes guaranteed through the VA Home Loan program.

91.     In many respects, VA-HAMP modifications follow Treasury HAMP guidelines. Unlike FHA-HAMP, VA-HAMP loans can be modified into a term of up to 480 months.

92.     Loss mitigation evaluations are mandatory for VA loans in default. Like FHA-HAMP and HAMP, servicers participating in VA-HAMP are required to "evaluate defaulted mortgages for traditional loss mitigation actions . . . i.e., repayment plans, special forbearances,

and traditional loan modifications" before evaluating them for VA-HAMP relief. VA Circular 26-10-6 (May 24, 2010) (citing 38 CFR § 36.4819), available at http://www.benefits.va.gov/homeloans/documents/circulars/26_10_6.pdf. Loss mitigation evaluations must be performed expeditiously, and servicers are required to review homeowners' financial information and document the case with notes demonstrating why traditional loss mitigation would be insufficient, and the VA-HAMP modification is required.

93.     Crucially, servicers can use VA-HAMP modification authority "only if" certain "requirements" are met, the first of which is an evaluation finding that "the borrower does not qualify for traditional home retention loss mitigation." *Id.*

## V.     FACTUAL ALLEGATIONS

### A.     OneWest's longstanding failure to implement a loss mitigation program.

94.     At all relevant times, OneWest completely neglected its portfolio of FHA and VA loans, which numbered between 3,500 and 4,000, approximately. It considered the portfolio too small to be of consequence, and knowingly refused to dedicate the necessary resources to servicing the loans, especially when it came to complying with loss mitigation requirements.

### 1.     Subservicer LoanCare fails to perform loss mitigation, and OneWest covers-up that failure.

95.     In and before 2009, OneWest contracted with a company named LoanCare to service certain delinquent mortgages, including FHA-insured mortgages. As a subservicer acting on behalf and under the direction of OneWest, LoanCare was required to implement FHA's loss mitigation program on behalf of OneWest.

96.     In or about 2009, an audit by HUD focused on shortcomings in LoanCare's loss mitigation efforts. OneWest represented to HUD that it would relieve LoanCare of its responsibilities for delinquent mortgage servicing and take over those actions itself. Mitchell was

one of the three inexperienced OneWest employees who were hurriedly tasked with implementing the FHA loss mitigation program. Prior to that time, OneWest did not have an FHA loss mitigation program.

97.     By early 2010, it became apparent to Mitchell that LoanCare had not followed the loss mitigation requirements with respect to any of the approximately 1,000 delinquent FHA mortgages in its portfolio.

98.     LoanCare was failing to contact or respond to delinquent homeowners about their potential modifications, pushing many beyond not only the four-payment loss mitigation window, but also the 12-month window of FHA-HAMP eligibility.

99.     In addition, rather than following the detailed FHA loss mitigation waterfall analysis, LoanCare was in many instances letting delinquent homeowners *choose* their own monthly payments: payments were often half of the normal monthly payment, causing principal and interest to accrue in delinquency. And, rather than modifying homeowners into 360-month (30-year) mortgages, as HUD rules explicitly require, *see* Mortgagee Letter 2012-22, Attachment A (FHA Loss Mitigation Home Retention Option Priority Order (Waterfall)), LoanCare was signing contracts with homeowners, and accepting payments from homeowners, for 480-month (40-year) mortgages—loans that could not legally be re-securitized and sold. OneWest provided LoanCare with the spreadsheet template for these impermissible modifications.

100.     For example, in an April 1, 2011 email, Mitchell described OneWest's attempts to rescind invalid modifications issued on LoanCare's watch. After pulling back one invalid modification once it realized the loan could not be re-securitized and sold, LoanCare, at OneWest's direction, offered an invalid special forbearance that actually pushed the homeowner into FHA-

HAMP *ineligibility*. LoanCare and OneWest, however, were "oblivious" to FHA-HAMP, which could have saved the homeowner's home had the loan been properly evaluated under the program.

101.    All of the above practices constituted flagrant violations of HUD/FHA regulations and FHA-HAMP program rules. Nonetheless, of the approximately 1,000 delinquent mortgages in LoanCare's portfolio, approximately 40 homeowners had received modification contracts signed by OneWest that were legally binding on OneWest but not honored by it. Approximately 30% of the delinquent homeowners believed they had been issued a mortgage modification due to actions and statements by LoanCare and/or OneWest, but they had not. Nor did LoanCare or OneWest make any attempt to identify affected homeowners, explain the situation to them, and make good on OneWest's obligations under FHA-HAMP. LoanCare and OneWest's actions, including their failure to perform their loss mitigation duties, caused homeowners to become further delinquent and/or lose their eligibility to participate in FHA-HAMP.

102.    When Mitchell repeatedly brought these material violations to the attention of his superiors, OneWest hid them from HUD officials rather than disclosing them, as required by program regulations and the signed SPA. Specifically, OneWest told HUD that it had implemented FHA-HAMP, and had a process in place to ensure that loss mitigation evaluations and FHA-HAMP modifications proceeded as required.

103.    In one instance, a delinquent homeowner complained to HUD about OneWest's failure to modify her loan after she had executed and sent back a loan modification contract received from LoanCare. After HUD loss mitigation employee Darrell Powell inquired, OneWest responded that the homeowner did not receive a modification due to the homeowner's failure to provide a notarized signature page. This was not true; the actual reason the homeowner did not receive a modification was OneWest's failure to honor a signed a 40-year modification contract,

realizing as it did that such a contract could not be pooled, repackaged and sold as a mortgage-backed security under Ginnie Mae rules. After HUD Director of Loss Mitigation Matt Martin intervened, OneWest was forced to refund 9 months of delinquent interest payments to the homeowner.

104.    What OneWest did not inform HUD, however, was that this homeowner's situation was common among the 1,000 delinquent loans in LoanCare's portfolio. Nor did OneWest take any steps to issue refunds to other homeowners under similar circumstances. In fact, when Mitchell suggested that the resolution of this homeowner's complaint should set a precedent for OneWest's handling of other LoanCare loans, OneWest executive Karen Mastro bluntly told Mitchell in a meeting that she did not want to hear anything further about LoanCare's failure to perform loss mitigation evaluations.

105.    OneWest did not disclose LoanCare's loss mitigation violations to FHA, nor did OneWest disclose its own illegitimate review of the LoanCare loss mitigation portfolio. It continued to service FHA loans, participate in FHA-HAMP, receive payments under the FHA mortgage insurance program, and maintain its eligibility to receive incentive payments under FHA-HAMP.

**2.    OneWest ran its own sham loss mitigation program.**

106.    As noted above, after the HUD audit in 2009, OneWest promised to perform all FHA loss mitigation work in-house. Despite its certifications to the contrary, however, OneWest did not have any loss mitigation evaluation program in place, let alone an operational and legally compliant program.

107.    OneWest had an FHA loss mitigation program in name only, leading to routine and systematic violations of FHA and FHA-HAMP requirements, devastating consequences for

homeowners, and fraudulently induced FHA insurance payments to OneWest based on its false certifications of compliance.

108.    OneWest's immediate goal was to give the appearance of progress ahead of HUD's follow-up visit in January 2010. Acting on an emergency basis, OneWest assigned 15 people who lacked FHA loss mitigation training to review 1,300 to 1,500 mortgages for loss mitigation purposes in four days. This would have been an all-but-impossible task under the best of circumstances. But in OneWest's case, at least half of the delinquent mortgages could not be evaluated under the loss mitigation requirements due to missing records or incomplete files. The loans that were evaluated for loss mitigation were evaluated by untrained personnel using an error-filled loan calculator that produced incorrect results. In short, OneWest gave the appearance of performing loss mitigation but did not actually perform loss mitigation.

109.    Despite OneWest managers' awareness of the false and fraudulent nature of their loss mitigation review, OneWest told HUD auditors that all FHA loans had been evaluated for loss mitigation by 13 trained employees. This was doubly false, and OneWest knew it: the loans had not been evaluated according to FHA loss mitigation requirements, including FHA-HAMP, nor were the employees trained to perform those evaluations.

110.    Following the rushed and fraudulent efforts to demonstrate compliance to HUD, OneWest returned to business as usual, leaving Mitchell and two underperforming employees to manage a portfolio of between 3,500 and 4,000 FHA and VA loans, a significant percentage of which were distressed and in need of timely loss mitigation evaluations. Instead, OneWest failed to perform its loss mitigation obligations. As discussed below, it knowingly lacked the staffing, resources, documentation, compliant waterfall calculators, and even the basic paperwork (such as

modification contracts) to properly evaluate a distressed loan and to do so within the prescribed timeframe, let alone carry out temporary and permanent modifications.

111.    The results of OneWest's deficiencies were devastating for struggling homeowners. Homeowners, including veterans, who could have been kept in their homes with legitimate and timely loss mitigation evaluations were left to languish—and often actively deceived about the status of their evaluations—eventually causing foreclosure. Indeed, near the end of his tenure at OneWest, Mitchell compared the initial list of delinquent FHA loans he received in December 2009 against OneWest's foreclosure records, and discovered that approximately half or more had in fact proceeded to foreclosure over the relevant time period or gotten deep into the foreclosure process with a massive, incurable delinquency. Most, if not all, of these homeowners had never received the required loss mitigation evaluation prior to the loans becoming four payments past due. And, these foreclosures resulted in false and fraudulent insurance claims by OneWest to the Government, as Mitchell confirmed with a colleague who was employed as a supervisor in the default claims department of OneWest.

### a.    OneWest's loss mitigation program lacked trained personnel and necessary tools.

112.    During Mitchell's employment, OneWest's FHA loan portfolio accounted for a small fraction of its mortgage servicing business: OneWest serviced approximately 3,500 to 4,000 FHA mortgages compared to the tens of thousands of conventional loans in its portfolio.[13] Accordingly, OneWest management knowingly deprived the FHA portfolio of the time, attention, and resources needed to run a compliant servicing operation and made a calculated decision to avoid the cost of building a compliant loss mitigation program. As a result, the nominal OneWest FHA loss mitigation program was set up deficiently in material respects.

---

[13] This figure includes a small number of VA loans serviced by OneWest.

113.    OneWest left the creation of its internal FHA loss mitigation program to three inexperienced employees: Mitchell, who was a former construction foreman, and two other OneWest employees, neither of whom possessed relevant skills or expertise. OneWest managers provided them virtually no training, guidance, or resources, instead instructing them to give the appearance of "servicing activity" by sending a non-compliant form letter requesting financial information from homeowners. Compared with the dozens of employees devoted to servicing OneWest's larger, and more profitable, portfolio of conventional loans, this three-person FHA loss mitigation team was treated as an afterthought. Indeed, OneWest management knew this team lacked sufficient resources but chose not to spend the money required to properly service struggling homeowners in compliance with HUD requirements.

114.    OneWest's FHA loss mitigation department lacked necessary tools to perform mortgage evaluations. For example, loss mitigation evaluators did not have access to a functioning financial modeling tool that would enable them to evaluate the mortgage under HUD guidelines. They also did not have access to key documents, including solicitation documents, forbearance documents, and modification documents—all of which Mitchell, who lacked relevant training or experience, had to draft himself on an ad hoc basis for use by others in his department. OneWest regularly signed promissory notes for hundreds of thousands of dollars and issued deed-in-lieu-of-foreclosure documents drafted by Mitchell, a non-lawyer, without reviewing them for compliance with dozens of state-law requirements.

115.    Lacking sufficient resources or training, Mitchell attempted to become a self-taught expert in FHA loss mitigation during his time at OneWest. He repeatedly shared information with his colleagues and personnel from virtually all related departments at OneWest—including his direct managers, senior management, and executive management— about FHA's stringent loss

mitigation requirements, particularly after his independent research and day-to-day experiences revealed the extent of OneWest's noncompliance.

116.    OneWest's failure to provide adequate resources caused needless – and endless – delays in the loss mitigation process, with no explanation to homeowners. By failing to provide its already-backlogged FHA loss mitigation team with instructions or training, the FHA team, led by Mitchell, was forced to research complex program requirements, educate other personnel on them, and draft their own highly technical servicing documents. In so doing, OneWest hampered its employees' ability to do their one job: perform loss mitigation evaluations within the federally required time limits, to keep homeowners in their homes.

117.    As a result, progress was halting. Having languished for months and years, and with delinquent principal and interest continuing to accrue, many loans simply were no longer capable of being modified on affordable terms, nor was FHA-HAMP available until Mitchell built out that program in mid to late 2010. Mitchell was able to offer trial modifications to a small number of homeowners, but often on terms that could have been more favorable had OneWest pursued loss mitigation efforts as required by regulation.

118.    By fall 2010, some of these homeowners completed their trial modifications and were thus owed a permanent modification within 30 days, but OneWest had no plan or existing loan modification agreement in place to do this. Once again, Mitchell was required to develop the necessary procedures and draft the legal contract to enable a permanent modification. This went far beyond having Mitchell, a construction foreman without any previous work experience in the mortgage servicing or legal industries, draw up the relevant legal contracts, which itself shows a troubling degree of neglect by OneWest. Shockingly, Mitchell was forced to educate himself and later teach various management personnel from multiple business units about OneWest's

obligation to purchase loans after successful trial modifications, and how to *repurchase and re-securitize* these loans for sale back into the mortgage-backed securities market. After less than a year on the job, the former construction worker with no mortgage- industry background or training was drafting securities transaction schedules for sign-off by OneWest's CEO, Steven Mnuchin.

119.    Indeed, Mitchell was independently forming the individual pools of modified loans and determining the terms of each individual loan that was repooled, all without supervision beyond a pro forma signature by CEO Mnuchin. After being securitized by the untrained, unsupervised former construction foreman, these mortgages were re-securitized into Ginnie Mae pools as investments that are guaranteed by the U.S. Government.

120.    Not only did this poorly-staffed and poorly-resourced loss mitigation "department" result in loans not being evaluated on time (if at all), but it also led to improper modifications on those relatively rare occasions a modification was completed. These entirely preventable and recklessly-created errors severely undermined a core purpose of the loss mitigation efforts: creating the most affordable monthly payments allowed by the programs on a timely basis, so as to minimize the risk of foreclosure and resulting insurance claims.

> **b.      OneWest systematically failed to evaluate mortgages within proper time limits, causing unnecessary foreclosures.**

121.    As referenced above, despite its obligation to perform loss mitigation evaluations before they were four months delinquent, OneWest failed to perform almost all FHA loss mitigation evaluations within the legally required window. *See* HUD Mortgagee Letter 2008-27 ("Failing to evaluate mortgages before they are four months delinquent constitutes a failure to engage in loss mitigation, warranting a treble damages penalty."). Indeed, when OneWest took over loss mitigation evaluations from LoanCare, Mitchell received hundreds of mortgage files for

evaluation that had been delinquent for more than four months, and some much longer than that—even beyond 24 months of delinquency.

122.    A key problem was that OneWest and its prior subservicer LoanCare were not proactively evaluating mortgages, as required by HUD regulations and FHA-HAMP program requirements, in part because the meager FHA loss mitigation department was constantly playing catch-up. The three employees were first tasked with evaluating the hundreds of files inherited from LoanCare, but approximately half of these lacked current documentation, meaning the loss mitigation team had to gather updated documents from homeowners – an already painstaking process made harder by the significant time that had already lapsed. Meanwhile, new accounts were falling delinquent every day, starting a four-month-delinquency clock on mandatory loss mitigation evaluations. So far behind was OneWest in loss mitigation evaluations, and so poorly staffed was its program, that it routinely missed the four-month deadline.

123.    Of the few evaluations that were performed within four months of delinquency, most or all of them did not follow the detailed FHA loss mitigation protocol because they were performed using a defective financial analysis spreadsheet, as described more fully below.

124.    Worsening matters, OneWest regularly allowed mortgages to languish in its nominal loss mitigation program without being reviewed in a timely fashion, despite Mitchell's repeated warnings, resulting in homeowners falling more than 12 months delinquent on their mortgages and losing their eligibility for an FHA-HAMP modification. *See* HUD Mortgagee Letter 2009-23 and Accompanying Guidance; *see also* HUD Mortgagee Letter 2012-22 (eliminating this requirement as of February 14, 2013).

125.    For example, one homeowner—a divorced schoolteacher and mother of three—unknowingly received an invalid trial modification from LoanCare and was already more than four

payments delinquent when Mitchell inherited the list from LoanCare. The required FHA- HAMP evaluation had not been done. Mitchell managed to qualify the homeowner for a standard modification after 14 months of delinquency, which provided little relief, leading the homeowner to protest to OneWest executives that she should have received an FHA-HAMP modification approximately a year ago, and indeed she thought she had. OneWest executives set the loan aside, privately admitting that the homeowner would have received an FHA-HAMP modification had OneWest and LoanCare performed the required evaluation. Mitchell informed his supervisors that they would need to take similar action with respect to hundreds of loans, but they declined to do so.

126. Most homeowners had no idea they were slipping into foreclosure; indeed, they thought OneWest was taking the required actions to prevent it, based on the representations OneWest made to them. Relying on OneWest's and/or LoanCare's assurances that they were in the mortgage modification process, many of these homeowners reasonably believed that they had already received a modification or would soon. In many cases, OneWest was not actually conducting loss mitigation evaluations.

127. Perversely, OneWest's delay while pretending to fulfill its loss mitigation responsibilities prevented homeowners from obtaining mortgage relief through no fault of the homeowners, because the likelihood of obtaining a modification decreases with every additional delinquent month.

    **c.**    <u>**OneWest used an incorrect evaluation tool to evaluate delinquent mortgages.**</u>

128. Performing FHA loss mitigation evaluations involves a series of calculations using multiple data sources. *See* Attachment A to Mortgagee Letter 2013-32 ("FHA Loss Mitigation Home Retention Option Priority Order (Waterfall)"). Determining eligibility for various

modification options, including FHA-HAMP, requires loss mitigation specialists to use a loan calculator tool. At OneWest, the FHA loss mitigation calculator contained significant mathematical flaws through mid-2010.

129.    OneWest was therefore purporting to conduct loss mitigation *without actually evaluating mortgages for FHA-HAMP modifications*, a required step in the process. After working in FHA loss mitigation for six months, Mitchell became aware that OneWest performed *zero* FHA-HAMP modifications during that time period even though it had denied modifications for countless loans, which made no sense since the FHA-HAMP modification was easily the most robust loss mitigation option and was expected to save loans that would have been foreclosed under the preexisting options.

130.    Specifically, OneWest's spreadsheet did not provide a mechanism for reducing the amount of the partial claim component of FHA-HAMP to be equal to or greater than 31% of the homeowner's front-end debt-to-income ratio (DTI), an original eligibility requirement of FHA-HAMP. *See* HUD Mortgagee Letter 2009-23 ("The principal deferment amount for a specific case shall be limited to such an amount that will bring the mortgagor(s) total monthly mortgage payment to 31 percent of gross monthly income."). Instead, OneWest's spreadsheet solely applied the maximum allowable partial claim amount of 30% of the unpaid loan principal balance, causing nearly all loans to appear to be ineligible for FHA-HAMP for having an apparently too-low DTI— based solely on OneWest's flawed calculations.

131.    In other words, OneWest knowingly used a fixed percentage when it was obligated to perform a specific calculation. By doing so, many loans that could have been eligible for modification under FHA-HAMP – and thus kept from foreclosure – were rejected based on the flawed deferred principal calculation. When the loss mitigation calculator tool was finally fixed,

it was only because Mitchell personally researched the calculation guidelines and then rebuilt the spreadsheet with formulas that would comply with FHA and FHA-HAMP rules, something OneWest simply ignored despite falsely assuring HUD that it had familiarized itself with, and indeed, was complying with FHA-HAMP. However, lacking the requisite expertise, Mitchell could not be certain that he had rendered the spreadsheet formulas compliant; nor could he confirm that all members of the loss mitigation department were consistently using them.

132.    As noted, this inexcusable failure led OneWest to reject mortgages that could have been saved with a downward adjustment to the deferment, in violation of FHA-HAMP rules. It also led to those loans being sent to foreclosure, and thus to insurance claims paid out by the Government to OneWest.

133.    OneWest officials knew about this problem in 2010, but upon information and belief, failed to disclose it to HUD or other regulators at any time despite its duty to do so.

### d.    OneWest put homeowners into foreclosure after fraudulently certifying that loss mitigation had been performed.

134.    FHA-HAMP guidelines restrict loan servicers from proceeding with a foreclosure sale until a homeowner has been evaluated for loss mitigation, including FHA-HAMP, and found ineligible. If the homeowner is determined to be eligible, then FHA-HAMP guidelines prohibit proceeding to foreclosure and require the servicer to offer the homeowner the opportunity to participate in FHA-HAMP. *See* HUD Mortgagee Letter 2009-23 and Accompanying Guidelines. OneWest's knowing failure to comply with its obligations under FHA loss mitigation standards led to homeowners' homes being placed into foreclosure.

135.    Frequently, OneWest began foreclosure proceedings against homeowners who should have been eligible for one of the FHA loss mitigation options, including FHA-HAMP, but

were not offered any such option, because OneWest failed to perform a timely and accurate loss mitigation evaluation, as described above.

136.    In addition, OneWest placed mortgages into foreclosure status after fraudulently certifying to HUD that the FHA mortgages were timely and accurately evaluated for loss mitigation. After Mitchell refused to make these certifications and warned loss mitigation management personnel to not sign off on foreclosures because the critical requirement of evaluating the loan before four payments were past due was not met on virtually any of the loans, the OneWest foreclosure department began making the certifications, despite widespread knowledge at OneWest that timely evaluations had not been performed.

137.    Of the initial list of FHA mortgages Mitchell received when he began working as a OneWest loss mitigation specialist, Mitchell determined that approximately 40% to 50% were placed into foreclosure or forced into a disposition option, resulting in false and fraudulent insurance claims to HUD/FHA. Mitchell developed this estimate in 2011, shortly before resigning his employment at OneWest, by checking a random sample of the current status of all mortgages on the initial list he received when he was thrust into the loss mitigation department.

**3.    OneWest ignored its VA mortgage portfolio.**

138.    OneWest serviced a small population of approximately 200 VA loans, some of which were delinquent. OneWest completely ignored its small VA mortgage portfolio unless homeowners called to complain, allowing veteran homeowners to languish for 2 to 3 years without receiving a proper modification and forcing many into foreclosure.

139.    Prior to 2011, OneWest had no loss mitigation program in place for VA loans, a clear violation of federal regulations. Only after Mitchell persisted in objecting for a year and

threatened to disclose the violations publicly did OneWest allow him to create a loss mitigation program for VA loans—a program that should have existed long before he was hired.

140.    On the few rare occasions that OneWest purported to perform loss mitigation evaluations on VA loans, they were evaluated according to more stringent FHA standards, rather than the appropriate VA-HAMP standards. This led to veteran homeowners receiving fewer modifications and suffering more foreclosures.

### 4.    **OneWest's knowledge of the violations.**

141.    At all relevant times described herein, OneWest managers and supervisors possessed actual knowledge of OneWest's failure to engage in loss mitigation as required by statute, FHA regulations, FHA-HAMP guidelines, and VA regulations; or, at minimum, OneWest acted with reckless disregard and deliberate indifference within the meaning of the False Claims Act.

142.    Mitchell personally informed colleagues, superiors, and other managers about each of these violations throughout 2010 and 2011, often emphatically.

143.    On or about January 27, 2011, Mitchell reported systemic violations occurring in the VA loan program to several of his superiors in the loss mitigation department and managers from related departments. The next day, he reported the pervasive fraud in the FHA loss mitigation department in a meeting with members of the OneWest's human resources department and various corporate vice presidents.

144.    In February 2011, he reported the pervasive fraud to Bill Glasgow, director of home loan servicing at OneWest, and later in 2011 to senior OneWest executives.

145.    On Friday, December 2, 2011, Mitchell sent three detailed "whistleblower memoranda" to a number of OneWest senior management and leadership describing OneWest's systemic failures in the VA and FHA loan portfolios.

146.    On January 12, 2012, at his request, Mitchell met with OneWest's senior executives in Pasadena, California, to discuss his allegations of fraud. Present at this meeting were CEO Mnuchin, along with OneWest's chief operating officer, vice chairman, and senior vice president of asset management. Mitchell gave a detailed and comprehensive presentation explaining that the large majority of OneWest's reimbursement claims for FHA loans were invalid. Soon thereafter, he ended his employment with OneWest.

## B.    OneWest's HAMP violations

147.    Despite repeatedly certifying compliance with HAMP program guidelines and relevant laws in its SPAs and annual certifications, and despite accepting millions upon millions of dollars in HAMP incentives, OneWest in fact failed to carry out that program in a compliant manner. This resulted in OneWest making false claims for HAMP incentives.

### 1.    OneWest engaged in widespread dual tracking

148.    OneWest routinely continued moving homeowners' mortgages into and through the foreclosure process even as OneWest was supposed to be evaluating the mortgages for loss mitigation options and HAMP. Loan files were either not placed on foreclosure suspension long enough to be thoroughly reviewed for loss mitigation options, or they were not placed on foreclosure suspension at all.

149.    This practice caused delinquent loans to continue moving through foreclosure when the foreclosure process should have been suspended, as required by HAMP regulations, including SD-09. See § IV.B.2., supra. OneWest's pervasive practice of dual tracking violated the SPA and

the Amended SPA, in which it certified its compliance with loss mitigation procedures, including foreclosure suspension.

150.     OneWest's dual tracking continued at least through October 2013; before that time, it was widespread and pervasive. Indeed, it was documented in several internal and external audits that occurred between 2007 and 2010. One internal report revealed that 15,000-25,000 loans were improperly being dual tracked in this way. At another point, OneWest's contemporaneous volume of dual-tracked loans reached 45,000-50,000.

151.     Furthermore, OneWest lacked clear channels and processes for communicating with its foreclosure department. Specifically, OneWest lacked any specific process to enable one department to communicate with another to start or stop foreclosure. This failure was commonly known among employees and supervisors at OneWest.

152.     OneWest's practice of dual tracking led many homeowners to lose their homes in foreclosure, when foreclosure should have been suspended pending the resolution of modification and other workout processes. Further, given the sheer number of loans that were subject to dual tracking, it is a virtual certainty that OneWest sought HAMP incentives for loans where homeowners had been subject to foreclosure proceedings even as they awaited the results of their modification applications.

153.     Because the elimination of dual tracking was a critical piece of HAMP's earliest guidelines and central to its purpose, and because it resulted in egregious harm to the homeowners HAMP was meant to protect, violation of the prohibition against dual tracking would have been material to the Government decision to pay HAMP funds.

### 2.   __OneWest routinely engaged in unlawful capitalization practices__

154.   When calculating HAMP modifications, OneWest improperly capitalized all payments in arrearage, including the principal amount, in the monthly past due payments. This was plainly improper: only the delinquent interest and escrow should have been included. *See* § IV.B.3., supra.

155.   Adding the entire delinquent payment, including principal, effectively charged homeowners for money OneWest never loaned. OneWest was not entitled to charge the homeowner for money it never advanced to the homeowner. Additionally, when calculating HAMP modifications, OneWest often added to the homeowners' principal balance escrow amounts that were not yet due but which would become due later in the year. This common practice violated HAMP's requirement that only escrow amounts that were due or had been advanced by the servicer out of pocket could be included.

156.   In monthly billing statements, OneWest did not break down delinquent escrow for homeowners, so homeowners had no ability to determine what portion of the escrow charge was taxes, what portion was improperly capitalized principal, and what portion related to other charges.

157.   Homeowners were never provided a credit for these improperly charged amounts. Often, OneWest would then charge the customer again for the same escrow obligation at the end of the year.

158.   The Government would not have paid HAMP incentives to OneWest had it known that OneWest was double-capitalizing principal payments and/or double-charging homeowners for escrow payments, to the benefit of both itself and the investor. OneWest's misrepresentations regarding these violations, unknown to the Government because OneWest failed to disclose them though obligated to do so, were material under the FCA.

### 3.    OneWest's lack of adequate HAMP systems, processes, staffing, and training

159.    OneWest also knowingly lacked internal document management systems and processes to ensure compliance with HAMP regulations.

160.    On a regular basis, homeowners would submit mortgage-related documents that would not be reviewed because the papers were not properly logged and tracked. Homeowners routinely received automatic modification denials arising from a lack of documentation, despite homeowners having submitted the documents to OneWest.

161.    OneWest knew its document imaging system, Docuware, was overwhelmed by the volume of HAMP-related submissions but failed to implement new document management process and systems to meet its obligations under HAMP. OneWest's risk management department identified this pervasive failure to the company, but OneWest executives declined to fix the problems.

162.    The inadequate systems were exacerbated by OneWest's knowing failure to hire a sufficient number of adequately experienced trained loss mitigation and foreclosure employees. For example, many OneWest loss mitigation employees had no experience working with homeowners in default, and OneWest's training of them was threadbare, particularly with respect to the various loss mitigation options available to homeowners in default.

163.    OneWest's failure to hire a sufficient number of adequately trained employees to handle the volume of modifications in OneWest's default portfolio resulted in known systematic errors and homeowner harm, such as wrongful HAMP denials and wrongful foreclosures. For example, overwhelmed loss mitigation employees would deny HAMP modifications because they could not find documents submitted by the homeowners, and because of their insufficient training and the volume of loans for which they were responsible would not conduct a proper inquiry to

locate the documents. Thus, the inadequate systems were exacerbated by inadequate numbers of adequately trained employees. OneWest also regularly missed regulatory timelines because of an insufficient number of adequately trained loss mitigation employees. OneWest's inadequate control processes also failed to adequately detect and remediate its known failures and violations.

164.    OneWest's programmatic failures were well known within the company. They were continually referenced at meetings of the Loss Mitigation department, including the HAMP unit, and in meetings between HAMP employees and managers and OneWest's Risk Management team.

165.    OneWest's inadequate systems, hiring, and training, rendered false its repeated representations in its SPA. For example, OneWest repeatedly falsely represented that it had performed its services in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and that it used qualified individuals with suitable training, education, experience and skills to perform the Services, including making required augmentations of its systems, staffing, and procedures, and taking all actions necessary to ensure it has the capacity to implement HAMP in accordance with the SPA.

166.    OneWest's inadequate controls also rendered false its annual HAMP certifications concerning adequate internal controls.

167.    The Government would not have paid HAMP incentives to OneWest had it known that OneWest lacked internal document management systems to meet its obligations under HAMP, and that it had inadequate staffing and training practices. And in any case, OneWest's misrepresentations regarding these violations, known to OneWest and unknown to the Government because OneWest failed to disclose them though obligated to do so, were material under the FCA.

**C.**     **Insurance and incentive payments to OneWest**

168.     OneWest's fraudulent FHA loss mitigation program caused the Government to pay money it would not have otherwise paid. Furthermore, OneWest's misrepresentations and failure to disclose information it had a duty to disclose were material to the Government's decision to pay within the meaning of the False Claims Act.

**1.**     **FHA insurance payments to OneWest**

169.     Under the FHA mortgage insurance program, when homeowners default on their mortgages and the home is conveyed through foreclosure, servicers including OneWest can file an insurance claim with HUD to receive compensation for the unpaid principal balance.

170.     To file an FHA insurance claim, OneWest (through a subcontractor) submitted an "Application for Insurance Benefits – form HUD-27011." By submitting this form, OneWest expressly certified that the statements and information provided were true and accurate, subject to civil penalties and/or criminal prosecution. *See* HUD Guide to Filing a Claim for Insurance Benefits, https://entp.hud.gov/pdf/mp_sfs3_cp_clminpt.pdf (citing, inter alia, the False Claims Act, 31 U.S.C. 3729 *et seq*.).

171.     When it filed FHA insurance claims, OneWest also falsely certified that it was in compliance with its loss mitigation obligations under FHA and FHA-HAMP.

172.     As a result of these false certifications, FHA paid OneWest tens of thousands of dollars, or more, *per claim*.

173.     Mitchell raised his concerns about false claim submissions with a colleague who had firsthand knowledge of the FHA insurance claims being submitted. The colleague confirmed that OneWest submitted FHA insurance claims for foreclosed properties as a standard business practice, and confirmed that the dollar value of each submission was in the tens of thousands of

dollars. Additionally, Mitchell independently confirmed that claim amounts averaged tens of thousands of dollars by reviewing servicing notes on FHA loans that had completed foreclosure. Tellingly, the colleague also revealed that, following Mitchell's complaints to management, OneWest had demanded there be no discussions with Mitchell about loss mitigation or related issues.

### 2.      FHA-HAMP incentive payments to OneWest

174.    OneWest submitted false or fraudulent claims for, and received, incentive payments and Pay for Success Compensation Payments for FHA mortgages that were required to be timely evaluated for loss mitigation under FHA-HAMP.

175.    To receive these payments, OneWest falsely certified compliance with the above-described terms of the FHA-HAMP program, when in fact it had knowingly violated material terms of the programs by, among other improper practices, failing to engage in loss mitigation within the prescribed timeframes. When it received these incentive payments, OneWest was not eligible to participate in or receive payments under the FHA mortgage insurance program, FHA-HAMP, or the Pay for Success Compensation program, because it failed to perform loss mitigation evaluations and to evaluate homeowners for FHA-HAMP.

176.    Even for loans modified under FHA-HAMP, OneWest's failures described above would have caused homeowners to pay more under the modified terms than they would have if OneWest had followed the correct procedures. In such instances, had the Government known the truth, it would have denied incentive payments to OneWest, since OneWest would have thwarted the key goal of FHA-HAMP—less financial burden on the homeowners while minimizing re-default rates. Furthermore, OneWest's knowing misrepresentations and omissions were material

to the Government's decision to make FHA-HAMP payments to OneWest within the meaning of the FCA.

### 3.     HAMP incentive payments to OneWest

177.    OneWest also submitted false or fraudulent claims for, and received, incentive payments and Pay for Success Compensation Payments for conventional (non-FHA) mortgages that were required to be evaluated for loss mitigation under HAMP. OneWest violated the express terms of its HAMP SPA by, among other illegal practices, entirely failing to engage in FHA loss mitigation and evaluate homeowners for participation in FHA-HAMP, as well as failing to adequately staff, train, and oversee its mortgage modification department.

178.    Moreover, OneWest violated the express terms of its HAMP SPA by knowingly engaging in dual tracking and unlawful capitalization practices, and maintaining a poorly-run HAMP operation, despite its representations that it was complying with regulations that prohibit these practices. Furthermore, OneWest's knowing misrepresentations and omissions were material to the Government's decision to make HAMP payments to OneWest within the meaning of the FCA.

## VI.     CLAIMS FOR RELIEF

### COUNT I
### False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

179.    Relator re-alleges, and fully incorporates by reference all preceding paragraphs.

180.    By virtue of the acts described above (including the material misrepresentations and failures to disclose information OneWest was obligated to disclose), OneWest knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval by the United States of America, to the damage of the Treasury of the United States of America, by causing it to pay out money it was not obligated to pay.

181.    As a result of OneWest's conduct described herein, the United States of America sustained financial damages.

## COUNT II
## False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

182.    Relator re-alleges, and fully incorporates by reference all preceding paragraphs.

183.    By virtue of the acts described above (including the material misrepresentations and failures to disclose information OneWest was obligated to disclose), OneWest knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States of America, in contravention of the False Claims Act, to the damage of the Treasury of the United States of America, by causing it to pay out money it was not obligated to pay.

184.    As a result of OneWest's conduct described herein, the United States of America sustained financial damages.

## COUNT III
## False Claims Act, 31 U.S.C. § 3729(a)(1)(G)

185.    Relator re-alleges, and fully incorporates by reference all preceding paragraphs.

186.    By virtue of the acts described above (including the material misrepresentations and failures to disclose information OneWest was obligated to disclose), OneWest knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in contravention of the False Claims Act, to the damage of the Treasury of the United States of America, by causing it to pay out money it was not obligated to pay.

187.    As a result of OneWest's conduct described herein, the United States of America sustained financial damages.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Relator prays for relief and judgment against Defendant, as follows:

188.    Judgment in favor of the United States of America against OneWest, by reason of the violations of the False Claims Act as set forth above, in an amount equal to three times the amount of damages the United States has sustained because of OneWest's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation.

189.    Award to the Relator, as the Qui Tam Plaintiff, of the maximum amount allowed under 31 U.S.C. § 3730(d) of the False Claims Act on the United States' recovery.

190.    Award to the Relator of all reasonable expenses plus reasonable attorneys' fees and costs, under 31 U.S.C. § 3730(d) of the False Claims Act, and

191.    Such other relief as the Court deems proper.

## JURY TRIAL DEMANDED

192.    Relator demands a trial by jury on all issues so triable.

Dated: October 11, 2019                    Respectfully submitted,

/s/Jeffrey R. Bragalone
Jeffrey R. Bragalone
Texas Bar No. 02855775
Patrick J. Conroy
Texas Bar No. 24012448
Stephanie R. Wood
Texas Bar No. 24057928

**BRAGALONE CONROY PC**
2200 Ross Avenue
Suite 4500W
Dallas, TX 75201
Tel: (214) 785-6670
Fax: (214) 785-6680
jbragalone@bcpc-law.com
pconroy@bcpc-law.com
swood@bcpc-law.com

B. Russell Horton (*admission pending*)
Texas Bar No. 10014450
**GEORGE BROTHERS KINCAID & HORTON, L.L.P.**
114 W. 7th St., Ste 1100
Suite 4500W
Austin, TX 78701
Tel: (512) 495-1482
rhorton@gbkh.com

Roger D. Sanders
Texas Bar No. 17604700
J. Michael Young
Texas Bar No. 00786465
**SANDERS, O'HANLON, MOTLEY, YOUNG & GALLARDO, P.L.L.C.**
111 South Travis Street
Sherman, Texas 75090
Tel: (903) 892-9133
Fax: (903) 892-4302
roger.sanders@somlaw.net
michael.young@somlaw.net

***Counsel for Relator/Qui Tam Plaintiff Andrew Mitchell***

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on October 11, 2019 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).

*/s/ Jeffrey R. Bragalone*
Jeffrey R. Bragalone