# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ANDREW MITCHELL, AND ANDREW MITCHELL, Individually,<br><br>*Plaintiffs/Relator,*<br><br>v.<br><br>CIT BANK, N.A., d/b/a ONEWEST BANK, and CIT GROUP, INC.,<br><br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ Civil Action No. 4:14-CV-00833<br>Judge Mazzant |

## MEMORANDUM OPINION AND ORDER

Relator Andrew Mitchell raised a discovery issue with the Court when he filed his Request for Expedited Abatement of the June 7 Destruction Deadline (Dkt. #172). This issue revolves around CIT Bank, N.A., d/b/a OneWest Bank, and CIT Group, Inc. (collectively referred to as "CTI") withholding documents CIT claims it inadvertently produced.

### BACKGROUND

In 2008, the United States faced a housing crisis caused, in part, by mortgage fraud and predatory lending. The crisis caused home prices to plummet and foreclosures to skyrocket, leaving homeowners with negative equity in their homes. Distressed homeowners were unable to sell or refinance their homes to meet their mortgage obligations. In response to this crisis, the Government enacted the Emergency Economic Stabilization Act of 2008 ("EESA").

The Home Affordable Modification Program ("HAMP"), administered by the Treasury Department, was a voluntary program under EESA designed to prevent avoidable foreclosures by providing homeowners with affordable mortgage-loan modifications and other alternatives to

eligible buyers. HAMP's primary goal was to relieve the burden on homeowners by lowering their mortgage payments to 31% or less of their gross monthly income. Investors would receive payments and a guarantee that no modification would result in a mortgage worth less than the net-present value of the property. In return, mortgage servicers, in addition to their annual servicing fees, received HAMP incentive payments to complete the modifications. Each successful modification entitled the servicer from $1,200–2,000 depending on how long the mortgage was delinquent. From the program's start in 2009 through the second quarter of 2016, HAMP generated more than 1.6 million permanent modifications. In addition to HAMP, the Fair Housing Administration's ("FHA") and Veterans Administration ("VA") each had companion HAMP programs: "FHA-HAMP" and "VA-Hamp," respectively.

In 2009, OneWest Bank ("OWB") enrolled in the HAMP, FHA-HAMP, and VA-HAMP programs. On August 18, 2009, OWB Executive Vice President and Chief Operating Officer Tony Ebers expressly certified OWB's compliance with HAMP guidelines and applicable federal laws in signing the initial Servicer Participation Agreement ("SPA"). The SPA named OWB as the servicer and Fannie Mae as Financial Agent of the United States. The SPA required OWB to provide annual certifications of compliance with the specified terms and conditions.

Defendant expressly represented in the SPAs and annual certifications that: (1) it was in compliance with the terms and guidelines of HAMP; (2) it was in compliance with all applicable laws and requirements; (3) it created and maintained an effective HAMP program and committed the resources needed to employ enough trained, experienced personnel with the tools and technology necessary to provide quality service to homeowners; and (4) it had adequately documented and monitored its compliance and immediately reported to the Government any credible evidence of material violations of these certifications. Each annual certification included

an express statement certifying that OWB continued to meet the terms and conditions of the SPA, including the representation of compliance with applicable laws.

On April 13, 2011, the Office of Thrift Supervision ("OTS") entered into a consent order with OWB ("2011 Consent Order"). Pursuant to the consent order, "a monitor was tasked to work with [OWB] to identify and remedy all deficiencies with its mortgage servicing and lending modification programs" (Dkt. #60). The terms of the 2011 Consent Order were reaffirmed by a consent order entered on March 11, 2014 ("2014 Consent Order"). On July 14, 2015, the Office of the Comptroller of the Currency terminated the 2011 and 2014 Consent Orders after finding that the Consent Orders were no longer required for the "protection of the depositors, other customers, and shareholders of the Bank, as well as its safe and sound operation" (Dkt. #60, Exhibit 8).

On May 21, 2021, CIT discovered it had inadvertently produced documents (Dkt. #175 at p. 5). On May 26, 2021, CIT requested that Relator return the documents under the February 6, 2020 Protective Order (Dkt. #175 at p. 5). Relator, however, believes the May 26 "snapped back" documents are non-privileged factual compilations of business records (Dkt. #173 at p. 2). Believing that the documents were not privileged, on June 4, 2021, Relator filed a motion requesting the Court to abate the June 7 destruction deadline until further order of the Court (Dkt. #172). Relator also filed a letter (Dkt. #173) (the "June 3 Letter") with the motion.

Having reviewed the letter, the Court temporarily abated the June 7 destruction deadline until further order of the Court (Dkt. #174). In the Order, the Court set a briefing schedule for the parties (Dkt. #174). With the issue briefed, the Court now addresses the merits of Relator's June 3 letter and motion.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 26(b)(1), parties may "obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense…" FED. R. CIV. P. 26(b)(1). "[A] party claiming privilege must (1) expressly claim privilege and (2) sufficiently describe the nature of documents or communications, without revealing the protected information, such that the opposing party is able 'to assess the claim.'" *SmartPhone Tech. LLC v. Apple, Inc.*, No. 6:10-cv-74 LED-JDL, 2013 WL 789285, at *1 (E.D. Tex. Mar. 1, 2013) (quoting FED. R. CIV. P. 26(b)(5)(A)).

**Work Product Privilege**

"Work product is not a substantive privilege within the meaning of Federal Rule of Evidence 501." *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 476 (N.D. Tex. 2004) (citing *Interphase Corp. v. Rockwell Int'l Corp.*, No. 3-96-CV-0290-L, 1998 WL 664969, at *4 (N.D. Tex. Sept. 22, 1998)); *see also Pete Rinaldi's Fast Foods, Inc. v. Great Am. Ins. Co.*, 123 F.R.D. 198, 201 (M.D.N.C. 1998) (work product doctrine is merely qualified immunity from discovery "not having an intrinsic value outside the litigation arena."). "The work-product doctrine 'insulates a lawyer's research, analysis of legal theories, mental impressions, notes, and memoranda of witnesses' statements from an opposing counsel's inquiries.'" *Adams v. Mem'l Hermann*, 973 F.3d 343, 349 (5th Cir. 2020) (citing *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 875 (5th Cir. 1991)). Therefore, the resolution of whether the documents fall within the work product doctrine is governed by federal law. *Navigant*, 220 F.R.D. at 476 (citing *Interphase*, 1998 WL 667969, at *4; *Varuzza by Zarrillo v. Bulk Materials, Inc.*, 169 F.R.D. 254, 257 (N.D.N.Y. 1996); *In re Combustion, Inc.*, 161 F.R.D. 51, 52 (W.D. La. 1995)).

Federal Rule of Civil Procedure 26(b)(3) provides that only documents prepared "in anticipation of litigation" are exempt from discovery. *Navigant*, 220 F.R.D. at 476; *see Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 875 (5th Cir. 1991); *Elec. Data Sys. Corp. v. Steingraber*, No. 4:02-cv-225, 2003 WL 21653414, at *4 (E.D. Tex. July 9, 2003); *Robinson v. Tex. Auto. Dealers Ass'n*, 214 F.R.D. 432 (E.D. Tex. 2003). Rule 26(b)(3) states in relevant part:

> [A] party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent.) But…those materials may be discovered if: (i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

FED. R. CIV. P. 26(b)(3)(A). The Fifth Circuit has stated that the protection "can apply where litigation is not imminent, 'as long as the primary motivating purpose behind the creation was to aid in possible future litigation.'" *Mondis Tech., Ltd. v. LG Elec.*, Nos. 2:07-CV-565-TJW-CE, 2:08-CV-478-TJW, 2011 WL 1714304, at *2 (E.D. Tex. May 4, 2011) (quoting *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000) (citations omitted)).

"The work-product doctrine provides qualified protection of documents and tangible things prepared in anticipation of litigation, including 'a lawyer's research, analysis of legal theories, mental impressions, notes, and memoranda of witnesses' statements.'" *Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 219 F.R.D. 396, 400 (E.D. Tex. 2003) (quoting *Dunn,* 927 F.2d at 875). Rule 26(b)(3) distinguishes between opinion work product, which consists of the "mental impressions, conclusions, or legal theories of any attorney or other representative of a party," and ordinary work product, which consists of the "factual material prepared in anticipation of litigation or trial." *United States ex rel. Bagley v. TRW, Inc.*, 212 F.R.D. 554, 559 (C.D. Cal. 2003); *see,*

*e.g., United States ex. rel. Burroughs v. DeNardi Corp.*, 167 F.R.D. 680, 684 (S.D. Cal. 1996); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 144 F.R.D. 396, 401 (D. Colo. 1992).

**Attorney-Client Privilege**

"The attorney-client privilege protects two related, but different communications: (1) confidential communications made by a client to his lawyer for the purpose of obtaining legal advice; and (2) any communication from an attorney to his client when made in the course of giving legal advice, whether or not that advice is based on privileged communications from the client." *United States v. Mobil Corp.*, 149 F.R.D. 533, 536 (N.D. Tex. 1993) (citing *In re LTV Sec. Litig.*, 89 F.R.D. 595, 600–03 (N.D. Tex. 1981)). The purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

"For a communication to be protected under the privilege, the proponent 'must prove: (1) that he made a confidential communication; (2) to a lawyer or his subordinate; (3) for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding.'" *EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 695 (5th Cir. 2017) (quoting *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997)). "Communications by the lawyer to the client are protected 'if they would tend to disclose the client's confidential communications.'" *O'Malley v. Pub. Belt R.R. Comm'n for City of New Orleans*, CV 17-4812, 2018 WL 814190, at *2 (E.D. La. Feb. 9, 2018) (quoting *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985)). "Because the attorney-client privilege 'has the effect of withholding relevant information from the fact-finder,' it is interpreted narrowly so as to 'apply only where necessary to achieve its purpose.'" *BDO USA, L.L.P.*, 876 F.3d at 695 (brackets omitted) (quoting *Robinson*,

121 F.3d at 974). Further, "[t]he privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn*, 449 U.S. at 395.

"[A]pplication of the attorney-client privilege is a 'question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents.'"[1] *In re Auclair*, 961 F.2d 65, 68 (5th Cir. 1992) (quoting *Hodges, Grant & Kaufmann*, 768 F.2d at 721). "Determining the applicability of the privilege is a 'highly fact-specific' inquiry, and the party asserting the privilege bears the burden of proof." *BDO USA, L.L.P.*, 876 F.3d at 695 (quoting *Stoffels v. SBC Commc'ns, Inc.*, 263 F.R.D. 406, 411 (W.D. Tex. 2009)). Attorney-client privilege is not presumed, *United States v. Tedder*, 801 F.2d 1437, 1441 (4th Cir. 1986), and "[a]mbiguities as to whether the elements of a privilege claim have been met are construed against the proponent," *BDO USA, L.L.P.*, 876 F.3d at 695.

## ANALYSIS

Relator claims the "snapped back" documents on May 26 are non-privileged factual compilations and business records (Dkt #173 at p. 2). Relator contends that the snapped back documents are spreadsheets reflecting the borrowers impacted by OWB's improper 40-year modifications of Fair Housing Act ("FHA") loans and contain factual information derived entirely from Defendants' databases regarding its FHA loan portfolio (Dkt. #173 at p. 2).

CIT contends that it inadvertently produced the spreadsheets and related emails, which contained privileged information (Dkt. #175 at p. 5). CIT claims the documents are both attorney work product and are protected under the attorney-client privilege (Dkt. #175 at pp. 11–15).

---

[1] Because the Court has subject matter jurisdiction here based on the presence of a federal question, federal common law governs the attorney-client-privilege analysis. *Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 495 (5th Cir. 2005).

**I. Attorney Work-Product**

As the party asserting work-product protection over the materials, CIT must demonstrate: "(1) the materials sought are tangible things; (2) the materials sought were prepared in anticipation of litigation or trial; (3) the materials were prepared by or for a party's representative." *Mondis Tech., Ltd.*, 2011 WL 1714304, at *2 (E.D. Tex. May 4, 2011) (citing *SEC v. Brady*, 238 F.R.D. 429, 441 (N.D. Tex. 2009)).

CIT posits the spreadsheets were "prepared at attorneys' direction primarily to assess OneWest's legal exposure." (Dkt. #175 at p. 11). Relator, however, claims "[t]here is no evidence that the primary motivating purpose behind the creation of the snapped-back documents was to aid in actual or future litigation." (Dkt. #176 at p. 2).

In its response, CIT stated the following:

> Mitchell's concerns that OneWest's sub-servicer offered FHA borrowers loan modifications with 40-year terms, in contravention of FHA rules, posed a credible threat that OneWest would become involved in litigation with regulators, aggrieved borrowers, or Mitchell himself. Indeed, CIT's concern that litigation could arise from Relator's allegations was spot-on, as his allegations concerning modifications of FHA mortgages with 40-year terms are very much at issue in this case.

(Dkt. #175 at p. 12).

"The threshold determination is whether the documents sought to be protected were prepared in anticipation of litigation or for trial." *Elec. Data Sys. Corp.*, 2003 WL 21653414, at *4; *see Upjohn*, 449 U.S. at 400. The Fifth Circuit has described the standard for determining whether a document has been prepared in anticipation of litigation as follows:

> It is admittedly difficult to reduce to a neat general formula the relationship between preparation of a document and possible litigation necessary to trigger the protection of the work product doctrine. We conclude that litigation need not necessarily be imminent, as some courts have suggested, as long as the *primary motivating purpose* behind the creation of the document was to aid in the possible future litigation.

*United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. Unit A Feb. 1981) (citations omitted) (emphasis added). "Among the factors relevant to determining the primary motivation for creating a document are 'the retention of counsel and his involvement in the generation of the document and whether it was a routine practice to prepare that type of document or whether the document was instead prepared in response to a particular circumstance.'" *Navigant*, 220 F.R.D. at 477 (quoting *Elec. Data Sys. Corp.*, 2003 WL 21653414, at *5 (citing *Piatkowski v. Abdon Callais Offshore, L.L.C.*, No. Civ. A. 99-3759, 2000 WL 1145825, at *2 (E.D. La. Aug. 11, 2000)). If the document would have been created without regard to whether litigation was expected, it was made in the ordinary course of business and is not protected by the work product doctrine. *Id.*

The work product doctrine, however, is not "an umbrella that shades all materials prepared by a lawyer, or agent of the client[,]" and the doctrine excludes materials assembled in the ordinary course of business. *Elec. Data Sys. Corp.*, 2003 WL 21653414, at *4 (citing *El Paso Co.*, 682 F.2d 530). It also does not extend to the underlying facts relevant to the litigation. *Id.*; *see also Upjohn*, 449 U.S. at 395–96; *Adams*, 973 F.3d at 350.

CIT argues the spreadsheets were not created in the ordinary course of business and that its "ordinary-course of business records concerning [the] loans were its loan files on WebXtender and SDM, which have already been produced in this litigation." (Dkt. #175 at p. 13). CIT further contends that the spreadsheets, however, "include specific information extracted from those loan files and further analysis completed at OneWest's counsel's request to assist counsel in assessing OneWest's legal and regulatory exposure." (Dkt. #175 at p. 13). CIT claims it was concerned that it might become involved in litigation with regulators, aggrieved borrowers, or the Relator himself (Dkt. #175 at p. 12).

Relator suggests that "[t]here is no evidence that the primary motivating purpose behind the creation of the snapped-back documents was to aid in actual or future litigation." (Dkt. #176 at p. 2). Relator argues that in CIT's response to interrogatory 8, CIT never suggested that O'Melveny & Myers was hired to assess CIT's legal exposure or that the snapped-back documents were created at the request of O'Melveny & Myers to aid CIT in possible future litigation. *See* (Dkt. #176 at p. 2–3); citing (Dkt. #175, Exhibit 13 at pp. 4–6).

Here, CIT has not carried its burden in establishing the primary motivating purpose for creating these documents was to aid in future litigation. CIT does not provide evidence helpful in supporting its position. Its exhibits attached to its response shed little to no light on the question of whether the spreadsheets were created to aid in future litigation. Additionally, CIT cannot merely point to the fact that this litigation is proceeding to show that it knew litigation was likely over a decade ago. Consequently, CIT has not carried its burden in showing that the work-product privilege should apply to the snapped-back documents.

## II. Attorney-Client Privilege

CIT argues "[e]ven if Relator's substantial need could overcome the attorney work-product immunity, it could not defeat CIT's attorney-client privilege[,]" because the spreadsheets were communicating facts to attorneys for the purposes of seeking legal advice (Dkt. #175 at p. 14).

"A party asserting a privilege exemption from discovery bears the burden of demonstrating its applicability." *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001). "A general allegation of privilege is insufficient to meet this burden." *Navigant Consulting, Inc.*, 220 F.R.D. at 473. Instead, "[t]he proponent must provide sufficient facts by way of detailed affidavits or other evidence to enable the court to determine whether the privilege exists." *Id.*

The circumstances of CIT's privilege assertion are less straightforward, however, since corporate in-house counsel is involved with outside counsel. As described by the court in *Stoffels*,

> The attorney-client privilege applies in a corporate setting. However, because in-house counsel has an increased level of participation in the day-to-day operations of the corporation, it is more difficult to define the scope of the privilege when a communication is made to in-house counsel. Thus, in such a setting, the attorney-client privilege attaches only to communications made for the purpose of giving or obtaining legal advice or services, not business or technical advice or management decisions. The critical inquiry is, therefore, whether any particular communication facilitated the rendition of *predominantly legal advice or services* to the client.

*Stoffels*, 263 F.R.D. at 411 (emphasis added) (citations omitted). "Legal advice, as contrasted with business advice, 'involves the interpretation and application of legal principles to guide future conduct or to assess past conduct.'" *EEOC v. BDO USA, L.L.P.*, 856 F.3d 356, 365 (5th Cir. 2017) (quoting *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007)), *opinion withdrawn and superseded*, 876 F.3d 690 (5th Cir. 2017).

If advice offered by in-house counsel intertwines business and legal advice, attorney-client privilege protects the communication only if the legal advice predominates. *Neuder v. Battelle Pac. Nw. Nat. Lab.*, 194 F.R.D. 289, 292 (D.D.C. 2000). Simply labeling communications as "legal advice" is conclusory and insufficient to satisfy the privilege-proponent's burden. *See Coltec Indus., Inc. v. Am. Motorists Ins. Co.*, 197 F.R.D. 368, 373 (N.D. Ill. 2000) ("[D]escribing a document as 'legal advice' . . . is not the same as establishing that [it is] immune from discovery.").

To justify its assertion of attorney-client privilege over the snapped-back documents, CIT states "where several non-lawyer employees have collaborated to prepare factual analysis at counsel's direct and request, the process of preparing the communication itself is also privileged." (Dkt. #175 at p. 14). This explanation is not enough.

11

It is incumbent on the party asserting attorney-client privilege to prove its applicability. *Taylor Lohmeyer L. Firm P.L.L.C. v. United States*, 957 F.3d 505, 509 (5th Cir. 2020). CIT offers nothing more than the conclusory "prepared at direction of in-house and outside counsel" label in its privilege log for these documents and provides little to no explanation as to why these documents should be protected. CIT has not carried its burden as to its assertion of attorney-client privilege over the materials in question, and, accordingly, CIT cannot "snap-back" the documents.

### III. Motion to Compel

Relator also requests that the Court compel production of communications with "third-party Navigant" and "communications with the government." (Dkt. #173). Due to the urgent nature of the destruction deadline and how documents at issue are relevant for Relator's expert reports, the Court has taken up the issue regarding the documents CIT sought to snap back. The remaining relief sought, however, should be denied.

On February 25, 2021, the Court entered an Amended Scheduling Order on the above-referenced case (Dkt. #162). Addressing discovery disputes, the Amended Scheduling Order states,

> [i]f the parties are unable to resolve [a] dispute without court intervention, the parties must then call the Court's chambers to schedule a telephone conference regarding the subject matter of the dispute prior to filing any motion to compel. After reviewing the dispute, the Court will resolve the dispute, order the parties to file an appropriate motion, or direct the parties to call the discovery hotline.

(Dkt. #162 at p. 4). As Relator did not follow the Court's procedure regarding the remaining discovery disputes, the Court find that the remaining relief in the motion should be denied at this time.

## CONCLUSION

It is therefore **ORDERED** that Relator is not required to destroy the spreadsheets or emails CIT attempted to snap back on May 26.

All remaining relief sought is hereby **DENIED** at this time.

**SIGNED this 28th day of July, 2021.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE