# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | § | |
| and ANDREW MITCHELL, and ANDREW | § | |
| MITCHELL, Individually | § | Civil Action No.  4:14-CV-00833 |
| *Plaintiffs*, | § | Judge Mazzant |
| | § | |
| v. | § | |
| | § | |
| CIT Bank, N.A. d/b/a One West Bank, and | § | |
| CIT Group, Inc., | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is CIT Bank, N.A. d/b/a OneWest Bank, and CIT Group, Inc.'s

Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(1) for Lack of Subject Matter

Jurisdiction (Dkt. #157).  Having considered the motion and the relevant pleadings, the Court finds

that the Motion should be DENIED.

## BACKGROUND

In 2008, the United States faced a housing crisis caused, in part, by mortgage fraud and

predatory lending.  The crisis caused home prices to plummet and foreclosures to skyrocket,

leaving homeowners with negative equity in their homes.  Distressed homeowners were unable to

sell or refinance their homes to meet their mortgage obligations.  In response to this crisis, the

Government enacted the Emergency Economic Stabilization Act of 2008 ("EESA").

The Home Affordable Modification Program ("HAMP"), administered by the Treasury

Department, was a voluntary program under EESA designed to prevent avoidable foreclosures by

providing homeowners with affordable mortgage-loan modifications and other alternatives to

eligible buyers.  HAMP's primary goal was to relieve the burden on homeowners by lowering their

mortgage payments to 31% or less of their gross monthly income.  Investors would receive payments and a guarantee that no modification would result in a mortgage worth less than the net-present value of the property.  In return, mortgage servicers, in addition to their annual servicing fees, received HAMP incentive payments to complete the modifications.  Each successful modification entitled the servicer from $1,200–2,000 depending on how long the mortgage was delinquent.  From the program's start in 2009 through the second quarter of 2016, HAMP generated more than 1.6 million permanent modifications.  In addition to HAMP, the Fair Housing Administration's ("FHA") and Veterans Administration ("VA") each had companion HAMP programs: "FHA-HAMP" and "VA-Hamp," respectively.

In 2009, OneWest Bank ("OWB") enrolled in the HAMP, FHA-HAMP, and VA-HAMP programs.  On August 18, 2009, OWB Executive Vice President and Chief Operating Officer Tony Ebers expressly certified OWB's compliance with HAMP guidelines and applicable federal laws in signing the initial Servicer Participation Agreement ("SPA").  The SPA named OWB as the servicer and Fannie Mae as Financial Agent of the United States.  The SPA required OWB to provide annual certifications of compliance with the specified terms and conditions.

Defendant expressly represented in the SPAs and annual certifications that: (1) it was in compliance with the terms and guidelines of HAMP; (2) it was in compliance with all applicable laws and requirements; (3) it created and maintained an effective HAMP program and committed the resources needed to employ enough trained, experienced personnel with the tools and technology necessary to provide quality service to homeowners; and (4) it had adequately documented and monitored its compliance and immediately reported to the Government any credible evidence of material violations of these certifications. Each annual certification included

an express statement certifying that OWB continued to meet the terms and conditions of the SPA, including the representation of compliance with applicable laws.

On April 13, 2011, the Office of Thrift Supervision ("OTS") entered into a consent order with OWB ("2011 Consent Order").  Pursuant to the consent order, "a monitor was tasked to work with [OWB] to identify and remedy all deficiencies with its mortgage servicing and lending modification programs" (Dkt. #60).  The terms of the 2011 Consent Order were reaffirmed by a consent order entered on March 11, 2014 ("2014 Consent Order").  On July 14, 2015, the Office of the Comptroller of the Currency terminated the 2011 and 2014 Consent Orders after finding that the Consent Orders were no longer required for the "protection of the depositors, other customers, and shareholders of the Bank, as well as its safe and sound operation" (Dkt. #60, Exhibit 8).

On December 23, 2014, Relator Michael J. Fisher ("Fisher") and Relator Andrew Mitchell ("Mitchell" or "Relator") filed their Original Complaint under seal (Dkt. #1).  On October 21, 2016, Fisher and Mitchell filed an Amended Complaint under seal (Dkt. #24).  On September 13, 2019, Fisher withdrew as a Relator (Dkt. #50; Dkt. #51).  Subsequently, Mitchell filed Relator's Second Amended Complaint ("SAC") on October 11, 2019 (Dkt. #52).   Defendants were subsequently served on October 15, 2019 (Dkt. #53; Dkt. #54).

In Mitchell's Second Amended Complaint, Mitchell, a former employee of OWB from 2009-2011, alleges that OWB made false claims to the United States in relation to its obligations under HAMP, FHA-HAMP, and VA-HAMP.  More specifically, Mitchell alleges that OWB falsely certified that it was in compliance with the requirements of those programs by: (1) not having a loss mitigation program; (2) running a sham loss mitigation program that had insufficient resources, caused unnecessary foreclosures due to untimely mortgage evaluations, and used

incorrect evaluation tools to evaluate delinquent mortgages; (3) engaging in dual-trafficking; (4) offering inappropriate options to mortgagors under HAMP; and (5) improperly capitalizing principal and unaccrued escrow payments.

On February 12, 2021, Defendants this Motion to Dismiss (Dkt. #157) asserting for the first time that Relator does not have standing to pursue his claims because he purportedly signed a release prior to filing the instant *qui tam* action, which Defendants claim encompass his *qui tam* claims. On March 12, 2021, Relator filed his Response (Dkt. #164). Defendants replied on March 23, 2021 (Dkt. #165), and Relator filed a Sur-Reply on March 30, 2021 (Dkt. #166). Subsequently, Relator filed supplemental authority on May 5, 2021 (Dkt. #168), to which Defendants responded on May 7, 2021 (Dkt. #169). Relator then replied to Defendants' response on May 10, 2021 (Dkt. #170).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction when the district court lacks statutory and constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). The issue of standing is one of of subject matter jurisdiction and is properly raised by a motion to dismiss under Rule12(b)(1). *See Cobb v. Cent. States,* 461 F.3d 632, 635 (5th Cir. 2006).

Motions under 12(b)(1) can come in two different ways: either a facial or a factual attack on jurisdiction. *See Paterson v. Weinberger,* 644 F.2d 521, 523 (5th Cir. 1981); *see also* 5B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1350 (3d ed.); O'CONNOR'S FEDERAL RULES * CIVIL TRIALS Ch. 3-C § 5.1 (2021 ed.). "A 'facial attack' on the complaint requires the court merely to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes

4

of the motion." *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) (citing

*Mortensen v. First Federal Savings & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "A 'factual

attack,' however, challenges the existence of subject matter jurisdiction in fact, irrespective of the

pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id*.

When a defendant mounts a factual attack, the presumption of truthfulness does not attach to the

plaintiff's allegations. *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981). To prevail in

showing the Court has jurisdiction, "the plaintiff must 'prove the existence of subject-matter

jurisdiction by a preponderance of the evidence.'" *Irwin v. Veterans Admin.*, 874 F.2d 1092, 1096

(5th Cir. 1989) (citing *Middle South Energy, Inc. v. City of New Orleans,* 800 F.2d 488, 490 (5th

Cir. 1986)).

## ANALYSIS

Mitchell brings this *qui tam* action pursuant to the False Claims Act ("FCA").  31 U.S.C.

§ 3729(a)(1)(A)–(B). "The [FCA] is designed to allow suits 'by private parties on behalf of the

United States against anyone submitting a false claim to the government.'" *United States ex rel.*

*Fried v. W. Indep. Sch. Dist.*, 527 F.3d 439, 441 (5th Cir. 2008) (quoting *Hughes Aircraft Co. v.*

*United States ex rel. Schumer*, 520 U.S. 939, 941 (1997)). The FCA "promot[es] private citizen

involvement in exposing fraud against the government," while "prevent[ing] parasitic suits by

opportunistic late-comers who add nothing to the exposure of fraud."  *Id.* (quoting *Reagan*, 384

F.3d at 174).

Defendants move the Court to dismiss this action alleging the Court does not have subject

matter jurisdiction. In bringing their argument, Defendants claim Relator lacks standing because

"he released any claims he has that relate to, arise out of, or are based on his employment by OneWest, which includes the claims he asserts in this *qui tam* action." (Dkt. #157 at p. 19).

Relator responds by arguing (1) the Court should allow additional discovery before considering the motion; (2) this motion is an indirect attack on the merits of Relator's claims; (3) the release is unenforceable because it contravenes public policy interests; (4) even if the release is enforceable, Relator has constitutional standing to sue on behalf of the government; and (5) Defendants cannot enforce other provisions of the consulting agreement against Mitchell because the statute of limitations expired long ago. *See* (Dkt. #164 at pp. 19–35).

The Court agrees that the Release is not enforceable on public policy grounds and, therefore, does not address Relator's other arguments. *See United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 957 (9th Cir. 1995) ("We assume for the purposes of analysis that . . . the Release encompassed both Green's right to bring a *qui tam* action as well as any recovery that might flow from the action. Nonetheless, we hold that this aspect of the Release is unenforceable because its enforcement would impair impermissibly a substantial public policy."); *see also United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 23 (2nd Cir. 2016) ("Assuming that Ladas's release was sufficiently broad to encompass his *qui tam* claims, we hold that the release is unenforceable as a matter of public policy.").

### I. Standing

Defendants claim that Relator lacks standing because he allegedly executed an agreement releasing his *qui tam* claims. On February 10, 2012, Relator entered into an agreement titled "Individual Consulting Agreement" ("Consulting Agreement") (Dkt. #157, Exhibit 12 at p. 5). The Consulting Agreement provides that Relator "desires voluntarily to terminate his employment relationship with OneWest;" and that "OneWest desires to continue to have access to Mitchell's

services for purposes of completing it investigation of the issues . . ." relating to OneWest's loss mitigation in connection with the servicing of certain government-insured mortgages (Dkt. #157, Exhibit 12 at p. 5).

Defendants claim that Relator released all of his claims after the United States Department of Housing and Urban Development ("HUD")—the United States Government entity Relator alleges was defrauded—became aware of and had an opportunity to investigated OneWest's alleged violations of HUD's rules for servicing FHA insured loans that form the basis for Relator's claims (Dkt. #157 at p. 4).

Defendants assert that HUD had already identified the issues with the OneWest's loan servicing policies, procedures, and practices for FHA-insured loans when the HUD conducted its January 2010 audit of OneWest (Dkt. #157 at p. 5). Further, Defendants claim HUD understood OneWest had violated various FHA loss-mitigation rules, and, thus, the government was aware of the violations underlying Relator's complaint (Dkt. #157 at p. 6). Defendants believe that as part of the Consulting Agreement and for more than $150,000, Relator released his claims—including his *qui tam* claim. The relevant release provisions (the "Release") from Consulting Agreement read as follows:

Except for the rights and obligations created by this Agreement, Mitchell, on behalf of Mitchell's agents, representatives, attorneys, assignees, heirs, executors, administrators and successors in interest, hereby releases and forever discharges the OneWest Companies, including, but not limited to OneWest Resources LLC, OneWest Bank, FSB, and all of their past, present and future owners, parents, subsidiaries, divisions, affiliates, related entities, joint venturers, partners and members, as well as each of their respective directors, officers, shareholders, agents, associates, representatives, employees, attorneys, predecessors, successors, and assigns, and any and all of them (collectively, the "Released Parties"), from any and all liability, actions, causes of action, claims, charges, complaints, demands, grievances, obligations, losses, damages, injuries and legal responsibilities, of any type whatsoever, whether known or unknown, unforeseen, unanticipated, unsuspected or dormant, that are based upon, relate to or arise out of Mitchell's employment with OneWest and/or the OneWest Companies, and/or the discontinuation of said employment (collectively, "Claims"), except claims that the law does not permit Mitchell to waive by signing this Agreement. The term "OneWest Companies" refers to OneWest, OneWest Bank,

FSB, its parent company, subsidiaries, affiliates and related companies. The Claims defined in the first sentence of this Section and released herein by Mitchell as to OneWest and the Released Parties include, without limitation, all Claims in law, equity, contract, and tort, and/or all Claims under the Dodd Frank Wall Street Reform and Consumer Protection Act, the Fair Labor Standards Act, the Equal Pay Act, National Labor Relations Act, Labor Management Relations Act, Employee Retirement Income Security Act, Title VII of the Civil Rights Act of 1964, as amended, Civil Rights Act of 1991, Americans with Disabilities Act, as amended, Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act of 1990, the Rehabilitation Act, Executive Order 11246, Family and Medical Leave Act, Sarbanes-Oxley Act of 2002, Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Code of Federal Regulations, the California and Texas Constitutions, California Civil Code, the Texas Civil Practices & Remedies Code, the Texas Administrative Code, the California and Texas Labor Codes and any other applicable state wage and hour statutes or wage orders, California Code of Regulations, the California and Texas Government Codes, California Business & Professions Code, the Texas Business and Commerce, California Fair Employment and Housing Act, the Texas Commission on Human Rights Act, California Family Rights Act, the California Workers' Compensation Act, any other applicable state employment-discrimination statutes, any similar provisions of Texas law and the law in any other jurisdiction, and/or all Claims under any other federal, state, municipal or other governmental statute, regulation, ordinance or order.

(Dkt. #157, Exhibit 12 at p. 11) (emphasis added).

Mitchell represents that Mitchell either does not have or will immediately dismiss (unless expressly prohibited by law) any lawsuit, claim, charge, grievance or complaint against any of the OneWest Companies in any forum, including without limitation any local, state or federal agency or court, based upon events occurring prior to the Effective Date. Mitchell also promises not to voluntarily encourage, counsel or assist (directly or indirectly) any current or former employee or third party in the preparation or prosecution of any civil dispute, difference, grievance, claim, charge or complaint against any of the OneWest Companies and/or any Released Parties unless compelled to do so by valid legal process.

(Dkt. #157, Exhibit 12 at p. 12–13).

Mitchell agrees to notify OneWest's General Counsel if he receives a request to participate or join in any way in any litigation or administrative proceeding before any federal or state agency, against any of the OneWest Companies or provide information, documents or assistance within three business days of Mitchell receiving the request. Nothing in this Agreement prohibits Mitchell from filing a charge or participating in any investigation or proceeding conducted by the Equal Employment Opportunity Commission or a comparable state or local agency. However, by signing this Agreement, Mitchell has waived the right to recover monetary damages in any charge, complaint, or lawsuit filed by Mitchell, or anyone else on Mitchell's behalf against any of the OneWest Companies asserting any c1aims released by this Agreement, and Mitchell has waived

the right to file an individual lawsuit against any of the OneWest Companies asserting any claims released by this Agreement.

(Dkt. #157, Exhibit 12 at p. 13).

Relator does not contest that he signed the release; rather, he contends the release only covered his personal claims and that he "never imagined, nor was it ever discussed with him, that he was supposedly waiving his right to assert claims belonging to the government, such as claims against OneWest for fraud against the government." (Dkt. #164 at pp. 15–16). Further, Relator argues the Release should not be enforced due to public policy concerns (Dkt. #164 at p. 23).

Assuming *arguendo* that the release covers Relator's *qui tam* claims, the Court finds the release should not be enforced on public policy grounds.

### A. Enforceability of Prefiling Release

Under the FCA, a relator may not unilaterally enter into an enforceable settlement agreement or release after filing an FCA action. *See* 31 U.S.C. § 3730(b)(1) ("The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting."); *United States ex rel. Longhi*, 575 F.3d 458, 474–75 (5th Cir. 2009) (affirming district court's refusal to enforce a *postfiling* release and indemnification on the grounds that the plain language of the FCA prohibits dismissal without the court's and Attorney General's consent and the interest in enforcing the release and indemnification were outweighed by public policy concerns). However, the Fifth Circuit has not directly considered the enforceability of a *prefiling release* in a *qui tam* action, but other circuits have considered the issue and applied the test from the Ninth Circuit developed in *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953 (9th Cir. 1995), and *United States ex rel. Hall v. Teledyne Wah Chang Albany*, 104 F.3d 230 (9th Cir. 1997). *United States ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161 (10th Cir. 2009); *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 600 F.3d 319 (4th Cir. 2010); *Ladas*,

824 F.3d 16 (2nd Cir. 2016). This Court has also previously applied the balancing test in *United States ex rel. Jackson v. University of North Texas*. 4:13-CV-734, 2016 WL 369693, at \*4 (E.D. Tex. Feb. 1, 2016). The Court will again apply the *Green* and *Hall* balancing test to this case as well.

In *Green*, the Court addressed "whether the release of a *qui tam* claim, when entered into without the United States' knowledge or consent, and prior to filing of an action based on that claim, is enforceable." *Green*, 59 F.3d at 956. The Ninth Circuit looked to the Supreme Court's decision in *Town of Newton v. Rumery*, 480 U.S. 386 (1987), to establish its balancing test. *Green*, 59 F.3d at 958. "Under the balancing test, the Ninth Circuit analyzed whether the interest in enforcing the release was outweighed in the circumstances by a public policy harmed by enforcing the release." *United States ex rel. Haight v. RRSA (Commercial Div.), LLC*, 3:16-CV-1975-S, 2021 WL 1721585, at \*4 (N.D. Tex. Apr. 30, 2021) (citing *Green*, 59 F.3d at 962). Ultimately, the Ninth Circuit concluded that enforcing the release would "impair a substantial public interest" because enforcing the release "would threaten to nullify the incentives Congress intended to create" with the FCA. *Green*, 59 F.3d at 963. "It is commonly recognized that the central purpose of the *qui tam* provisions of the FCA is to set up incentives to supplement government enforcement of the Act by encouraging insiders privy to a fraud on the government to blow the whistle on the crime[.]" *Id*. (cleaned up).

In *Green*, the Ninth Circuit found it critical "that the government only learned of the allegations of fraud and conducted its investigation *because of the filing of the qui tam complaint*." *Id*. at 966. Further, the Ninth Circuit opined that given the fact that a successful relator will receive at most thirty percent of the recovery for a successful *qui tam* suit, if a prefiling release were enforceable, "a rational relator would be willing to accept a substantially smaller amount to settle

10

the claim immediately than to preserve the right to eventually file a *qui tam* action in which the government would retain the lion's share of the proceeds." *Id*. at 965–66. Consequently, potential relators would be incentivized to settle before filing the *qui tam* action, thus inhibiting the government's ability to learn about instances of fraud and undermining the incentives created by the *qui tam* provisions of the FCA. *See id*. ("Accordingly, when we consider, as we do here, a release of a claim in the *pre*filing period, it is clear that our focus must be on what impact the release will have on the incentive effect Congress intended to create and the importance of that incentive effect in achieving the FCA's goals of detecting and deterring fraud on the government."). Having conducted its public policy analysis, the Ninth Circuit held that it would not enforce the prefile release to bar a subsequent *qui tam* claim when the release was entered into without the government's knowledge or consent. *Id*. at 969.

In contrast, in *Hall*, the Ninth Circuit held that a prefiling release was enforceable when the government had full knowledge of the relator's claims and had investigated the claims before the parties executed the release. 104 F.3d at 231. Hall—the relator—voiced concerns to his employer about issues with the nuclear manufacturing process, and his employer informed the Nuclear Regulatory Commission of Hall's concerns. *Id*. Hall also filed his own complaint with the Nuclear Regulatory Commission. *Id*. After Hall voiced his concerns, his employer terminated him leading to Hall filing a state court action for retaliation. *Id*. at 232. The parties settled, and Hall

11

signed a broadly worded release, but neither party informed the federal government of the state

action or the release. *Id*.[1]

Following the state action, Hall filed a *qui tam* case. *Id*. In the *qui tam* case, the Ninth

Circuit found that the circumstances present in *Green* were not present in *Hall*. *Id*. at 232–33.

Because the government was aware of Hall's allegations regarding the false certifications, "the

public interest in having information brought forward that the government could not otherwise

obtain is not implicated." *Id*. at 233.

To summarize, "the consent of the government is not a necessary condition precedent to

enforcement of an otherwise valid release where such a release is executed *prior* to filing a *qui*

*tam* action." *Radcliffe*, 600 F.3d at 328; *see also, e.g., Ritchie*, 558 F.3d at 1168; *United States ex*

*rel. Gebert v. Transp. Admin. Servs*., 260 F.3d 909, 915 (8th Cir. 2001); *Green*, 59 F.3d at 960.

And, "courts generally enforce a pre-filing release of a relator's right to bring a *qui tam* action so

long as the relator's allegations of fraud were sufficiently disclosed to the government prior to the

release, and the government had opportunity to fully investigate the allegations." *Jackson*, 2016

WL 369693, at *3 (first citing *Radcliffe*, 600 F.3d at 332; and then citing *United States ex rel.*

*Longhi v. Lithium Power Techs., Inc.,* 481 F. Supp. 2d 815, 820-21 (S.D. Tex. 2007), *aff'd* 575

F.3d 458 (5th Cir. 2009) (refusing to uphold a release after concluding that allegations were

insufficiently disclosed to the government prior to the release)).

Some courts frame the issue in terms of the public's issue:

> When the government is unaware of potential FCA claims the public interest
> favoring the use of *qui tam* suits to supplement federal enforcement weighs against
> enforcing prefiling releases. But when the government is *aware of the claims*, prior

---

[1] The release stated that it "includes, but is not limited to, all claims which were, or could have been, brought as claims or counterclaims in the above-referenced action. This Mutual Release of Claims also includes, but is not limited to, any other claims or complaints which could have been brought in any other type of action or proceeding." *Id*.

> to suit having been filed, public policies supporting the private settlement of suits
> heavily favor enforcement of a prefiling release.

*Radcliffe*, 600 F.3d at 332 (emphasis added) (omitting internal citations) (finding prefiling release

was enforceable when the government had already been investigating the relator's allegations prior

to the relator signing the release and filing the *qui tam* suit); *see also Ritchie*, 558 F.3d at

1170; *Gebert*, 260 F.3d at 915; *Green*, 59 F.3d at 960. Thus, the Courts inquiry focuses on whether

the allegations of fraud were sufficiently disclosed to the government before Relator signed

the Release.

Defendants argue the government was aware of the noncompliance before Relator signed

the Release (Dkt. #157 at p. 23). Specifically, Defendants assert that the core of Relator's

allegations are a failure to follow FHA's loss-mitigation rules and that HUD knew of the failures

as evidenced in HUD's April 5, 2010 Letter and OneWest's follow up in its June 7, 2010 Letter to

HUD (Dkt. #157 at p. 24). Further, Defendants claim that "[s]enior HUD employees clearly knew

there were issues with OneWest's FHA loss mitigation in 2010—years before [Relator's] February

2012 release—and had full opportunity to investigate them[]" and that "[i]t does not matter

whether HUD had 'full knowledge' of all the violations Mitchell claims to have observed."

(Dkt. #157 at p. 26).

Relator argues that there were many deficiencies and acts of fraud that were never disclosed

to the government and that the government did not have knowledge of the full scope of Relator's

allegations at the time he signed the release (Dkt. #164 at p. 25). Specifically, Relator asserts that

> "[t]he government had no idea that OneWest had intentionally concealed the fact
> that OneWest's loss-mitigation failures extended to non-FHA loans, including VA
> loans, for which OneWest did not even have a functional, much less compliant,
> loss-mitigation program, or that OneWest had been dual-tracking loans, or that
> OneWest did not have a working FHA-HAMP modification product, or that
> OneWest's non-compliance extended much further than the LoanCare issues of

13

which the government was aware at the time [Relator] signed his employment-related release."

(Dkt. #165 at p. 25).

Relator compares the June 7, 2010 Letter to HUD (Dkt. #157, Exhibit 3) to what is alleged in the Second Amended Complaint and in Relator's interrogatory responses (Dkt. #164 at pp. 25–26) (citing Dkt. #157, Exhibit 27). Relator notes that—contrary to what Defendants said in the June 7, 2010 Letter to HUD—Relator "observed OneWest's failure to establish an FHA-compliant loss mitigation program," "told management that OneWest was egregiously failing to engage in loss mitigation per HUD guidelines," "observed that OneWest failed to employ a properly trained and qualified loss mitigation staff," and "observed OneWest servicing FHA loans without providing employees formal training, manuals, job aides, or reference materials" (Dkt. #164 at p. 26) (citing Dkt. #157, Exhibit 27 at 9–10).

The Court is persuaded that, at the very least, the government was not aware of all of the acts of fraud and deficiencies and that the government certainly was not aware of the depth and breadth of the fraud. Defendants cite the Court to its prior opinion in *Jackson* to support its position that the Release should be enforced (Dkt. #157 at p. 27). *Jackson*, however, is distinguishable.

In *Jackson*, Jackson—the relator—filed an action asserting FCA claims against the JPMorgan Chase Bank, N.A., regarding his applications for, and alleged failure to receive, student loan funds while he was a student at the University of North Texas. 2016 WL 369693, at *1. Prior to filing the suit alleging FCA claims, Jackson filed suit against Chase asserting other claims against Chase Bank on the same facts. *United States ex rel. Jackson v. Univ. of N. Tex.*, 4:13-CV-734-ALM-CAN, 2015 WL 13744213, at *5 (E.D. Tex. Nov. 18, 2015). On March 8, 2012, Jackson released Chase Bank from all claims asserted in the first lawsuit, and Jackson also released Chase Bank "from any liability in the event the subject loans are not forgiven or discharged (in whole or

in part)." *Id*. After the first suit was dismissed, Jackson filed the second suit bringing the FCA claims. *Id*. at *1.

The Court dismissed the second case finding that the release Jackson entered into on March 8, 2012, covered his FCA claim and that the release was enforceable. *Jackson*, 2016 WL 369693, at *4. There, Jackson argued the government could not have had sufficient information to investigate his claims because it lacked specific documents that Jackson had. *Id*. The Court found that the government was indeed aware of his claims and that the disclosures Jackson made to the government were more than enough information to investigate. *Id*. The Court stated "there is no doubt that [Jackson's] allegations were sufficient to allow the [government] to investigate, since the [government] was aware of the specific allegations and had opportunity to uncover and/or investigate any fraud. At most, [Jackson's] additional documents merely corroborate the allegations he had already made to the Department." *Id*.

*Jackson* is distinguishable from the facts here. To begin, Jackson did "not dispute that the [government] was well aware of Relator's allegations prior to March 8, 2012 [(the date Jackson entered the settlement and release for his first suit)] . . . ." *Id*. at *3. Here, there is a dispute as to whether the government was well aware of his allegations. The Court recognizes that HUD had already audited Defendants and noted their violations of FHA rules, but this audit does not cover the extent of the fraud that Relator describes in this suit. Additionally, here, it is undisputed that the government did not know of all of the fraud for all of the loans.

Relator alleges Defendants committed fraud related to VA loans. In their reply, Defendants state, "[e]ven if [Relator was] correct that there were VA-loan violations of which the government was unaware, the release would still be enforceable to FHA loans (because HUD was aware of these alleged violations) and non-governmental loans (of which [Relator] has no knowledge)."

15

(Dkt. #165 at p. 12). Notably, Defendants state that "[t]he Court should grant OneWest's motion as to FHA and non-governmental loans, while leaving [Relator's] meritless VA-related claims to be dismissed at summary judgment or rejected at trial." (Dkt. #165 at p. 12). Defendants do not point to any documentation indicating the government was aware of fraud related to VA loans, and the Court will not impute such knowledge onto the government.

Accordingly, because the Court finds that the public interest in permitting this case to go forward outweighs the interest in enforcing the Release, the Court will not enforce the Release. *See Ladas*, 824 F.3d at 24 (holding the prefiling release was unenforceable as a matter of public policy because the government did not have sufficient knowledge of the fraud allegations at the time the release was executed). The Court, therefore, finds that Relator has standing to bring this *qui tam* suit and denies the Motion to Dismiss on this basis.

## CONCLUSION

It is therefore **ORDERED** that CIT Bank, N.A. d/b/a OneWest Bank, and CIT Group, Inc.'s Motion to Dismiss (Dkt. #157) is hereby **DENIED**.

**SIGNED this 17th day of August, 2021.**


AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE