# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* ANDREW MITCHELL, AND ANDREW MITCHELL, Individually, | § § § § | Civil Action No. 4:14-CV-00833 Judge Mazzant |
| *Plaintiffs/Relator,* | § § | |
| v. | § § | |
| CIT BANK, N.A., d/b/a ONEWEST BANK, and CIT GROUP, INC., | § § § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Motion for Partial Summary Judgment Under the Public Disclosure Bar (Dkt. #179).  Having considered the motion and the relevant pleadings, the Court finds that the motion should be **DENIED**.

## BACKGROUND

In 2008, the United States faced a housing crisis caused, in part, by mortgage fraud and predatory lending.  The crisis caused home prices to plummet and foreclosures to skyrocket, leaving homeowners with negative equity in their homes.  Distressed homeowners were unable to sell or refinance their homes to meet their mortgage obligations.  In response to this crisis, the Government enacted the Emergency Economic Stabilization Act of 2008 ("EESA").

The Home Affordable Modification Program ("HAMP"), administered by the Treasury Department, was a voluntary program under EESA designed to prevent avoidable foreclosures by providing homeowners with affordable mortgage-loan modifications and other alternatives to eligible buyers.  HAMP's primary goal was to relieve the burden on homeowners by lowering their mortgage payments to 31% or less of their gross monthly income.  Investors would receive

payments and a guarantee that no modification would result in a mortgage worth less than the net-present value of the property.  In return, mortgage servicers, in addition to their annual servicing fees, received HAMP incentive payments to complete the modifications.  Each successful modification entitled the servicer from $1,200–2,000 depending on how long the mortgage was delinquent.  From the program's start in 2009 through the second quarter of 2016, HAMP generated more than 1.6 million permanent modifications.  In addition to HAMP, the Fair Housing Administration's ("FHA") and Veterans Administration ("VA") each had companion HAMP programs: "FHA-HAMP" and "VA-Hamp," respectively.

In 2009, OneWest Bank ("OWB[1]") enrolled in the HAMP, FHA-HAMP, and VA-HAMP programs.  On August 18, 2009, OWB Executive Vice President and Chief Operating Officer Tony Ebers expressly certified OWB's compliance with HAMP guidelines and applicable federal laws in signing the initial Servicer Participation Agreement ("SPA").  The SPA named OWB as the servicer and Fannie Mae as Financial Agent of the United States.  The SPA required OWB to provide annual certifications of compliance with the specified terms and conditions.

OWB expressly represented in the SPAs and annual certifications that: (1) it was in compliance with the terms and guidelines of HAMP; (2) it was in compliance with all applicable laws and requirements; (3) it created and maintained an effective HAMP program and committed the resources needed to employ enough trained, experienced personnel with the tools and technology necessary to provide quality service to homeowners; and (4) it had adequately documented and monitored its compliance and immediately reported to the Government any credible evidence of material violations of these certifications.  Each annual certification included

---

[1] Unless otherwise specified, OWB refers collectively to Defendants' CIT Bank, N.A. (f/k/a OneWest Bank) and CIT Group Inc.

an express statement certifying that OWB continued to meet the terms and conditions of the SPA, including the representation of compliance with applicable laws.

On December 23, 2014, Relator Michael J. Fisher ("Fisher") and Relator Andrew Mitchell ("Mitchell" or "Relator") filed their Original Complaint under seal (Dkt. #1).   On October 21, 2016, Fisher and Mitchell filed an Amended Complaint under seal (Dkt. #24).   On September 13, 2019, Fisher withdrew as a Relator (Dkt. #50; Dkt. #51).   On October 11, 2019, Mitchell filed Relator's Second Amended Complaint ("SAC") (Dkt. #52).   In the SAC, Mitchell, an employee of OWB from 2009–2011, alleges that OWB made false claims to the United States in relation to its obligations under HAMP, FHA-HAMP, and VA-HAMP (Dkt. #52).   Defendants were thereafter served on October 15, 2019 (Dkt. #53; Dkt. #54).

On June 24, 2021, Defendant filed two summary judgment motions (Dkt. #178; Dkt. #179). While the first one (Dkt. #178) applies to all of Mitchell's claims, the second one (Dkt. #179), the present motion, focuses on a separate barrier to suit that applies only to Mitchell's Treasury HAMP claims.   The motion before the Court contends that partial summary judgment is warranted as to Mitchell's Treasury HAMP claims because Mitchell's claims are barred by the False Claims Act ("FCA")'s public disclosure bar (Dkt. #179).   On July 15, 2021, Mitchell filed his response (Dkt. #186).   On August 10, 2021, OWB filed a reply (Dkt. #198).   On August 31, 2021, Mitchell filed a sur-reply (Dkt. #208).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).   Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Substantive law identifies which facts are material.  *Id.*  The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981). The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact.  FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323.  If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case.  *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49).  A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257.  Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden.  Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment.

*In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)).  The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

OWB argues that partial summary judgment is warranted as to Mitchell's Treasury HAMP claims because they are barred by the FCA's public disclosure bar.  Under the public disclosure bar, the court "shall dismiss an action or claim" brought under the FCA "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media." 31 U.S.C. § 3730(e)(4)(A) (2010).[2]  However, a relator can avoid dismissal even if his claims were publicly disclosed if he is an "original source of the information." *Id.*  Under the statute, an "original source" is defined as a person "who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B).[3]

---

[2] The FCA was amended in 2010. Before the 2010 amendment, the statute provided that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media . . . ." 31 U.S.C. § 3730(e)(4)(A) (2006).  The Fifth Circuit applies the pre-2010 version to allegations based on conduct that occurred prior to March 23, 2010, and applies the 2010 version to allegations based on conduct occurring on or after that date. *See U.S. ex rel. Lockey v. City of Dallas*, 576 F. App'x 431, 435, 437 (5th Cir. 2014).  Because Mitchell's SAC alleges claims involving conduct both pre- and post-dating the March 2010 Amendment of the statute, the Court must analyze Mitchell's claims under both versions. However, because the differences in the inquires under the two versions are minimal, the Court's analysis applies to both pre- and post-March 2010 conduct, except where otherwise noted.

[3] The pre-amendment version of the statute defined an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B) (2006).

Courts in the Fifth Circuit apply a three-part test to determine whether the public disclosure bar applies, asking: "(1) whether there has been a 'public disclosure' of allegations or transactions, (2) whether the *qui tam* action is 'based upon' such publicly disclosed allegations, and (3) if so, whether the relator is the 'original source' of the information." *U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 173 (5th Cir. 2004) (quotations omitted).  The Court is not required to rigidly follow the three steps. *U.S. ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011).  Indeed, the Fifth Circuit has recognized that "combining the first two steps can be useful, because it allows the scope of the relators' action in step two to define the 'allegations or transactions' that must be publicly disclosed in step one." *Id.*; *see also U.S. ex rel. Fried v. W. Indep. Sch. Dist.*, 527 F.3d 439, 442 (5th Cir. 2008) (combining the first two steps).

The purpose of the public disclosure bar is both to promote private citizen involvement in fraud exposure and to "prevent[] parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud." *Reagan*, 384 F.3d at 174 (quotations omitted).  A FCA qui tam action even partly based upon public allegations or transactions is nonetheless barred. *Id.* at 176.  When determining if an action is barred, the defendant bears the burden to point to documents or transactions on which the relator's complaint is based. *Jamison*, 649 F.3d at 327.  Then, "once the opposing party has identified public documents that could plausibly contain allegations or transactions upon which the relator's action is based, the relator bears the burden of demonstrating that they do not." *Id.*

OWB argues that the public disclosure bar precludes Mitchell's Treasury HAMP claims because 1) the allegations in Mitchell's SAC are substantially the same as ones in public disclosures, and 2) Mitchell does not qualify as an original source (Dkt. #179 at p. 6–7).  Mitchell disagrees with OWB on both points (Dkt. #186 at p. 5).  The Court examines them in turn.

I.      **Whether the Treasury HAMP Allegations in Mitchell's Complaint Are Substantially the Same as Allegations and Transactions Set Forth in Public Disclosures**

To resolve whether the public disclosure bar precludes Mitchell's Treasury HAMP claims, the Court must determine if there has been a public disclosure of the allegations or transactions, and whether the *qui tam* action is substantially the same[4] as those publicly disclosed allegations. *See Jamison*, 649 F.3d at 327 ("[C]ombining the first two steps can be useful . . . ."). To do this, the Court compares the allegations contained in Mitchell's SAC with public disclosures available at the time the complaint was filed. *U.S. ex rel. Solomon v. Lockheed Martin Corp.,* 878 F.3d 139, 144 (5th Cir. 2017). If the complaint could have been synthesized from the disclosures, the Court then determines if Mitchell qualifies as an original source. *Id.*

OWB points to six[5] documents that it claims publicly disclosed Mitchell's Treasury HAMP allegations (Dkt. #179 at p. 10). More specifically, OWB contends the 2011 Consent Order between OWB and the Office of Thrift Supervision ("OTS"), the Federal Deposit Insurance Corporation Office of Inspector General's ("FDIC OIG") publicly reported 2010–2011 Audit, reports from the Congressional Oversight Panel ("COP") as well as the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP"), and testimony and published remarks by Assistant Secretary Timothy Massad, the senior Treasury official for HAMP, publicly disclosed the allegations in Mitchell's SAC (Dkt. #179 at p. 10–11). Although Mitchell does not dispute that these documents qualify as public disclosures because they are among the sources enumerated

---

[4] As previously noted, the pre-2010 version of the FCA required courts to consider whether the action was "based upon" the publicly disclosed transactions. 31 U.S.C. § 3730(e)(4)(A) (2006). However, courts have found the "change [from 'based upon' to 'substantially the same'] has no real impact, as courts considering the term 'based upon' interpreted it to mean 'substantially the same.'" *U.S. ex rel. Hendrickson v. Bank of Am., N.A..,* 343 F. Supp. 3d 610, 623 (N.D. Tex. 2018) (internal citations omitted).

[5] OWB actually points to seven documents—the last one being Fisher's original SDNY complaint (Dkt. #179 at p. 10–11). However, the document was only relevant in determining whether Mitchell's improper capitalization allegations were publicly disclosed. Because Mitchell claims he is no longer pursuing those allegations, (Dkt. #186 at p. 6), the Court did not consider the document.

in 31 U.S.C. § 3730(e)(4)(A)(i)–(iii), he argues the public documents do not disclose the "scope and breadth" of his claims (Dkt. #186 at p. 17).

While the parties do not agree on many things, they do agree that the Fifth Circuit has adopted the X + Y = Z test set forth in *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994), to determine whether public disclosures contain sufficient indicia of an FCA violation to bar a subsequently filed FCA complaint. *Solomon*, 878 F.3d at 144.   Under the *Springfield* test, "the combination of X and Y must be revealed, from which the readers or listeners may infer Z[.]" *Solomon*, 878 F.3d at 144 (quoting *Springfield*, 14 F.3d at 654).  Z is an inference of fraud under the FCA, while X and Y are two required elements for the inference: "a misrepresented state of facts and a true state of facts." *Id.* (quoting *Springfield*, 14 F.3d at 655). "The presence of one or the other in the public domain, but not both, cannot be expected to set government investigators on the trail of fraud." *Id.*   Thus, the public disclosures must provide "specific details about the fraudulent scheme and the types of actors involved in it sufficient to set the government on the trail of fraud." *Id.* (internal quotations omitted).

Applying the *Springfield* formula, OWB contends that its representations of material compliance in its SPA and annual certifications, together with the records of Treasury's payment of HAMP incentives to OWB, form the "X" (Dkt. #179 at p. 15).  As well, OWB claims the "Y" in the *Springfield* formula—the critical elements of Mitchell's allegations of fraud—were reflected in the 2011 OTS Consent Order, the FDIC OIG's 2010–2011 Audit, reports by COP and SIGTARP, and remarks and testimony by Assistant Secretary Massad (Dkt. #198 at p. 13).  Taken together, OWB claims these disclosures "equipped the government with more than enough information to 'set' Treasury 'on the trail of fraud' alleged by Mitchell—namely, that, contrary to

its legal-compliance representations, [OWB] was allegedly violating servicing-related laws and regulations during its participation in HAMP" (Dkt. #179 at p. 16).

Mitchell disagrees.  He argues the alleged public disclosures do not provide the necessary components of the *Springfield* formula.  First, Mitchell argues though it is OWB's burden to establish conclusively all of the facts on which its motion is based, OWB has not produced any evidence demonstrating that OWB's annual certifications were publicly available (Dkt. #186 at p. 8).    Thus, without proof of "X"—the misrepresented state of facts or the "very misrepresentations of [OWB] upon which Relator's claims are based"—the *Springfield* test fails (Dkt. #186 at pp. 8, 27).  Second, Mitchell contends that the public disclosures "fail to correspond to the full scope and breadth of Relator's claims," and thus do not contain the critical elements as to the true state of facts, so the "Y" element of the *Springfield* formula is also missing (Dkt. #186 at 17, 28).

After reviewing the disclosures submitted by OWB and comparing them to the SAC, the Court finds it likely that the publicly disclosed information was "sufficient to set the government on the trail of fraud." *Jamison*, 649 F.3d at 329.  Simply put, the SAC alleges OWB defrauded Treasury by certifying its material compliance with all HAMP laws and regulations in its SPA and annual certifications, while at the same (1) engaging in impermissible dual tracking,[6] and (2) maintaining inadequate systems, processing, staffing and training (Dkt. #52 ¶¶ 148–167).[7] While the public disclosures mostly state highly generalized allegations, they nevertheless contain

---

[6] The SAC defines dual tracking as "the practice of pursuing foreclosure and loan modification simultaneously" (Dkt. #52 ¶ 60).
[7] Although the SAC also contains allegations relating to OWB's improper capitalization practices regarding Treasury HAMP modifications, Mitchell claims in his response that he is no longer pursuing that allegation (Dkt. #186 at p. 6). Accordingly, the Court did not consider them.

information that would lead to an inference of fraud—that contrary to its representations, OWB was violating servicing-related laws and regulations during its participation in HAMP.

The 2011 Consent Order is the most revealing document—it identified certain deficiencies and unsafe or unsound practices by OWB (Dkt. #60, Exhibit A).  Specifically, it found that OWB had "failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes" and "failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures . . . ." (Dkt. #60, Exhibit A at p. 4). Further, the Consent Order required OWB to retain an independent consultant to review certain foreclosure actions, including "whether a foreclosure sale occurred when an application for a loan modification or other Loss Mitigation was under consideration . . ." and "whether Loss Mitigation Activities with respect to foreclosed loans were handled in accordance with the requirements of the HAMP . . . ." (Dkt. #60, Exhibit A at p. 17).  Accordingly, though the Consent Order was not nearly as detailed as the SAC, there is nevertheless overlap between the publicly disclosed information and the core of the allegations in the SAC.  Therefore, based on the unsafe and unsound practices identified, the Consent Order disclosed "Y," the true state of facts. *See U.S. ex rel. Advocs. for Basic Legal Equal., Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 431 (6th Cir. 2016) (finding that consent order requiring defendant to undertake "measures 'to ensure [that] reasonable and good faith efforts, consistent with applicable Legal Requirements, are engaged in Loss Mitigation and foreclosure prevention for delinquent loans constituted a public disclosure'" constituted a public disclosure where relator had alleged that defendant had failed to take required loss mitigation measures before foreclosing) (emphasis omitted).

As well, OWB's representations of material compliance in its SPA and annual certifications, together with the records of Treasury's payments of HAMP incentives to OWB

formed "X," the misrepresented state of facts.  Though Mitchell argues that the absence of OWB's annual certifications in the public domain is fatal, OWB's SPA coupled with the form annual certifications in the public domain and Treasury payments was sufficient (Dkt. #198, Exhibit 83 & Exhibit 84). *See Solomon*, 878 F.3d at 146 (finding that model contract not specifically connected to defendant was sufficient for an inference of fraud).  Of course, the SAC adds much detail to the information in the public disclosures, but the public disclosures sufficiently indicate misconduct to lead to an inference of fraud under the *Springfield* test.  Accordingly, because the Court finds that Mitchell's allegations are substantially the same as the public disclosures, his suit will be barred unless Mitchell qualifies as an original source.

## II.     Whether Mitchell Qualifies an Original Source

Even though Mitchell's SAC was substantially the same as the public disclosures, his FCA complaint may proceed if he is the original source of the publicly disclosed information.  To qualify as an original source under the current version of the statute, a relator must meet two requirements. 31 U.S.C. § 3730(e)(4)(B).  First, he must "ha[ve] knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions," and second, he must "ha[ve] voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B).[8]  When determining whether a relator is an original source, courts must examine the factual subtleties of the case before it and "attempt to strike a balance between those individuals who, with no details regarding its whereabouts, simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important

---

[8] Prior to the 2010 Amendment, an original source was defined as "a person who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B) (2006).

information about a false or fraudulent claim." *U.S. ex rel. Lam v. Tenet Healthcare Corp*., 287

Fed. App'x. 396, 400 (5th Cir. 2008) (unpublished) (quotation marks and citations omitted).

### A. Does Mitchell have independent knowledge that materially adds to the publicly disclosed allegations or transactions?

OWB argues that Mitchell fails to qualify as original source because he both 1) lacks

independent knowledge as to the Treasury HAMP allegations, and 2) cannot demonstrate that his

allegations materially add to the publicly disclosed allegations (Dkt. #179 at pp. 17–18).  The Court

examines these in turn.

### 1.  Independent Knowledge

OWB argues that Mitchell's knowledge is not independent "because he worked solely with

GSE, FHA, and VA loans at OneWest, which were not part of OneWest's participation in Treasury

HAMP" (Dkt. #179 at p. 17).  In support of its argument, OWB points to Mitchell's deposition

testimony and interrogatory responses where "Mitchell unambiguously conceded that his

independent knowledge of noncompliance did not extend to any violations that could extend to

Treasury HAMP" (Dkt. #198 at p. 14).  For example, when Mitchell was asked "Did you observe

any noncompliance at OneWest Bank concerning anything outside of FHA loans, VA loans, or

GSE loans, i.e., "Fannie and Freddie Loans," he responded, "Nothing outside of those loan types"

(Dkt. #198, Exhibit 75 at 116:21–117:5).

Mitchell disagrees, claiming OWB's argument "ignores [Mitchell's] factual testimony and

allegations . . . ." (Dkt. #186 at p. 29).  He argues that his knowledge is independent because it

derives from "his training at OneWest and years of working at OneWest" (Dkt. #186 at p. 30).

Mitchell further contends his deposition testimony shows his knowledge is independent because

he testified that he observed dual tracking by one of his supervisors "with some degree of

frequency" (Dkt. #186, Exhibit 1 at 362:7–25).  Further, at the very least, Mitchell argues material

disputed issues of fact warrant denial of OWB's motion.   Indeed, Mitchell disputes that he conceded in his deposition that he had no personal knowledge of violations of Treasury HAMP (Dkt. #186 at p. 33).  Instead, he claims that "by answering in the negative," he "did no more than verify he was not aware of noncompliance unique to non-GSE loans" (Dkt. #186 at p. 33). Additionally, he points to other earlier testimony in his deposition that "shows he was personally aware of violations and tried to report them" (Dkt. #186 at p. 33 (citing Dkt. #186, Exhibit 1 at 7:13–19)).  Further, Mitchell contends OWB relies on Mitchell's outdated interrogatory responses, but his updated interrogatory responses show that he had personal knowledge of Treasury HAMP violations (Dkt. #186 at p. 34).

The Fifth Circuit has held that a relator's knowledge is independent if it "is not derived from the public disclosures." *Solomon*, 878 F.3d at 147 (internal quotations and citations omitted). Here, the Court finds that there is a genuine issue of material fact as to whether Mitchell's knowledge is independent.[9]   Although Mitchell primarily handled FHA and VA loans, not Treasury HAMP loans, his deposition testimony and updated interrogatory responses indicate he was still directly exposed to the Treasury HAMP portfolio during his employment and training at OWB (Dkt. #186, Exhibit 1 and Exhibit 4).   Accordingly, this evidence indicates that "the information from which Relator's claims are derived is based upon [his] independent observations from [his] employment with the [Defendant]'s company[y]"—not from the public disclosures. *See U.S. ex rel. Fisher v. Ocwen Loan Servicing, LLC*, No. 4:12-cv-543, 2016 WL 3031713, at *7

---

[9] Because the pre-amendment public disclosure bar also requires an original source to have independent knowledge, there is a genuine issue of material fact under that version of the statute for the same reasons as set forth in this section. *See* 31 U.S.C. § 3730(e)(4)(B) (2006) (defining an original source as "a person who has direct and independent knowledge of the information on which the allegations are based").  Additionally, under the pre-amendment version of the statute, a relator's knowledge also must be "direct." 31 U.S.C. § 3730(e)(4)(B) (2006).  To be direct, "the information must be firsthand knowledge." *Fried*, 527 F.3d at 442.  Since there is a factual dispute regarding whether Mitchell's knowledge stems from his employment with OWB and his personal observations of Treasury HAMP violations, there is also a genuine issue of material fact on whether Mitchell's knowledge is "direct."

(E.D. Tex. 2016).  Further, while some of his deposition testimony indicates that he did not have knowledge of any alleged violations relating to non-FHA, non-VA, and non-GSE loans (Dkt. #198, Exhibit 75 at 116:21–117:5), other parts of it indicate that he did have knowledge of Treasury HAMP violations (Dkt. #186, Exhibit 1 at 70:13–19; 362:7–25).  Thus, there is a genuine issue of material fact as to whether Mitchell's knowledge is independent as to his Treasury HAMP allegations.

### 2.  Materially adds

Second, OWB contends that Mitchell also fails to qualify as an original source because "he cannot demonstrate . . . that his allegations 'materially add[] to the publicly disclosed allegations or transactions'" (Dkt. #179 at p. 18 (quoting 31 U.S.C. § 3730(e)(4)(B))).  Although Congress added the "materially adds" language in 2010, the Fifth Circuit has yet to expound on the meaning of this language.  Neither has this Court.  As in all statutory-interpretation cases, the Court begins by examining the text of the statute. *United States v. Rains*, 615 F.3d 589, 596 (5th Cir.2010).  The Court follows "the plain and unambiguous meaning of the statutory language, interpreting undefined terms according to their ordinary and natural meaning [at the time Congress enacted the statute] and the overall policies and objectives of the statute." *United States v. Orellana*, 405 F.3d 360, 365 (5th Cir.2005).  In determining the ordinary meaning of terms, dictionaries are often a principal source. *Id.*

As stated, § 3730(e)(4)(B) defines "original source" as an individual "who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions . . . ." 31 U.S.C. § 3730(e)(4)(B).  Though Congress added this language in a 2010 amendment, it did not define the term.  Accordingly, the Court turns to dictionaries to ascertain the ordinary meaning of the language.  In 2010, "add" was ordinarily understood to mean "to join or unite so

as to bring about an increase or improvement." *Add*, MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2003). And "material" was defined as "having real importance or great consequences." *Material*, MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2003); *see also Material*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "material" to mean "[o]f such a nature that knowledge of the item would affect a person's decision-making," or "significant" or "essential."). Thus, these definitions indicate that a relator's information "materially adds" to the publicly disclosed allegations or transactions if it significantly contributes information that would affect a person's decision-making. Further, other language in the statute points to the same conclusion the immediate text suggests. For example, in the FCA's provisions defining the scope of liability, it states that "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

Additionally, other circuits have adopted a like definition of "materially adds." *See U.S. ex rel. Reed v. Keypoint Gov't. Sols*, 923 F.3d 729 (10th Cir. 2019); *U.S. ex rel. Winkelman v. CVS Caremark Corp*., 827 F.3d 201 (1st Cir. 2016); *U.S. ex rel. Advocates for Basic Legal Equal, Inc. v. U.S. Bank, N.A*., 816 F.3d 428 (6th Cir. 2016); *U.S. ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 306 (3d. 2016); *U.S. ex rel. Paulos v. Stryker Corp., 762 F.3d 688* (8th Cir. 2014). The Court finds that the Tenth Circuit's analysis in *Reed* to be especially helpful. *See* 923 F.3d at 756–59. Considering *Winkelman* to be persuasive, the Tenth Circuit found that the materially-adds standard will be satisfied if the relator's new information "is sufficiently significant or important that it would be capable of 'influenc[ing] the behavior of the recipient'— i.e. the government . . ." *Reed*, 923 F.3d at 756. By contrast, "a relator who merely adds background information or details about a known fraudulent scheme typically will be found not to have materially added to the publicly disclosed information." *Id.* Guided by the meaning of

"materially adds," the Court now turns to the question of whether Mitchell satisfies this standard. The Court finds that he does.

Mitchell does more than merely add background information to the existing public disclosures—he provides specific details of OWB's fraud and scienter.  Indeed, while the public disclosures only alleged general concerns over OWB's dual tracking and inadequate systems, processing, staffing, and training, the SAC does much more—it adds detailed and specific claims as well as allegations regarding CIT's pervasive fraud and knowing disregard for its obligations. *See Reed*, 923 F.3d at 756–57 ("That is, the fewer questions the public disclosures answer, the more room there is for a relator's allegations to add material information.").  Indeed, though the public disclosures contain general information regarding the deficiencies of OWB, there is no hint in any of them that any of OWB's actions were taken *knowingly* to defraud the government.  By contrast, Mitchell contends that OWB's violations were pervasive and well-known within the company, yet nothing was done (Dkt. #186, Exhibit 1 at 122:7–17).  In fact, Mitchell characterizes OWB's behavior as "a whitewash campaign to keep the government from learning how far out of compliance its program had become" (Dkt. #164, Exhibit 2 ¶ 9).

Further, Mitchell details how OWB was alerted to the specific issues alleged in Mitchell's SAC but ignored them.  For example, the SAC alleges that CIT's "programmatic failures were well known within the company," "were continually referenced at meetings of the Loss Mitigation department, including the HAMP unit, and in meetings between HAMP employees and managers and OneWest's Risk Management team" (Dkt. #52 ¶ 164).  He further specifies that "OneWest knew its document imaging system, Docuware, was overwhelmed by the volume of HAMP-related documents but failed to implement new document management process and systems to meets its obligations under HAMP" (Dkt. #52 ¶ 161).    Mitchell's deposition testimony supports his

claims—he testified that he told OWB senior executives that there were serious training issues across the entire portfolio (Dkt. #186, Exhibit 1 at 350:15–351:18).

Additionally, regarding dual tracking, his SAC reveals that it was expressly flagged as an issue by CIT and others in numerous internal and external audits from 2007 and 2010, and that internal reports estimated the volume to be 15-000-25,000 and later at 45,000-50,000 (Dkt. #52 ¶ 151).  Further, Mitchell testified how OWB knew it lacked an automated process to suspend foreclosures proceedings during loss mitigation efforts, which led to dual tracking (Dkt. #186, Exhibit 1 at 362:7–25).  And Mitchell testified that he "tried to raise issues, letting [OWB] know of violations that may have impacted" their decision to sign the Treasury HAMP SPA certification (Dkt. #186, Exhibit 1 at 70:13–19).  Thus, unlike the public disclosures which only contain general information regarding violations of OWB, Mitchell provides specific allegations that OWB was acting deliberately, and not merely carelessly.

That Mitchell's knowledge materially adds to the information available in the public disclosures is especially evident by comparing Mitchell's SAC to the public disclosures.  Of the six public disclosures that OWB relies on, four contain merely succinct, generalized allegations regarding the performance of Treasury HAMP servicers overall.  While the other two public disclosures that OWB relies on—the OIG Audit and 2011 Consent Order—relate specifically to OWB, they still contain no allegations that OWB violated its representations knowingly.

For example, while the OIG Audit investigated whether OWB had a "financial incentive . . . to foreclose rather than modify loans[,]" it  "did not find evidence to support the allegations" (Dkt. #60, Exhibit J at 2–3).  Thus, as Mitchell points out, the OIG Audit was actually dismissive of any misconduct by OWB.  Accordingly, like the other four disclosures, the OIG Audit does not reveal anything significant relating to OWB's fraud of the government.  In fact, it arguably reveals

even less than the other four disclosures because instead of uncovering violations, the OIG Audit

found the opposite—that "[OWB] administered loan modifications in accordance with HAMP"

(Dkt. #60, Exhibit J at p. 3).

And, finally, while the 2011 Consent Order is the most revealing document, it still contains

no allegations of fraud.  As stated previously, the 2011 Consent Order found that OWB had "failed

to devote to its foreclosure processes adequate oversight, internal controls, policies, and

procedures" as well as "sufficient financial, staffing and managerial resources" (Dkt. #60, Exhibit

A at p. 4).  Further, the Consent Order called for an investigation of whether foreclosures were

handled in accordance with the requirements of HAMP, and, more specifically, whether dual

tracking had occurred (Dkt. #60, Exhibit A at p. 17).  But, again, while documenting non-

compliance, the Consent Order contained no allegations of scienter or any hint that OWB's actions

were taken knowingly.  Of course, as soon as the government learned that OWB had engaged in

certain compliance violations, it necessarily knew that OWB had filed non-compliant documents.

But this information still provided the government with no evidence of OWB's scienter—a key

element to a violation under the False Claims Act.  And considering that OWB's failure to have

adequate systems, processing, staffing, and systems could have been a result of carelessness or

inadvertence by OWB, the findings in the Consent Order did not necessarily mean that OWB was

knowingly misrepresenting its compliance.

In sum, none of the public disclosures alleged or even hinted that OWB was well-aware of

its pervasive systematic violations.  In stark contrast to the general information provided by the

disclosures, Mitchell details specific instances that indicate OWB's actions were taken knowingly

to evade the requirements of the Treasury HAMP program and to defraud the government. *See*

*Winkelman*, 827 F.3d at 213 ("[F]urnishing information that a particular defendant is acting

'knowingly' (as opposed to negligently) sometimes may suffice as a material addition to information already publicly disclosed."). This information regarding OWB's scienter is sufficiently significant that it would be capable of influencing the government. *See Reed*, 923 F.3d at 760–61 ("False Claims Act 'cases often turn on the issue of scienter. Yet, 'the government is never in a good position to have direct evidence of guilty knowledge.'") (internal citations omitted). Thus, the Court finds that Mitchell's knowledge materially adds to the publicly disclosed allegations or transactions.

**B. Did Mitchell disclose his allegations to the Government before filing his lawsuit?**

OWB does not dispute whether Mitchell "voluntarily provided the information to the government before filing an action under this section." *See* 31 U.S.C. § 3730(e)(4)(B). Nevertheless, before filing on December 23, 2024, Mitchell and Relator Michael Fisher provided their disclosures to the government (*See* Dkt. #1 at ¶¶ 98–99; Dkt. #52 at ¶ 13).

## CONCLUSION

It is therefore **ORDERED** that Defendant's Motion for Partial Summary Judgment Under the Public Disclosure Bar (Dkt. #179) is hereby **DENIED**.

**IT IS SO ORDERED.**

**SIGNED this 13th day of January, 2022.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

19