# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | § | |
| ANDREW MITCHELL, AND ANDREW | § | |
| MITCHELL, Individually, | § | |
| | § | |
| *Plaintiffs/Relators,* | § | |
| | § | Civil Action No.  4:14-CV-00833 |
| v. | § | Judge Mazzant |
| | § | |
| CIT BANK, N.A., d/b/a ONEWEST BANK, | § | |
| and CIT GROUP, INC., | § | |
| | § | |
| *Defendants.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendants' Motion for Summary Judgment Under Federal Rule of Civil Procedure 56 (Dkt. #178).  Having considered the motion and the relevant pleadings, the Court finds that the motion should be **DENIED**.

## BACKGROUND

### I.      Factual Background

In the wake of the 2008 financial crisis, the Treasury Department created the Home Affordable Modification Program ("HAMP") to incentivize mortgage servicers (i.e., entities like OneWest Bank ("OWB"))[1] to initiate mortgage modifications to prevent avoidable foreclosures (Dkt. #265 ¶ 1).  HAMP sought to create a partnership between the Government and loan investors and loan servicers to reduce the monthly mortgage payments of at-risk homeowners (Dkt. #178 at p. 11).

In addition to "Treasury" HAMP, the Government created HAMP equivalents for the

---

[1] OWB refers collectively to Defendants CIT Bank, N.A. d/b/a OneWest Bank and CIT Group, Inc., unless otherwise specified.

Department of Housing and Urban Development ("HUD")'s Federal Housing Administration ("FHA") mortgage insurance program and the Department of Veterans Affairs ("VA")'s mortgage insurance program, known respectively as FHA-HAMP and VA-HAMP (Dkt. #265 ¶ 1).  The FHA mortgage-insurance program was designed to expand home ownership by incentivizing lenders to lend to borrowers who otherwise would not qualify for loans (Dkt. #178 at p. 12).  FHA-HAMP was added as an additional step in the loss mitigation process to provide further assistance to homeowners with FHA-insured loans who were unable to meet their mortgage payments ((Dkt. #265 ¶ 35).  Similar to FHA-HAMP, VA-HAMP was implemented in 2010 to stem the tide of foreclosures among veterans who purchased homes guaranteed through the VA Home Loan program (Dkt. #265 ¶ 84).  The addition of FHA-HAMP and VA-HAMP was essential because many FHA and VA homeowners are first-time and low-credit homebuyers and are among the most vulnerable homeowners (Dkt. #265 ¶ 2).

Treasury HAMP, FHA-HAMP, and VA-HAMP were designed to be a win for all parties (Dkt. #265 ¶ 4).  Distressed homeowners who qualified for loan modifications could stay in their homes for a lower monthly payment and, in some cases, received assistance from the Government in making their payments (Dkt. #265 ¶ 4).  Investors received payments and a guarantee that no modification would result in a mortgage less than the net present value of their property (Dkt. #265 ¶ 4).  And mortgage servicers like OWB, in addition to payments received from the investor, received HAMP incentive payments from the Government for successful modifications (Dkt. #265 ¶ 4).  Additionally, in the case of FHA loans, servicers also retained the right to submit insurance claims to the Government for their losses when homeowners defaulted (Dkt. #265 ¶ 4).

In 2009, OWB enrolled in the Treasury HAMP, FHA-HAMP, and VA-HAMP programs (Dkt. #265 ¶ 5).  Like all other servicers in the program, OWB was required to execute a Service

Participation Agreement ("SPA") to participate in HAMP (Dkt. #178 at p. 13).  The SPA also required OWB to provide annual certifications of compliance (Dkt. #178 at p. 14).  OWB expressly represented in the SPAs and annual certifications that: (1) it was in compliance with the terms and guidelines of HAMP; (2) it was in compliance with all applicable laws and requirements;[2] (3) it created and maintained an effective HAMP program and committed the resources needed to employ enough trained, experienced personnel with the tools and technology necessary to provide quality service to homeowners; and (4) it had adequately documented and monitored its compliance and immediately reported to the Government any credible evidence of material violations of these certifications (Dkt. #265 ¶ 73).  Each annual certification included an express statement certifying that OWB continued to meet the terms and conditions of the SPA, including the representation of compliance with applicable laws (Dkt. #265 ¶ 75).

As with the Treasury HAMP program, OWB was required to submit annual certifications to participate in the FHA insurance program (Dkt. #178 at p. 20).  The certifications require program participants to represent their compliance with a broad range of HUD regulations, which include certain loss mitigation measures (Dkt. #187 at p. 20).  For example, HUD expects servicers to review borrowers for loss mitigation within ninety days of delinquency and initiate foreclosures within six months of default unless the borrower qualifies for loss mitigation (Dkt. #178 at p. 21).  Further, HUD's loss-mitigation program requires servicers to consider delinquent borrowers for loss mitigation in a specific priority order (Dkt. #178 at p. 21).

Like Treasury HAMP and FHA-HAMP, servicers participating in VA-HAMP were required to evaluate defaulted mortgages for traditional loss mitigation actions before evaluating

---

[2]At some point, the annual certifications were amended to add the word "material," i.e., OWB expressly re-certified that it was "in material compliance with, and . . . all Services have been materially performed in compliance with" those same laws (Dkt. #265 ¶ 76).

them for VA-HAMP relief (Dkt. #265 ¶ 86).  The VA also requires servicers to report certain loan servicing events through an electronic web-based system called VALERI (Dkt. #265 ¶ 91).  When making manual submissions of loan-related events through VALERI, the servicer is required to certify that "the information provided . . . is accurate to the best of your knowledge and is substantiated by the accompanying documentation and proper justification" (Dkt. #265 ¶ 91).

Despite OWB certifying that it was in compliance with the terms of these programs, Relator Andrew Mitchell ("Mitchell"), a former loss-mitigation specialist at OWB from 2009–2011, alleges that OWB knew it was not in legal compliance (Dkt. #265 ¶ 91).  Thus, according to Mitchell, OWB's allegedly false certifications caused the Government to make hundreds of millions of dollars in federal insurance claims and incentive payments to OWB that it would not otherwise have made (Dkt. #265 ¶ 6).

For example, as to Treasury HAMP, Mitchell alleges that OWB engaged in widespread dual tracking, continuously moving homeowners' mortgages into and through the foreclosure process even as OWB was supposed to be evaluating the mortgages for loss mitigation options and HAMP (Dkt. #265 ¶ 147).  According to Mitchell, OWB's dual tracking led many homeowners to lose their homes in foreclosure when foreclosure should have been suspended during the resolution of modification and other workout processes (Dkt. #265 ¶ 152).  Mitchell further alleges that OWB knowingly lacked adequate HAMP systems, processes, staffing, and training (Dkt. #265 ¶ 154).  Though OWB's programmatic failures were known within the company, Mitchell claims that OWB executives declined to fix the problems, leading many wrongful HAMP denials and wrongful foreclosures to occur (Dkt. #265 ¶¶ 154–162).

As to FHA-HAMP, Mitchell alleges that OWB knowingly failed to implement any loss mitigation evaluation system whatsoever and failed to evaluate homeowners for the program itself,

4

despite its affirmative obligation to do so (Dkt. #265 ¶ 7).  More specifically, Mitchell alleges that OWB's subservicer, LoanCare, failed to contact or respond to delinquent homeowners about their potential modifications and engaged in impermissible modifications (Dkt. #265 ¶¶ 97–100).  And, after being alerted to the violations, Mitchell alleges OWB hid them from HUD officials rather than disclosing and resolving the issues (Dkt. #265 ¶ 102).  Along the same lines, after a HUD audit identified specific instances of noncompliance with HUD's rules, OWB was required to remedy the identified noncompliance.  Mitchell alleges, however, that OWB lied to HUD auditors to give the appearance of progress, though it knew it was still not performing loss mitigation (Dkt. #265 ¶¶ 106–110).  Further, according to Mitchell, because OWB's FHA loan portfolio accounted for a small percentage of its mortgage servicing business, OWB management knowingly deprived the FHA portfolio of the time, attention, and resources needed to run a compliant servicing operation (Dkt. #265 ¶¶ 112).  According to Mitchell, these deficiencies resulted in loans not being evaluated on time (if at all) as well as improper modifications on the rare occasions where a modification was completed (Dkt. #265 ¶ 120).

Finally, as to VA-HAMP, Mitchell alleges that OWB ignored its VA mortgage portfolio unless homeowners called to complain, allowing veteran homeowners to languish for up to three years without receiving a proper modification and forcing many into foreclosure (Dkt. #265 ¶ 138). And, prior to 2011, OWB had no loss mitigation program in place for VA loans (Dkt. #265 ¶ 139). Instead, on the rare few occasions that OWB purported to perform loss mitigation evaluations on VA loans, Mitchell claims OWB evaluated the loans under more stringent FHA-HAMP standards, rather than the VA-HAMP standards.  This led to veteran homeowners receiving fewer modifications and suffering more foreclosures (Dkt. #265 ¶ 140).

In contrast to Mitchell's allegations, OWB paints a far different story as to its efforts and

compliance with these programs.  According to OWB, notwithstanding industrywide difficulties, publicly available service assessments and third-party reviews show that OWB was one of the highest-rated servicers participating in HAMP (Dkt. #178 at p. 18).  Further, though Treasury had the power to withhold incentives for HAMP non-compliance, Treasury never did so and consistently paid HAMP incentive payments to OWB until the program expired (Dkt. #178 at p. 19).  Regarding FHA-HAMP, while OWB acknowledges that 2010 and 2015 HUD audits revealed instances of noncompliance, it notes that HUD continued to pay insurance and incentive claims to OWB (Dkt. #178 at pp. 23–26).

## II.    Procedural Background

In December 2012, Relator Michael Fisher ("Fisher") filed suit in the Southern District of New York ("SDNY"), alleging that OWB made false certifications in connection with its participation in Treasury HAMP (Dkt. #60, Exhibit 7).  On July 25, 2014, Fisher filed an amended complaint adding allegations concerning OWB's FHA-HAMP and VA-HAMP programs (Dkt. #178, Exhibit 72).  Fisher attributed the new allegations to Mitchell but did not add Mitchell as a relator (Dkt. #178, Exhibit 72 at ¶ 3 n.4).  On December 22, 2014, with the consent of the Government, Fisher's counsel filed a notice seeking to voluntarily dismiss the SDNY action (Dkt. #188 at p. 2).  The New York district court dismissed the action without prejudice on January 9, 2015 (Dkt. #178, Exhibit 73).

On December 23, 2014, the day after Fisher's counsel filed a notice of voluntary dismissal in the SDNY action, Fisher and Mitchell filed their original complaint in this Court under seal (Dkt. #1).  Their complaint included the same basic allegations as Fisher's amended complaint in the SDNY action, i.e., that OWB violated the FCA with respect to its Treasury HAMP, FHA-HAMP, and VA-HAMP programs (Dkt. #178, Exhibit 77).  On March 14, 2016, the Government

filed its notice of election to decline intervention (Dkt. #10).  On October 21, 2016, Fisher and Mitchell filed an amended complaint under seal (Dkt. #24).  On February 26, 2018, again, the Government declined to intervene, explaining that it had made the "decision not to intervene in this action for cause based on its investigation of the allegations in Relator's Amended Complaint" (Dkt. #43 at p. 1).  In fall 2019, Fisher withdrew as a Relator (Dkt. #51).  On October 11, 2019, Mitchell filed his second amended complaint, which added factual allegations related to OWB's improper dual tracking of loans and a new cause of action under 31 U.S.C. § 3729(a)(1)(G) (Dkt. #52).

On June 24, 2021, OWB filed the present motion (Dkt. #178).  On July 15, 2021, Mitchell filed his response (Dkt. #187).  One day later, on July 16, 2021, Mitchell filed a Rule 56(d) motion, seeking to defer the Court's ruling on the present motion (Dkt. #192).  While Mitchell's motion to defer remained pending, the briefing on the current motion was completed—on August 10, 2021, OWB filed its reply, (Dkt. #197), and, on August 24, 2021, Mitchell filed his sur-reply (Dkt. #205).

On October 25, 2021, this Court granted Mitchell's Rule 56(d) motion, thereby postponing ruling on the present motion until additional discovery was conducted (Dkt. #222).  Further, because the briefing on the present motion had been completed, the Court gave Mitchell until November 30, 2021 to file supplemental briefing (Dkt. #222).  On November 29, 2021, Mitchell filed a motion for leave to amend, requesting that the Court permit him to file a third amended complaint to add allegations concerning OWB's implied false certifications to the VA (Dkt. #242).  One day later, on November 30, 2021, Mitchell filed a supplemental response to the present motion (Dkt. #243).  On December 10, 2021, OWB filed a response to Mitchell's supplemental response (Dkt. #249), and, on December 23, 2021, Mitchell filed a reply to OWB's supplemental response

(Dkt. #254).  On January 24, 2022, the Court granted Mitchell's motion for leave, and Mitchell's Third Amended Complaint ("TAC")[3] was filed on the same day (Dkt. #264; Dkt. #265).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Substantive law identifies which facts are material.  *Id.*  The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact.  FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323.  If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence

---

[3] Though Mitchell's TAC was filed after the briefing on this motion was completed, the Court uses it to summarize the events leading up to the lawsuit and Mitchell's allegations.  While Mitchell's original complaint alleged that OWB made express certifications to the VA, the TAC adds allegations that OWB also made implied certifications to the VA (*see* Dkt. #265).

8

of evidence to support the nonmovant's case.  *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49).  A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment.  *Anderson*, 477 U.S. at 257.  Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden.  Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)).  The Court must consider all the evidence but "refrain from making any credibility determinations or weighing the evidence."  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Mitchell contends that OWB violated the FCA by making false certifications of compliance to obtain payment under three different Government programs—Treasury HAMP, FHA-HAMP, and VA-HAMP.  Thus, Mitchell effectively asserts three different FCA claims.  To prevail on a claim for a violation of the FCA, Mitchell must prove: (1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the Government to pay out money or to forfeit moneys due (i.e., that involved a claim). *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009).

OWB argues that summary judgment is warranted on Mitchell's FCA claims for several reasons (Dkt. #178 at p. 7).  First, OWB argues that the Court lacks jurisdiction to consider any of

Mitchell's claims under the FCA's first-to-file bar (Dkt. #178 at p. 7).  Second, OWB argues that Mitchell's claims fail because he cannot establish one or more of the required elements as to each claim (Dkt. #178 at p. 29).  For example, Mitchell asserts that Mitchell's Treasury HAMP and FHA-HAMP claims fail because he cannot satisfy the scienter and materiality elements (Dkt. #178 at pp. 8–9).  Lastly, OWB contends that Mitchell's VA claim fails because Mitchell cannot adduce any evidence of a certification by OWB to the VA, and thus cannot demonstrate a false statement or fraudulent conduct (Dkt. #178 at p. 9).  The Court examines these arguments in turn.

### I.     Whether Mitchell's Claims Are Barred by the First-to-File Bar

OWB contends that Mitchell's claims must be dismissed under the first-to-file bar because his original complaint in this Court was filed while Fisher's SDNY complaint remained pending (Dkt. #178 at p. 29).  In response, Mitchell offers four arguments as to why his action is not barred by the first-to-file rule.  First, Mitchell asserts that the first-to-file rule is inapplicable because this case was filed by the same plaintiff as the SDNY action (Dkt. #187 at p. 9).  Second, Mitchell argues that the filing of his amended complaint after the dismissal of the SDNY action cured any defect under the first-to-file bar (Dkt. #187 at p. 11).  Third, Mitchell contends a disputed issue of material fact over whether the SDNY action was already subject to dismissal at the time this lawsuit was filed precludes summary judgment (Dkt. #187 at p. 14).  Fourth, Mitchell states that the first-to-file rule does not apply because the first-filed case was subject to challenge under the public disclosure bar (Dkt. #187 at p. 15).  Because the Court finds Mitchell's first argument to be successful, the Court does not address Mitchell's remaining arguments on this matter.[4]

The FCA, which authorizes suits against those suspected of defrauding the Government,

---

[4] Throughout the briefing, the parties also dispute whether the first-to-file bar is jurisdictional or whether it bears on the merits of whether a plaintiff has stated a claim.  Because the Court finds the first-to-file bar inapplicable, the Court also does not address these arguments.

allows private individuals—*qui tam* relators—to sue on behalf of the Government. 31 U.S.C. §§ 3729–30.  "[S]eek[ing] to discourage opportunistic plaintiffs from filing parasitic lawsuits that merely feed off previous disclosures of fraud," Congress created several restrictions on *qui tam* suits. *U.S. ex rel. Branch Consultants v. Allstate Ins. Co*., 560 F.3d 371, 376 (5th Cir. 2009).  One such restriction is the first-to-file bar, which provides that "[w]hen a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).  The rule is designed to "address[] the problems that would result if many relators could file an action based on the same fraud" and "encourages prompt filing from relators desiring to be first to the courthouse." *United States v. Albertsons LLC*, No. SA-15-CV-957-XR, 2018 WL 6609571, at *2 (W.D. Tex. Dec. 17, 2018).  As such, "if the later-filed complaint alleges the same material or essential elements of fraud described in a pending *qui tam* action," the first-to-file rule bars the latter action. *U.S. ex rel. Fisher v. Ocwen Loan Servicing, LLC*, No. 4:12-cv-543, 2015 WL 4039929, at *5 (E.D. Tex. July 1, 2015).  Thus, the rule seems simple: a later-action based on facts underlying a first-filed suit cannot be brought while the first-filed action is pending.  But application of the rule is not so simple.

The Fifth Circuit and this Court have held that the first-to-file rule is not applicable in certain situations. *See Bailey v. Shell W. E&P, Inc*. 609 F.3d 710, 720 (5th Cir. 2010); *Ocwen*, 2015 WL 4039929, at *5; *U.S. ex rel. Fisher v. Homeward Residential, Inc*. No. 4:12-cv-461, 2015 WL 3776478, at *4–*5 (E.D. Tex. June 17, 2015).  Notably, in *Bailey*, the Fifth Circuit held the first-to-file bar was inapplicable when "the same plaintiff, for whatever reason, files the same [FCA] claim in a different jurisdiction . . . ." 609 F.3d at 720 (internal quotation marks omitted). Rather, the Court held that the first-to-file rule only applies "if an FCA claim 'ha[s] already been

filed by *another*. . . .'" *Id*.  Similarly, in *Homeward*, this Court found that the first-to-file rule does not apply to a second relator voluntarily added to an existing complaint in the later-filed suit. 2015 WL 3776478, at *3–*5; *see also Ocwen*, 2015 WL 4039929, at *5 (same).

From these decisions and the text § 3730(b)(5), the Court can delineate some principles that apply to the first-to-file bar.  But, before turning to these principles, the Court finds it helpful to summarize the unique procedural history of this case—facts that make the application of the first-to-file bar even more difficult.  In December 2012, Fisher filed the SDNY action, alleging that OWB made false certifications in connection with its participation in Treasury HAMP (Dkt. #60, Exhibit 7).  On July 25, 2014, Fisher filed an amended complaint in the SDNY action, adding allegations concerning OWB's FHA and VA violations (Dkt. #178, Exhibit 72).  Fisher attributed the FHA- and VA-related allegations to Mitchell in a footnote but did not add Mitchell as a relator at the time (Dkt. #178, Exhibit 72).  On December 22, 2014, with the express consent of the Government, Fisher filed a notice of voluntarily dismissal in the SDNY action (Dkt. #188 at p. 2). The New York district court, however, did not dismiss the action until January 9, 2015 (Dkt. #178, Exhibit 73).

On December 23, 2014, Fisher, along with Mitchell, filed the original complaint in this action under seal (Dkt. #1).  The original complaint included the same basic allegations as the amended complaint of the SDNY action, including that OWB violated the FCA with respect to Treasury HAMP, the FHA insurance program, and the VA mortgage insurance program (Dkt. #178, Exhibit 77).  In the fall of 2019, Fisher withdrew as a relator, leaving Mitchell as the sole relator in this action (Dkt. #51).  Mitchell subsequently amended his complaint twice.

Turning back to the text of § 3730(b)(5) and prior decisions interpreting the bar, several things are clear.  First, under the text of the statute, it is clear that if only Mitchell, as opposed to

Mitchell and Fisher, had brought the original action in this Court while Fisher's SDNY action was pending, it would be barred under the first-to-file rule. *See* 31 U.S.C. § 3730(b)(5) ("When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.").  Second, under *Bailey*, it is clear that if Fisher was the only relator in both actions, the first-to-file bar would not apply. *See* 609 F.3d at 720 (holding the first-to-file to be inapplicable when the same plaintiff files the same FCA claim in a different jurisdiction).  Third, under *Homeward*, it is also clear that if Fisher had added Mitchell as a co-relator when he amended his complaint to add Mitchell's new allegations in the SDNY action, the first-to-file rule would not have applied. *See* 2015 WL 3776478, at *5 (holding the first-to-file rule does not bar a voluntarily added relator in an existing case).  But what is not clear is the consequence of Fisher and Mitchell bringing this action together, specifically, whether *Bailey* and *Homeward* apply or whether Mitchell joining Fisher in filing this action constitutes an impermissible attempt to "*bring* a related action based on facts underlying the pending action." *See* 31 U.S.C. § 3730(b)(5).

On the one hand, this determination presents a question of statutory interpretation. As such, the Court must start its analysis with the text of the statute. *United States v. Lauderdale Cnty.*, 914 F.3d 960, 961 (5th Cir. 2019).  Turning to the statute, § 3730(b)(5) provides: "[w]hen a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). Thus, the plain language of §3730(b)(5) is clear—"no person *other than the Government*" may bring a related action.  Accordingly, the unequivocal language appears to apply equally to the original relator as any other person.  Indeed, the original relator is undeniably a "person other than

the Government."  As such, the plain language of §3730(b)(5) seems to bar all later-filed related actions that are not brought by the Government—even actions filed by the same relator.

On the other hand, this Court is obliged to follow the decisions of the Fifth Circuit.  *See Texas v. Alabama Coushatta Tribe of Tex.*, 298 F. Supp. 3d 909, 924 (E.D. Tex. 2018) (noting the court is bound by the Fifth Circuit precedent).  And, in *Bailey*, the Fifth Circuit examined the first-to-file bar and held that it "does not apply when the same plaintiff, for whatever reason, files the same claim in a different jurisdiction." 609 F.3d at 720 (internal quotations and citations omitted). In *Bailey*, the issue before the Court was whether the first-to-file rule bars the same relator from making the same FCA claim in a different jurisdiction—the question now before the Court.  In answering the question, the Court made clear that the first-to-file bar does not apply when the same relator files the same claim in different jurisdictions because the bar only prohibits subsequent actions filed by *another*. 609 F.3d at 720 (emphasis in *Bailey*).  Further, the Court explicitly stated that it "agree[d] with the reasoning of the District of Colorado court," *Id.*, which had found that "[i]t would be reasonable to read the [first-to-file bar] as prohibiting the same claim being made by a different party rather than the same party" because "[w]ith such an interpretation, the first-to-file rule would attach and eliminate duplicative proceedings while still serving the purposes of the False Claims Act." *United States v. Kinder Morgan Co2 Co.*, No. 04-cv-00716, 2005 WL 3157998, at *2 (D. Colo. Nov. 21, 2005).

Thus, the Fifth Circuit's interpretation of the first-to-file bar is clear. Accordingly, the Court must adhere to the Court's decision in *Bailey* as the proper interpretation of § 3730(b)(5). *See Concerned Citizens for Equality v. McDonald*, 863 F. Supp. 393, 404 n.22 (E.D. Tex. 1994) (citation omitted) (discussing the vertical component of the stare decisis doctrine which "commands trial courts to adhere to its jurisdiction's appellate court precedents and ultimately,

those of the United States Supreme Court.").  In *Bailey*, the Court squarely held that the first-to-file bar "does not apply when the same plaintiff, for whatever reason, files the same claim in a different jurisdiction . . . ." *Bailey*, 609 F.3d at 720 (internal quotations omitted).  This unequivocal holding has not been overruled, and therefore, this Court is bound by the principle of stare decisis to follow this holding.

Admittedly, the Court acknowledges that *Bailey* does not address the precise issue here— the effect of the first-to-file bar when the same relator files the same claim in a different jurisdiction, yet the second suit also includes an additional relator.  However, the Court finds that the addition of Mitchell as a co-relator in this action does not change the outcome under *Bailey*. First, as Mitchell notes, *Bailey* found the first-to-file rule inapplicable despite the fact that—like here—there was not complete identity of relators in the first-filed and second-filed lawsuits. *See id.*  For example, in *Bailey*, two relators brought FCA claims in the District of Colorado, but, subsequently, just one of the two relators asserted the FCA claims as counterclaims in a Texas lawsuit. *Id.*  Notwithstanding the change, the Fifth Circuit concluded that the first-to-file rule was inapplicable because both actions involved the same plaintiff and the same claims in different jurisdictions.  *Id.* at 721.  Similarly, here, both the SDNY action and the current action were filed by Fisher and involve the same claims—adding Mitchell does not transform application of the first-to-file rule.  Second, barring the action in this case would contravene the Court's holding in *Bailey*.  Indeed, the Court would effectively be barring an action filed by the same plaintiff bringing the same claim in a different jurisdiction.  Simply put, either the first-to-file bar applies to suits asserting the same FCA claims filed by the same relator, or it does not.  The Fifth Circuit has unequivocally held that it does not.  And this Court must faithfully follow this precedent.

That the first-to-file rule is inapplicable here becomes more evident when looking at both

*Bailey* and *Homeward*. *See Bailey*, 609 F.3d at 720; *Homeward*, 2015 WL 3776478, at *4.   In *Bailey*, the Court held that the first-to-file bar is inapplicable when the same plaintiff files the same claim in a different jurisdiction.   609 F.3d at 720.   And, in *Homeward*, this Court held that the first-to-file rule does not apply to a second relator who is voluntarily added to an existing *qui tam* complaint. 2015 WL 3776478, at *4–*5.[5]  Thus, under *Bailey* and *Homeward*, the first-to-file rule would bar neither Fisher from bringing this action, nor the subsequent addition of Mitchell. *See Bailey*, 609 F.3d at 720; *Homeward*, 2015 WL 3776478, at *4.   Therefore, precedent guides the Court's conclusion that the first-to-file bar does not apply in this instance.

In reaching this conclusion, the Court does not ignore the plain meaning of the statute, but merely adheres to the Fifth Circuit's interpretation of the statute.   Indeed, in *Bailey*, after considering the text and policy goals of the statute, the Court construed § 3730(b)(5) to be inapplicable to a plaintiff who files the same claim in a different jurisdiction. And, here, the original relator, Fisher, along with Mitchell, filed the same FCA claim in a different jurisdiction. Consequently, barring the action because Mitchell brought it with Fisher would not comport with *Bailey* and its interpretation of the statute, which expressly allows a relator to file the same claim in a different jurisdiction. *Id.*   Further, barring this action because Mitchell was added as a co-relator "would not advance the purpose of the fist-to-file bar." *Homeward*, 2015 WL 3776478, at *5. As this Court has previously recognized, barring the addition of a second relator "could have

---

[5] In *Homeward*, this Court relied on a Tenth Circuit decision that held that a voluntarily added second relator would not be barred because the addition of the party would not be "an intervention" within the meaning of Rule 24. 2015 WL 3776478, at *4 (quoting *Precision Co v. Koch. Indus., Inc..,* 31 F.3d 1015, 1017 (10th Cir. 1994)).  However, the Court also rejected other decisions applying the first-to-file bar because the relator "made new allegations within the amended complaint." *Homeward*, 2015 WL 3776478, at *4.  Thus, it is unclear how much weight this Court put on the fact that the relator had made new allegations within the amended complaint.  Nevertheless, the Court also notes that the Third Circuit recently held that the first-to-file bar does not bar voluntarily adding parties to an existing suit—whether or not the new party adds allegations to the complaint. *See In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig.* (No. II), 974 F.3d 228, 233 (3d Cir. 2020).

a negative consequence of discouraging voluntary agreements between relators with information concerning related claims against a single defendant and decrease judicial efficiency." *Id.*

For the reasons above, the Court finds the first-to-file rule inapplicable.  Accordingly, the Court turns to OWB's arguments regarding whether Mitchell has established the required elements as to this FCA claims.  Because OWB asserts that Mitchell's Treasury HAMP and FHA-HAMP claims fail for the same reasons—that he cannot establish the scienter and materiality elements— the Court examines Mitchell's Treasury HAMP and FHA-HAMP claims together, beginning with the materiality requirement and then turning to the scienter requirement.  Then the Court turns to OWB's arguments regarding Mitchell's VA claim.

## II.   Whether Mitchell's Treasury HAMP and FHA-HAMP Allegations Meet the Materiality Requirement

### A.  Applicability of Materiality Requirement

Mitchell brings his claims under 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G).[6]  As noted, to prevail on a claim under the FCA, Mitchell must prove: (1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the Government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *Longhi*, 575 F.3d at 467.  OWB argues that summary judgment is warranted as to Mitchell's Treasury HAMP and FHA-HAMP claims because Mitchell fails to satisfy the FCA's materiality requirement.  In response, Mitchell argues his express false claims under § 3729(a)(1)(A) do not require a showing of materiality (Dkt. #187 at p. 16).  Thus, he argues the

---

[6] Subsection (A) creates liability for anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).  Subsection (B) creates liability for anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* at § 3729(a)(1)(B).  Subsection (G), sometimes referred to as the reverse false claims section, creates liability for anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *Id.* at § 3729(a)(1)(G).

Court should not grant summary judgment on the basis of materiality because it is not a requirement for claims under § 3729(a)(1)(A) (Dkt. #187 at p. 16).  Accordingly, the Court first considers whether a showing of materiality is required for express claims under § 3729(a)(1)(A).

Mitchell contends that materiality is not a requirement for express false claims brought under 31 U.S.C. § 3729(a)(1)(A) because neither the text of the statute nor the common law impose the requirement (Dkt. #187 at pp. 16–17).  First, Mitchell argues that unlike other FCA provisions such as 31 U.S.C. §§ 3279(a)(1)(B) and (G), which explicitly require a showing of materiality in the text of the statute, the plain language of § 3279(a)(1)(A) does not require a showing of materiality (Dkt. #187 at p. 16).  Second, Mitchell contends that the common law also does not support a materiality requirement, pointing out that the Supreme Court has rejected the notion that "at common law the term 'false statement' acquired any implication of materiality" (Dkt. #187 at p. 17 (quoting *United States v. Wells*, 519 U.S. 482, 491 (1997)).  While Mitchell acknowledges that the Supreme Court's decision in *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176 (2016) imposed a materiality requirement for claims under § 3729(a)(1)(A), he argues *Escobar* only established a materiality requirement for "implied" false claims (Dkt. #187 at p. 16).

The Court finds Mitchell's argument to be without merit.  Although *Escobar*, which itself was a § 3729(a)(1)(A) case, involved an implied false certification claim, "nothing in the opinion suggests that its materiality requirement was intended to be limited to that specific theory of liability." *U.S. ex rel. Foreman v. AECOM*, 19 F.4th 85, 105 (2d Cir. 2021) (discussing *Escobar*, 579 U.S. at 191).  To the contrary, the Court examined the language of § 3729(a)(1)(A) generally and concluded that it incorporates a common-law materiality requirement. *Id*.  Simply put, the Supreme Court broadly held that "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in

order to be actionable under the False Claims Act." *Escobar,* 579 U.S. at 181.

Further, as OWB notes, post-*Escobar*, the Fifth Circuit has routinely applied the materiality requirement to express misrepresentation claims under the FCA. *See, e.g., United States v. Hodge*, 933 F.3d 468, 473 (5th Cir. 2019); *U.S. ex rel. Harman v. Trinity Indus. Inc*., 872 F.3d 645, 647, 654 (5th Cir. 2017); *Abbott v. BP Expl. & Prod., Inc*., 851 F.3d 384, 387 (5th Cir. 2017). Moreover, other circuits have also concluded that *Escobar* imposes a materiality requirement on all claims under § 3729(a)(1)(A). *See U.S. ex rel. Mamalakis v. Anesthetix Mgmt. LLC*, 20 F.4th 295, 300, 301 n.1 (7th Cir. 2021); *Foreman*, 19 F.4th at 105; *U.S. ex rel. Janssen v. Lawrence Mem'l Hosp*., 949 F.3d 533, 539 n.8 (10th Cir. 2020). Accordingly, the Court finds that materiality is a required element for express false claims under § 3729(a)(1)(A). Since all of Mitchell's claims require a showing of materiality, the Court now turns to whether Mitchell's Treasury HAMP and FHA-HAMP claims satisfy this requirement.

### B. Materiality Analysis

In *Escobar*, the Supreme Court clarified how courts should interpret the materiality requirement. 579 U.S. at 192. The unanimous Supreme Court explained that the materiality standard "is demanding," as it serves to protect the FCA from being transformed into "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 194. Further, the Supreme Court noted that the FCA itself defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at 192–93. Thus, "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id*. at 193 (internal citations and quotations omitted). It asks whether "a reasonable person would attach importance to" the misrepresented fact in making his or her payment decision. *Id*. at 193 n.5 (quoting Williston on Contracts, § 69:12).

The Supreme Court further explained some of the evidence relevant to the materiality issue: (1) "the Government's decision to expressly identify a provision as a condition of payment[,]" (2) "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement'" and (3) whether "noncompliance is minor or insubstantial." *Id.* at 194–95. Importantly for this case, the Supreme Court expounded further:

> [I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id*. at 195.  Since *Escobar*, the Fifth Circuit has reiterated that "[t]he materiality test under the FCA is demanding." *U.S. ex rel. Lemon v. Nurses to Go, Inc*., 924 F.3d 155, 161 (5th Cir. 2019). Further, the Fifth Circuit has confirmed that "[n]o one factor is dispositive, and [the] inquiry is holistic." *Id.*

OWB asserts that Mitchell cannot meet *Escobar*'s demanding standard (Dkt. #178 at p. 33).  According to OWB, because the Government continued to pay Treasury HAMP incentives and FHA claims even after it became aware of OWB's non-compliance, the allegedly false certifications were immaterial to the Government's payment decision (Dkt. #178 at pp. 33, 37). Mitchell responds that OWB's argument is flawed for several reasons (Dkt. #187 at p. 19).  First, Mitchell points out that "the [G]overnment's continued payment is only relevant when [the Government] has *actual knowledge* of a defendant's noncompliance" (Dkt. #187 at p. 19) (emphasis in original).  Second, Mitchell argues that the Government's continued payment is *not* dispositive of materiality, and other factors that are equally relevant weigh in favor of materiality (Dkt. #187 at p. 24).  The Court addresses these arguments in turn.

### 1.   The Government's Continued Payments

Accordingly, the main dispute between the parties' centers on the significance of the Government's continued payment to OWB.  Here, it is undisputed that Treasury consistently paid HAMP incentives to OWB until HAMP expired in 2020, and HUD continued to pay insurance and incentive claims to OWB until 2018, at which point OWB's remaining loans were transferred to a sub-servicer.  But what is highly disputed is the Government's knowledge of the purported violations and how much weight this should be given in the materiality determination.

As the Fifth Circuit has explained, "though not dispositive, continued payment by the federal [G]overnment after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." *Harman,* 872 F.3d at 663; *see also Escobar*, 579 U.S. at 195 ("[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."). However, the Government's continued payment after discovery of fraud does not necessarily preclude a finding of materiality. *Harman*, 872 F.3d at 663 (recognizing that continued payment by the federal government is not dispositive).  What is more, as this Court has previously held, "[i]t is the Government's actual knowledge of the fraud—not mere awareness of it—that is particularly relevant to the Government's payment decision." *U.S. ex rel. Fisher v. JPMorgan Chase Bank N.A*., No. 4:16-cv-00395, 2020 WL 3265060, at *8 (E.D. Tex. June 17, 2020).

OWB points to two pieces of evidence to show that the Government was aware of OWB's alleged non-compliance.  First, OWB contends that "Mitchell's lawsuit, together with the [G]overnment's subsequent investigation of his complaint, provided the [G]overnment" with knowledge of OWB's alleged Treasury HAMP and FHA violations (Dkt. #197 at p. 10).  Second, for the alleged FHA violations, OWB asserts the Government likewise had knowledge of them

"because the extensive audits HUD completed in 2010 and 2015 revealed all of the major violations Mitchell claims to have uncovered" (Dkt. #197 at p. 11).  The Court examines these arguments in turn.

### i.      The Filing of Mitchell's Complaint and the Government's Subsequent Investigation

As noted, OWB argues that Mitchell's lawsuit and the Government's subsequent investigation show the Government was aware of the purported Treasury HAMP and FHA-HAMP violations (Dkt. #197 at p. 10). While OWB recognizes this Court has previously "drawn a distinction between 'mere awareness' of allegations and 'actual knowledge of the fraud,'" OWB argues the Government was more than "merely aware" of Mitchell's allegations in this case (Dkt. #178 at p. 33).  Here, according to OWB, "the [G]overnment made clear in this case that it *has* investigated the allegations in this complaint, explaining in a February 26, 2018 filing in this Court that it declined to intervene 'for cause based on its investigation of the allegations in the Relators' Amended Complaint'" (Dkt. #178 at pp. 33–34).  Thus, because the Government itself affirmed that it investigated the allegations, and yet continued to make payments, "[t]hat is overwhelmingly strong evidence of immateriality" (Dkt. #197 at p. 10).  In response, Mitchell contends that "the Government's investigation into Relator's *allegations* does not somehow transform those *allegations* into actual knowledge of the fraud" (Dkt. #205 at p. 12).

Here, the Court finds that the Government's decision and explanation to deny intervention based on its investigation is probative of materiality, but not dispositive on the issue. *See U.S. ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 507 F. Supp. 3d 734, 767 (W.D. Tex. Dec. 14, 2020) ("That the Government conducted an investigation is certainly probative of materiality, but without evidence of actual knowledge, the Court cannot apply the strong presumption of immateriality highlighted by *Escobar*.").  First, as noted previously, "[i]t is the Government's

actual knowledge of the fraud—not mere awareness of it—that is particularly relevant to the Government's payment decisions." *JPMorgan Chase Bank N.A.*, 2020 WL 3265060 at \*8; *see also Harman*, 872 F. 3d at 661 ("Unlike in the case we decide today, the [First Circuit] found no evidence that the relevant Government agency had *actual knowledge* of any violations when it decided to pay the claims.") (emphasis added) (citing *United States ex rel. Escobar v. Universal Health Servs., Inc.* (*Escobar II*), 842 F.3d 103, 110 (1st Cir. 2016)).

Thus, contrary to OWB's argument, the Government's investigation into Mitchell's allegations followed by its continued payment does not indicate the Government had actual knowledge of OWB's noncompliance. *See Montcrieff*, 507 F. Supp. 3d. at 766–67 (finding that the Government's investigation into plaintiff's allegations and declination to intervene did not warrant the conclusion that the Government was aware of the fraud itself); *U.S. ex rel. Campbell v. KIC Dev., LLC*, No. EP-18-CV-193-KC, 2019 WL 6884485, at \*11 (W.D. Tex. Dec. 10, 2019) ("[T]he Government's actual knowledge that it has been defrauded is not necessarily imputed from its awareness that allegations of fraud have been brought by a relator.").  Further, the Court's conclusion is reinforced by the fact that there is no evidence that Treasury and HUD—the entities who continued to pay OWB—had knowledge of significant violations alleged in Mitchell's complaint, including OWB's improper dual tracking and OWB's failure to implement an FHA-HAMP modification option (Dkt. #187 at pp. 21–23).

Moreover, other courts agree that the Government's decision to decline intervention is insufficient to establish a lack of materiality. *See Janssen*, 949 F.3d at 542 n.12 (declining to put much weight on the fact that DOJ was aware of the allegations and declined intervention); *U.S. ex rel. Prather v. Brookdale Senior Living Cmtys., Inc*., 892 F.3d 822, 836 (6th Cir. 2018) (rejecting argument that Government's declination to intervene is relevant to materiality); *Campbell*, 2019

WL 6884485, at *12 ("[T]he Government did not necessarily have actual knowledge of the alleged fraud simply because the relator filed this action."); *see also U.S. ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 455 (5th Cir. 2005) (finding the district court's speculation as to the motives of the Government's actions in not joining an FCA action to be unreasonable).

While OWB attempts to distinguish this case from others based on the Government's specific language in its notice, the Court finds this argument unconvincing.  According to OWB, because the Government's notice stated that it declined to intervene "for cause based on the investigation of the allegations in the Relators' Amended Complaint," this shows the Government "was more than merely *aware* of *allegations*" (Dkt. #197 at p. 10).  Though OWB appears to put great weight on this difference, the Court declines to do so.  If the Government's notice of declination and the language in it were dispositive, then this would make the Government's intervention decision conclusive of materiality.  But that would "undermine the purposes of the FCA, which is explicitly designed to permit private persons to litigate suits in lieu of the Government." *Janssen*, 949 F.3d at 542 n.12.  Thus, OWB's attempt at distinguishing this case from others falls short—the Government's notice of declination of intervention is insufficient to establish lack of materiality.  Without more evidence concerning the Government's knowledge of the alleged fraud, the Court finds that Mitchell's lawsuit and the Government's subsequent investigation coupled with the Government's continued payments does not preclude a finding of materiality.

The Court now turns to OWB's argument that the HUD audits in 2010 and 2015 show that the Government had actual knowledge of the alleged FHA violations.

### ii.        The HUD 2010 and 2015 Audits

OWB also argues that the Government had actual knowledge of the alleged FHA violations "because the extensive audits HUD completed in 2010 and 2015 revealed all of the major violations Mitchell claims to have uncovered" (Dkt. #197 at p. 11).  In fact, OWB contends its correspondence with HUD regarding the 2010 audit leaves no doubt that HUD "understood the specific alleged violations that the complaint attributed to Mitchell [] and [] amply investigated those violations to draw its own conclusions about the extent of any violation" (Dkt. #178 at p. 38).  Further, OWB contends the 2015 audit uncovered other areas of noncompliance, including concerns about the training of OWB's loss-mitigation personnel (Dkt. #178 at p. 38).  But, despite knowledge of the violations alleged in Mitchell's complaint, HUD never once denied payment (Dkt. #178 at p. 38).  Yet HUD took other remedial measures, like requiring OWB to refund HUD for claims made on one loan and seeking indemnification on three other claims (Dkt. #178 at p. 39).  Thus, "the fact that the Government took remedial action *other than* withholding payment only underscores the lack of materiality" (Dkt. #178 at p. 40).

In response, Mitchell contends that the evidence shows "the HUD audits did not uncover *major* violations by [OWB], including [OWB]'s widespread dual tracking and the fact that [OWB] *did not even have* an FHA-HAMP modification option at the time that [OWB] misrepresented to the Government agencies that it was in the process of curing the deficiencies found by HUD . . ." (Dkt. #205 at p. 13).  Further, according to Mitchell's expert, Nelson Locke, OWB concealed from the Government (1) that OWB (and not LoanCare) was directly responsible for financial analysis calculation errors; (2) that OWB made automatic "robo-calls" instead of qualifying collection attempts; (3) that OWB had improperly modified certain loans to a term of 40 years; and (4) that OWB made false assurances to HUD that OWB was already in the process of curing

certain deficiencies (Dkt. #191, Exhibit 1 at 93–94).  According to Mitchell, testimony from Mollie

Schiffman, another former employee of OWB, also confirms that many of the representations

OWB made to HUD auditors in 2010 were false (Dkt. #187 at p. 23).  Further, while conceding

that the 2015 audit revealed additional concerns about the training and knowledge of OWB's loss-

mitigation personnel, Mitchell claims OWB still "did not disclose to HUD the true extent of its

liability for [OWB's] FHA portfolios" (Dkt. #187 at p. 23).

Accordingly, the parties vigorously dispute the extent of the information the Government

gleaned from the 2010 and 2015 audits.  Thus, OWB's argument on this point suffers the same

fate as its previous argument—there are genuine disputes of material fact concerning whether the

Government had actual knowledge of OWB's noncompliance as a result of the audits.  While the

audits certainly uncovered some violations, Mitchell has also presented evidence that OWB

concealed major violations from the Government.  Specifically, Locke's Report, as well as

testimony by Mitchell and Schiffman, indicate that OWB misrepresented and concealed significant

violations from the Government, as well as the true extent of OWB's liability.  Further, that HUD

addressed OWB's violations through remedies other than nonpayment does not foreclose

Mitchell's FHA-HAMP claims. *See United States v. Ocwen Loan Serving, LLC*, No. 4:12-CV-

461, 2016 WL 2992229, at *6 (E.D. Tex. May 24, 2016) ("[T]he Court finds that the alternative

remedies do not foreclose an FCA claim.").

In sum, while OWB argues Mitchell's complaint and the Government's subsequent

investigation as well as the HUD audits show the Government had actual knowledge of OWB's

noncompliance with Treasury HAMP and FHA-HAMP, there are factual disputes concerning what

the Government knew and when. *See Ocwen*, 2016 WL 299229, at *7 n. 3 ("Defendants have also

not demonstrated that [the Government] had full knowledge of the alleged violations or the extent

to which Defendants were allegedly falsely certified within the SPA and annual certifications. Therefore, the Court finds that this issue is not appropriate for summary judgment determination."). Accordingly, the Government's continued payments in this case is not dispositive of materiality. Nonetheless, the Court finds summary judgment is not appropriate for an additional reason—other factors weigh in favor of materiality.

## 2. Other Evidence of Materiality

The Government's continued payments despite actual knowledge of a defendant's violations is only one factor in the materiality analysis and thus not dispositive. *See Lemon*, 924 F.3d at 161 ("No one factor is dispositive, and [the] inquiry is holistic."). While OWB contends that "Mitchell cites no contrary evidence that could outweigh" the Government's continued payments (Dkt. #197 at p. 10), the Court disagrees—Mitchell has offered evidence of other factors laid out in *Escobar* that weigh in favor of materiality.

For example, one factor *Escobar* identifies as relevant to materiality is whether the Government "expressly identif[ied] a provision as a condition of payment." 579 U.S. at 194. Mitchell provides evidence, which OWB does not dispute, that OWB's compliance with the laws, regulations, and guidance was an express condition of payment under HAMP (Dkt. #187 at p. 25 (citing Dkt. #191, Exhibit 1)). Indeed, "[a]s a 'condition precedent to payment,' [OWB] was required to certify annually that its performance conformed to the rigid program requirements and to identify known areas of non-compliance" (Dkt. #187 at pp. 25–26 (citing Dkt. #191, Exhibit 1)).

*Escobar*'s materiality analysis also looks at whether "noncompliance is minor or insubstantial." 579 U.S. at 194. Here, Mitchell offers evidence that OWB's noncompliance was "not minor or insubstantial," but went to the "essence of the bargain." *Id.* at 193 n.5, 194.

Mitchell's damages expert, David Fuller, estimates that OWB received more than $490 million in payments from the Government in connection with its HAMP programs through the end of 2015 (Dkt. #187 at p. 28) (citing Dkt. #191, Exhibit 4 ¶ 27).  And, excluding amounts that were paid for OWB to pass on to investors and borrowers, Fuller estimates OWB was paid over $167 million for providing materially non-compliant loan servicers (Dkt. #191, Exhibit 4 ¶ 28).  Undoubtedly, the Government would attach importance to such a large sum of money.  Further, Mitchell also offers evidence "that the Government has consistently refused to pay claims when it has knowledge of similar violations" (Dkt. #187 at p. 26 (citing Dkt. #191, Exhibit 1 at p. 112)).  In particular, Mitchell points to Treasury's withholding of incentive payments to Bank of America, J.P. Morgan Chase, and Wells Fargo until their performance was substantially improved in HAMP after they failed to prevent foreclosures (Dkt. #187 at pp. 26–27).

Mitchell also argues that OWB "knew that the [G]overnment refuses to pay claims for similar violations because, pursuant to HUD instructions, [OWB] issued refunds to HUD whenever HUD correctly identified deficiencies in [OWB]'s loss mitigation programs" (Dkt. #187 at p. 27).  Mitchell further points to the existence of statutory penalties for a mortgagee's failure to engage in loss mitigation activities under FHA-HAMP as an indication that the Government attaches importance to the underlying violations (Dkt. #187 at p. 27).  And Mitchell argues that improperly snapped-back spreadsheets that "reflect [OWB]'s analysis of the scope of its 'exposure,'" "show[] that OWB knew HUD would not have paid OWB . . . had HUD known that [OWB] improperly modified loans to 40-year terms or that [OWB] failed to even attempt workouts for many loans" (Dkt. #243 at pp. 4–5).

In response to Mitchell's evidence supporting other materiality factors, OWB rehashes its argument that the Government's continued payment "is definitive evidence of non-materiality"

and is not outweighed by Mitchell's other evidence (Dkt. #197 at pp. 12–13).  The Fifth Circuit, however, has made clear that no one factor is dispositive. *See Lemon*, 924 F.3d at 161 ("No one factor is dispositive, and [the] inquiry is holistic."); *Abbott*, 851 F.3d at 388 (noting the government's continued approval after substantial investigation into plaintiffs' allegations represented "strong evidence" that had not been rebutted by any evidence proffered by the plaintiffs).  Here, given that certain evidence weighs in favor of materiality, summary judgment is inappropriate.

In sum, the Court finds that disputed issues of material fact preclude summary judgment on materiality.  First, there are factual disputes concerning the extent of the Government's knowledge.  Indeed, the parties highly dispute what exactly the Government knew and when.  Second, even if the Government had actual knowledge of OWB's noncompliance, other factors weigh in favor of materiality.  Thus, the cases cited by OWB are distinguishable.  For example, in *Harman*, unlike this case, the evidence at trial demonstrated that the government agency had actual knowledge of the violations, thoroughly investigated them, expressly approved the traffic guardrail system despite the violations, and approved reimbursement. 872 F.3d at 647, 663–64.  Further, in many of the other cases, the relators failed to identify evidence supporting a finding of materiality.  By contrast, Mitchell has pointed to evidence showing that Treasury and FHA were unaware of significant violations and identified other evidence supporting a finding of materiality.  Thus, summary judgment is inappropriate.  To be sure, Mitchell and OWB have each provided evidence that could reasonably be construed to favor their materiality arguments.  However, the Fifth Circuit commands the Court not to weigh this evidence. *See Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009).

**III.    Whether Mitchell's Treasury HAMP and FHA-HAMP Allegations Meet the Scienter Requirement**

Having considered whether Mitchell's Treasury HAMP and FHA claims meet the materiality element, the Court must next address whether Mitchell's Treasury HAMP and FHA-HAMP claims satisfy the scienter requirement.  To prove that the false statements were made with the requisite level of scienter, Mitchell must show that OWB had either "(1) actual knowledge of falsity, (2) acted with deliberate ignorance of the truth or falsity of the information provided, or (3) acted with reckless disregard of the truth or falsity of the information provided" to the Government. *Longhi*, 575 F.3d at 468.  While no proof of specific intent to defraud is required, mere negligence or even gross negligence does not satisfy the scienter requirement. *Id.*  Further, like materiality, the scienter requirement is "rigorous" and must be "strict[ly] enforce[d]." *Escobar*, 579 U.S. at 192.  However, when "state of mind is an essential element," "it is less fashionable to grant summary judgment because a party's state of mind is inherently a question of fact which turns on credibility." *Int'l Shortstop, Inc. v. Rally's, Inc*., 939 F.2d 1257, 1265 (5th Cir. 1991).  But the "presence of an intent issue does not automatically preclude summary judgment; the case must be evaluated like any other to determine whether a genuine issue of material fact exists." *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996).

OWB makes several arguments for why Mitchell falls short of satisfying the scienter requirement.  First, with respect to Mitchell's Treasury HAMP allegations, OWB contends that its extensive policies, procedures, and controls to ensure compliance foreclose a finding of the necessary scienter (Dkt. #178 at p. 35).  Relatedly, OWB claims that the record evidence that "OWB repeatedly sought and received guidance from Treasury to ensure its compliance" indicates that OWB did not act with the requisite scienter (Dkt. #178 at p. 36).  Further, according to OWB, given the numerous external audits and investigations and "consistent feedback that [OWB]'s

performance was outstanding and that it was in compliance, no reasonable juror could conclude that OWB actually knew (or was in reckless disregard) that it was in fact in material violation of HAMP rules" (Dkt. #178 at p. 37).

Second, as to Mitchell's FHA claims, OWB asserts similar arguments for why Mitchell cannot make the requisite showing of scienter—relying significantly on the correspondence between HUD and OWB as a result of the audits (Dkt. #178 at p. 40).  For example, OWB asserts the so-called "government knowledge defense," claiming that "[t]he extensive correspondence between [OWB] and HUD regarding HUD's audit findings, including [OWB]'s acknowledgement of numerous violations and its cataloging of ongoing efforts to come into compliance, negate any possibility that Mitchell will be able to show the necessary scienter" (Dkt. #187 at p. 40).

In response, Mitchell argues that there are at least disputed issues of material fact regarding these issues (Dkt. #187 at p. 31).  For example, with respect to Mitchell's Treasury HAMP allegations, Mitchell points to Locke's Report and internal emails from OWB as evidence that OWB knew it was engaging in systematic dual tracking (Dkt. #187 at pp. 31–32).  Additionally, according to Mitchell, OWB's "scrubbing" of many of its loan files suggests an attempt to conceal its misconduct from later discovery (Dkt. #187 at p. 33).   Further, Mitchell contends that his declaration and Schiffman's testimony confirm that OWB knowingly engaged in dual tracking (Dkt. #187 at p. 33; Dkt. #205 at p. 14).  With respect to Mitchell's FHA-HAMP allegations, Mitchell contends that his declaration and Schiffman's testimony show that OWB knowingly failed to report and intentionally concealed FHA-HAMP violations from HUD (Dkt. #205 at p. 15).  Moreover, Mitchell contends the improperly snapped-back spreadsheets show that OWB knew it had improperly modified FHA loans to 40-year terms in material violation of FHA-HAMP (Dkt. #243 at p. 5).  And finally, with respect to OWB's assertion of the government-knowledge

defense, Mitchell argues it is not applicable because there are fact issues "concerning whether the Government had actual knowledge of OWB's noncompliance . . ." (Dkt. #187 at p. 34).

Here, the Court finds that there are genuine factual disputes over whether OWB had the requisite scienter.  Mitchell's evidence, including his declaration, Schiffman's testimony, Locke's Report, internal emails, and the improperly snapped-back spreadsheets, demonstrate there is a disputed material fact concerning whether OWB had the requisite scienter.  Further, OWB's argument to the contrary are unconvincing.  While OWB asserts that "Fifth Circuit precedent makes clear that evidence of *violations* is not evidence of the requisite *scienter*," (Dkt. #197 at p. 14), Mitchell's evidence goes beyond showing that OWB simply engaged in violations like dual tracking—it indicates OWB had actual knowledge of these violations.  Indeed, Mitchell's declaration and Schiffman's testimony are especially probative on this point (Dkt. #164, Exhibit 2; Dkt. #189; Dkt. #206, Exhibit 30).  Further, contrary to OWB's suggestion, Schiffman's testimony as to the dual tracking is relevant—Mitchell's expert states that Treasury prohibited dual tracking as early as 2009 and Schiffman testified that she observed instances of dual tracking "that were actually a violation of a law or regulation" (Dkt. #205 at p. 14).  And while it is true that OWB had extensive procedures in place to ensure compliance and that external audits revealed that OWB was among the best servicers in the Treasury HAMP program, there is also evidence that OWB knew its systems failed to stop certain violations, yet OWB concealed this from the Government.

Lastly, contrary to OWB's argument, OWB's dialogue with Treasury concerning compliance with HAMP and extensive correspondence with HUD regarding HUD's audit findings do not negate any possibility that Mitchell can show the necessary scienter.  First, as Mitchell notes, the so-called "government knowledge defense" "serves simply as a factor weighing against

the defendant's knowledge, as opposed to a complete negation of the knowledge element." *United States v. Bollinger Shipyards, Inc*., 775 F.3d 255, 264 (5th Cir. 2014).  Second, the "government knowledge defense" applies only if "the claimant knew that the [G]overnment knew of the falsity of the statement and was willing to pay anyway." *Id.* at 263 (internal quotations omitted).  Here, as noted, there are disputed issues of material fact concerning what the Government knew and when.  Thus, though the HUD audits revealed areas of non-compliance and indicate that OWB and the Government were working together to fix these issues, other evidence indicates that OWB knowingly concealed significant issues from the Government (*see* Dkt. #164, Exhibit 2 ¶¶ 8–9; Dkt. #189; Dkt. #206, Exhibit 30).  Accordingly, while OWB's dialogue with the Government is relevant, it is not dispositive—especially when the evidence indicates that there are genuine issues of material fact concerning the extent of the Government's knowledge.

In short, given the several disputed facts with respect to scienter, summary judgment is inappropriate.  While OWB presents persuasive evidence demonstrating that Mitchell cannot satisfy the scienter requirement, Mitchell also presents compelling evidence to the opposite effect. *See United States v. Hangar One, Inc*., 563 F.2d 1155, 1157 (5th Cir. 1977) (finding that affidavits from employees stating that they had personally engaged in acts of fraud created a genuine issue of material fact).  It is not the Court's duty at this stage to make credibility assessments or weigh the evidence. *Deville*, 567 F.3d at 164.  Thus, the Court finds that OWB is not entitled to summary judgment on Mitchell's Treasury HAMP and FHA-HAMP allegations for lack of scienter.

### IV.    Whether Summary Judgment is Appropriate for Mitchell's VA Allegations

After considering OWB's arguments at to Mitchell's Treasury HAMP and FHA claims, the Court now turns to OWB's argument concerning Mitchell's VA allegations.  OWB's primary argument alleges that Mitchell's VA claim fails because "he does not and cannot adduce any

evidence of a VA certification" and thus cannot demonstrate a false statement or fraudulent conduct (Dkt. #197 at p. 15).  In response, Mitchell contends that OWB must have made express false certifications to the VA when it reported VA claims through the VALERI portal and signed VALERI certifications confirming that "[t]he information provided       . . . is accurate to the best of your knowledge and is *substantiated by the accompanying documentation and proper justification*" (Dkt. #187 at p. 36).  Consequently, the parties' briefing focused on whether OWB's VALERI submissions constituted express certifications of compliance.  However, after the parties completed both their initial and supplemental briefing on the underlying motion, the Court granted Mitchell's motion for leave to amend his complaint.  Mitchell's TAC now includes allegations that OWB made "*implied* false certifications" to the VA concerning OWB's "compliance with the laws, regulations, and guidance governing VA-HAMP, while knowing that it did not have a functional VA-HAMP program" (Dkt. #265 ¶¶ 172–73).  Thus, the absence of any evidence of an express certification will not preclude Mitchell's VA claim.  Further, in light of Mitchell's TAC, OWB filed another motion for partial summary judgment, contending that Mitchell cannot prove either materiality or scienter on his VA-related FCA claims (Dkt. #268).

Here, summary judgment is not appropriate if there is a genuine issue of material fact as to whether OWB made false certifications to the VA—whether express or implied.  Courts have held that a claim may be false or fraudulent under the FCA if it includes a false certification of compliance with a federal statute, regulation, or contract that is a prerequisite to obtaining the Government benefit. *U.S. ex rel. Graves v. ITT Educ. Servs., Inc*., 284 F. Supp. 2d 487, 497 (S.D.Tex. 2003*), aff'd*, 111 Fed. App'x. 296 (5th Cir. 2004); *see also U.S. ex rel. Ruscher v. Omnicare, Inc*., 663 Fed.App'x. 368, 373 (5th Cir. 2016) (per curiam) ("A claim is legally false when 'a claimant . . .  falsely certifies compliance with [a] statute or regulation.'").  Legal falsity

can take two forms. *Ocwen*, 2016 WL 2992229, at *5.  It can be express, where the party affirmatively certifies compliance with a statute, regulation, or contract requirement that is a material condition of payment. *Id.*  Alternatively, it can be implied, where a party submits a claim to the Government and fails to disclose a violation of relevant statutes, regulations, or contract requirements that are material conditions of payment. *Id.*

The Court finds there are genuine issues of material fact as to whether OWB made false certifications to the VA.  As noted, the parties vigorously dispute the significance and meaning of OWB's certifications through the VALERI portal.  OWB maintains that its representations in the VALERI portal merely indicate that the information reported was accurate, not that OWB was complying was the VA's loss-mitigation rules (Dkt. #197 at p. 15).   Mitchell asserts otherwise— that the certifications in VALERI represent an express certification of compliance with VA requirements (Dkt. #205 at p. 17).  Here, after looking at the language of the certifications in VALERI, the Court finds that they are not express certifications of compliance. *Compare United States v. Dental Health Programs, Inc*., No. 3:18-cv-463, 2021 WL 3213709, at *5 (N.D. Tex. July 29, 2021) (stating an express certification of compliance is made "when a party affirmatively certifies compliance with a statute, regulation, or contract requirement that is material condition of payment") (internal quotations omitted), *with*, (Dkt. #187 at p. 35) (arguing OWB made an express certification of compliance when it submitted that "[t]he information provided . . . is accurate to the best of your knowledge and is substantiated by the accompanying documentation and proper justification.").

In short, Mitchell's interpretation is too broad—the language in VALERI does not indicate that OWB was certifying that it was in compliance with the terms of the VA regulations. *See U.S. ex rel. Barko v. Halliburton Co*., 241 F. Supp. 3d 37, 58–59 (D.D.C. 2017), *aff'd,* 709 Fed. App'x

23 (D.C. Cir. 2017) (finding that relator failed to demonstrate the existence of an express false certification where certification did not expressly include certification of compliance with law, regulation, or contract).   Further, the Court's interpretation is reinforced by comparing the language at issue with the language in OWB's express certifications of compliance under Treasury HAMP and FHA-HAMP (*See* Dkt. #265 ¶ 74 ("By executing the Amended SPA, OneWest expressly certified that 'Servicer is in compliance with, and covenants that all Servicers will be performed in compliance with, all applicable Federal, state and local laws, regulations . . . .")).   In contrast to the express language in OWB's certifications under Treasury HAMP and FHA-HAMP, the language at issue here does not expressly indicate that OWB was certifying its compliance with VA laws and regulations.

However, in light of Mitchell's amended complaint, summary judgment is inappropriate. There is a genuine issue of material fact as to whether OWB made implied certifications to the VA.   Further, though OWB raised a materiality argument in its sur-reply brief for this motion, it briefed the issue more fully in its recent motion for partial summary judgment.   Therefore, the Court will address OWB's remaining arguments as to Mitchell's VA allegations when it addresses the most recent motion for summary judgment.

## CONCLUSION

It is therefore **ORDERED** that Defendants' Motion for Summary Judgment Under Federal Rule of Civil Procedure 56 (Dkt. #178) is hereby **DENIED.**

**IT IS SO ORDERED.**
**SIGNED this 16th day of March, 2022.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE