# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ANDREW MITCHELL, and ANDREW MITCHELL, Individually, § § § § § *Plaintiffs/Relator,* § § v. § § CIT BANK, N.A., d/b/a ONEWEST BANK, § and CIT GROUP, INC., § § *Defendants.* | Civil Action No. 4:14-CV-00833 Judge Mazzant |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion to Exclude Proposed Expert Testimony of Nelson Locke (Dkt. #217). Having considered the motion and the relevant pleadings, the Court finds that the motion should be **DENIED**.

### BACKGROUND

The background of this lawsuit is more thoroughly set forth in the Court's Memorandum Opinion and Order on Defendants' motion for summary judgment (Dkt. #271). Highly summarized, this case arises out of allegations made by Relator Andrew Mitchell ("Mitchell") that One West Bank ("OWB")[1] violated the False Claims Act ("FCA") by submitting false claims to the Government to obtain payment under three different Government loan-modification programs. These three programs were Treasury's Home Affordable Modification Program ("HAMP"), the Department of Housing and Urban Development ("HUD")'s Federal Housing Administration ("FHA") mortgage insurance program ("FHA-HAMP"), and the Department of Veteran Affairs

---

[1] Unless otherwise specified, OWB refers collectively to Defendants' CIT Bank, N.A. (d/b/a OneWest Bank) and CIT Group Inc.

("VA")'s mortgage insurance program ("VA-HAMP").  Mitchell contends that OWB certified to these agencies that it was in material compliance with relevant laws and regulations, while OWB knew it was not.  These false certifications allegedly caused the government to make payments to OWB that it would not have otherwise made.

On October 21, 2021, OWB filed the present motion, seeking to exclude Mitchell's expert, Nelson Locke, Esq. ("Locke"), from testifying at trial (Dkt. #217).  On November 4, 2021, Mitchell filed his response (Dkt. #227).  On November 10, 2021, OWB filed its reply, (Dkt. #231), and on November 17, 2021, Mitchell filed his sur-reply (Dkt. #238).  On December 7, 2021, Mitchell submitted a letter to the Court, notifying the Court of an error in Locke's declaration that was submitted in support of Mitchell's sur-reply.  On the same day, Locke filed a supplemental declaration, correcting the misstatement (Dkt. #246).  On December 8, 2021, OWB submitted a letter to the Court in response to Locke's supplemental declaration, arguing that Mitchell's need to correct Locke's misstatements, which Mitchell only did after OWB raised the issue, further supports the present motion.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue.  FED. R. EVID. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court instructed courts to function as gatekeepers, and determine whether expert testimony should be presented to the jury.  509 U.S. 579, 590–93 (1993).  Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The party offering the expert's testimony has the burden to prove that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable. *Daubert*, 509 U.S. at 590–91. A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education." FED. R. EVID. 702. Moreover, to be admissible, expert testimony must be "not only relevant but reliable." *Daubert*, 509 U.S. at 589. "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kuhmo*, 526 U.S. at 147).

In deciding whether to admit or exclude expert testimony, the Court should consider numerous factors. *Daubert*, 509 U.S. at 594. In *Daubert*, the Supreme Court offered the following, non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593–94; *Pipitone*, 288 F.3d at 244. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Daubert*, 509 U.S. at 595.

The *Daubert* factors are not "a definitive checklist or test." *Id.* at 593. As the Supreme Court has emphasized, the *Daubert* framework is "a flexible one." *Id.* at 594. The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue. *Kuhmo*, 526 U.S. at 152. Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court. *St. Martin v. Mobil Expl. & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000) (citations omitted).

## ANALYSIS

Mitchell retained Locke as an expert to assess "whether the servicing of residential mortgage loans by [OWB] complied with mortgage loan servicing industry customs, practices and standards of care, and complied with the requirements of" of MHA Treasury HAMP, HUD's FHA Loss Mitigation Program, and the VA Home Loan Guaranty Program" (Dkt. #217, Exhibit 1 at p. 6). In its motion, OWB asserts that Locke's testimony should be excluded for two main reasons. First, OWB contends that Locke's opinions result from unreliable methods "because they hinged on factors beyond [OWB]'s control, and thus resulted in findings of non-compliance even when [OWB] did nothing wrong" (Dkt. #217 at p. 7). Second, OWB argues that Locke's methods were unreliably applied because his analysis contained egregious errors, his team was inexperienced and had inadequate time to complete their review, and Locke ignored more than 12 gigabytes of data that OWB produced (Dkt. #217 at p. 15–17). Further, OWB attacks Locke's and his team's credentials throughout its briefing (Dkt. #217 at p. 14). In response, Mitchell contends that none of OWB's arguments support excluding Locke's testimony. Rather, OWB's criticisms of Locke's report are areas that are best addressed with cross-examination (Dkt. #227 at p. 5). Moreover, according to Mitchell, OWB's attacks are premised on "erroneous factual statements and incomplete characterizations of his testimony" (Dkt. #227 at p. 11).

"When expert testimony has been challenged, it is incumbent upon the court to conduct a preliminary fact-finding to determine whether the expert is qualified to render the proffered opinions and whether the substance of the testimony is both reliable and relevant." *Allison v. NIBCO, Inc.*, No. 9:02-CV-172, 2003 WL 25685229, at *1 (E.D. Tex. May 21, 2003). The court must also articulate its basis for admitting expert testimony. *See Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001). To be reliable, and therefore admissible under Rule 702 of the

Federal Rules of Evidence, expert testimony as to a scientific, technical or other specialized area must: (1) assist the trier of fact to understand the evidence or to determine a fact in issue; (2) be based upon sufficient facts or data; (3) be the product of reliable principles or methods; (4) and have reliably applied the principles and methods to the facts.  FED. R. EVID. 702.  "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et. alia."  *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).

The party offering the expert testimony has the burden of establishing by a preponderance of the evidence that the challenged testimony is admissible.  *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).  It is not necessary for the proponent to prove that the expert's testimony is correct, but the proponent must prove the testimony is reliable.  *Id.*  The Court examines OWB's arguments in turn, beginning with the credentials of Locke and his team.  The Court then will address OWB's argument that Locke's opinions result from unreliable methods and then OWB's argument that Locke unreliably applied his methodology.

### I.      Qualifications of Locke and His Team

"Whether an individual is qualified to testify as an expert is a question of law." *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 614–15 (5th Cir. 2018) (citing *Mathis v. Exxon Corp.*, 302 F.3d 448, 459 (5th Cir. 2002)).  Pursuant to Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion." FED. R. EVID. 702; *see also United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992) ("To qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'"); *Kumho Tire Co.*, 526 U.S. at 151 (stating that a witness may be an expert even if his

5

or her expertise is based purely on experience). Rule 702 does not require "that an expert be highly qualified in order to testify about a given issue." *Williams*, 898 F.3d at 614–15. Indeed, "[a]lthough an expert's qualifications may be less-than-sterling, she may still be certified." *Id.* For all a Court must find "are 'sufficient indicia' that an individual will 'provide a reliable opinion' on the subject . . . ." *Id.* at 625 (citing *Huss v. Gayden*, 571 F.3d 442, 455–56 (5th Cir. 2009)). This is because "[d]ifferences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.*

With that being said, "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting *Holbrook v. Lykes Bros. Steamship Co., Inc.,* 80 F.3d 777, 781 (3d Cir. 1996)). In making the determination of whether an expert is qualified, a district court is afforded "wide latitude." *Id*. at 936–37 (citing *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997)).

### A. Whether Locke is Qualified to Testify

OWB criticizes Locke's credentials for several reasons. First, OWB argues that Locke "lacks the real world experience necessary to qualify as an expert" since he has "never worked for a mortgage servicer or servicing regulator, and, in his words, has 'not done much servicing review'" (Dkt. #231 at p. 5). OWB also criticizes Locke's specific prior experience with HAMP (Dkt. #217 at p. 14). Second, OWB contends that Locke has a "tenuous grasp on the rules and regulations governing [Mitchell]'s claims[,]" which is disqualifying (Dkt. #217 at p. 14). According to OWB, Locke "has no understanding of key loss mitigation requirements, such as the difference between Treasury HAMP, FHA loss mitigation, and VA loss mitigation rules" (Dkt. #231 at pp. 5–6). More specifically, according to OWB, Locke's analysis on OWB's compliance

with Real Estate Settlement Procedures Act ("RESPA")'s live contact requirement ignores when the regulation became effective, and his deposition testimony indicates that he did not know that dual-tracking regulations changed over time (Dkt. #217 at pp. 13–14).

Here, the Court finds that there are "sufficient indicia" that Locke can provide a reliable opinion as an expert. *See Mobility Workx, LLC v. Cellco P'ship*, 4:17-CV-00872, 2019 WL 5721814, at *14 (E.D. Tex. Nov. 5, 2019). To begin, Locke has extensive experience performing HUD compliance reviews (Dkt. #217, Exhibit 1 at pp. 6–7). In his capacity as a mortgage banker, he ultimately served as the Legal and Compliance Manager for Value Financial, a national, publicly-traded and HUD-approved lender (Dkt. #217, Exhibit 1 at pp. 6–7). To be sure, since 2005, he has performed or approved HUD FHA Level Compliance post-closing Quality Control Reviews on at least 5,000 Mortgage Loan files (Dkt. #217, Exhibit 1 at p. 6). Moreover, in his current role as a consultant, he routinely advises clients on compliance issues in the mortgage industry (Dkt. #217, Exhibit 1 at p. 6). Thus, it is evident that Locke's training and real-world experience make him qualified to serve as an expert witness in this case. *See Barbe v. Gov't Emps. Ins. Co.*, No. 4:13-CV-441, 2014 WL 12601572, at *2 (E.D. Tex. June 30, 2014).

Further, though OWB takes issue with Locke's prior familiarity with HAMP specifically, "courts routinely reject efforts to artificially narrow the scope of a witness's expertise in order to disqualify him or her." *Holcombe v. United States*, 516 F. Supp. 3d 660, 685 (W.D. Tex. 2021). Rather, "[a] lack of specialization should generally go to the weight of the evidence rather than its admissibility" and "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications." *United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013). As such, though Locke's experience mostly stems from conducting HUD reviews, this does not warrant exclusion of his testimony. Indeed, it is evident that Locke has ample experience

7

with compliance issues related to the mortgage servicing industry in general. Thus, OWB's issues concerning Locke's prior familiarity with HAMP can be addressed on cross-examination. *See Wen Chyu Liu*, 716 F.3d at 168.

Moreover, though OWB argues that Locke "has no understanding of key loss mitigation requirements" (Dkt. #221 at p. 5) because he tested the same generic criteria for the three programs at issue though they have key differences, the Court finds this criticism unhelpful to OWB's position. For one thing, while OWB points to illustrative examples of differences between the programs, it fails to explain why Locke's failure to account for these differences render Locke's analysis faulty. *See Earl v. Boeing Co.*, No. 4:19-CV-507, 2021 WL 3140545, at *7 (E.D. Tex. July 26, 2021). Further, in response to OWB's argument, Mitchell asserts that the fundamental requirements of the programs largely overlapped and thus Locke "tested for [OWB]'s compliance with basic criteria that applied to all three programs" (Dkt. #238 at p. 5). Thus, a closer look reveals that the parties dispute here concerns the factual assumptions underlying Locke's report—namely, whether the three programs shared key loss mitigation requirements. As such, OWB's criticism is not a basis for exclusion. *See Boeing*, 2021 WL 3140545, at *8 ("[E]ven if [Locke] made factual errors or incorrect assumptions, these go only to the weight, not admissibility, of [his] testimony."). Likewise, the Court is unconvinced by OWB's criticisms of Locke's analysis of RESPA and his understanding that the programs' requirements changed over time. While these might be sources for cross-examination, these critiques do not show Locke's opinions are so fundamentally unsupported that they would not assist the fact-finder in reaching a sound verdict. Accordingly, the Court finds that Locke has sufficient experience to serve as an expert in this case. The Court now turns to OWB's criticisms of Locke's team.

### B.  Whether Locke's Team Caused Locke's Review to be Unreliable

OWB argues that Locke's auditing team was unqualified and inappropriately trained, which exacerbated the unreliability of Locke's review (Dkt. #231 at p. 5).  In particular, OWB criticizes Locke's team of ten field auditors for having "no mortgage servicing experience whatsoever" (Dkt. #217 at p. 17).  Further, OWB attacks Locke's structure of the loan file review, contending that Locke gave his team "woefully inadequate time to complete the[] review" and "incentivized them to move quickly by paying them on a 'per file' basis . . . regardless of how many documents were actually in the file" (Dkt. #217 at p. 17).  In response, Mitchell argues that Locke specially trained every reviewer on his team, and Locke himself performed several measures to ensure quality control (Dkt. #227 at pp. 8–9).

As with Locke himself, the Court finds that Locke's auditing team was qualified and did not cause Locke's review to be unreliable. Though OWB takes issues with the team's lack of mortgage *servicing* experience, all ten auditors "[had] [] mortgage industry experience" (Dkt. #214, Exhibit 1 at pp. 51–52).  Further, three of the ten auditors had significant auditing experience in the mortgage-related field and the remaining seven auditors all had experience with processing or quality control (Dkt. #214, Exhibit 1 at pp. 51–52).  Even more so, Locke specially trained every reviewer and even recorded the training sessions (Dkt. #227 at p. 8).  Thus, the team's prior experience coupled with Locke's training rendered his team qualified and competent to conduct the review.  Further, though OWB criticizes Locke for compensating the reviewers on a per-loan basis rather than an hourly basis and estimating the amount of time it might take to review a loan, these criticisms are not a basis for disqualification, but rather the proper subject of cross-examination.

Finding Locke and his team qualified, the Court now turns to OWB's argument that Locke's methodology was unreliable.

## II. Whether Locke's Methodology Was Reliable

OWB contends Locke's methods "were unreliable because they hinged on factors beyond [OWB]'s control, and thus resulted in findings of non-compliance even when [OWB] did nothing wrong" (Dkt. #217 at p. 7). More specifically, OWB argues that Locke's methodology in determining whether a loan was "materially non-compliant" was flawed. For example, OWB explains that the only three criteria Locke used to determine if a loan was "materially non-compliant" were whether OWB's "imaged loan documents contained evidence that (i) [OWB] solicited delinquent borrowers; (ii) [OWB] received financial information from buyers; and (iii) [OWB] reviewed a 'checklist containing enough data to justify a mod review for each delinquent borrower'" (Dkt. #217 at pp. 7–8). But, according to OWB, it had no control over the second or third criterion because none of the loss mitigation programs at issue "required loan servicers to submit their financial information to the servicer" (Dkt. #217 at p. 8). In other words, Locke's loan review "focused on whether OWB's imaged loan document repository included certain documents without analyzing whether the documents should have been there at all" (Dkt. #231 at p. 2). Thus, OWB argues that "the absence of these documents in [OWB]'s records says nothing at all about its compliance" because OWB could not "compel borrowers to provide the documents" (Dkt. 217 at p. 9).

In response, Mitchell asserts that "Locke's loan review evaluated the contents of the file and not just one or more specific documents to determine whether [OWB] complied with the applicable criteria or if a reasonable inference could be made as to program compliance based on the contents of the file" (Dkt. #227 at p. 12). Thus, Mitchell contends that OWB's argument is

10

"simply incorrect" because "[i]if there was evidence that a borrower refused to submit financial information to [OWB], [] Locke took that into account" (Dkt. #238 at p. 2). In support of this contention, Mitchell includes a declaration from Locke stating that he "considered whether the absence of required documentation was due to reasons purely outside of [OWB]'s control" (Dkt. #238, Exhibit 1 at p. 1). Further, in the declaration, Locke further explicitly states that "[i]f there was evidence in a loan file that a borrower refused to submit necessary information to [OWB] . . . I took that into account in my analysis" (Dkt. #238, Exhibit 1 at p. 1).

Here, the Court finds that OWB's disagreement with Locke's methodology does not warrant the exclusion of Locke's testimony. The core of OWB's argument is that Locke's methodology was unreliable because he considered only whether certain documents were present in OWB's imaged loan files "even though documents were absent solely due to borrower's failure to provide them" (Dkt. #231 at p. 1). However, Locke's declaration makes clear that this was not the case—that Locke considered whether the absence of required documentation was due to reasons purely outside of OWB's control (Dkt. #238, Exhibit 1). Moreover, according to Locke's deposition testimony, the contents of the file, not just one or more specific documents, were evaluated to determine whether OWB complied with the applicable criteria or if a reasonable inference could be made based on the contents of the file (Dkt. #227, Exhibit F at 122:12–15). Thus, Locke considered alternative explanations for the missing documents. *See Bray Int'l, Inc. v. Computer Assocs, Int'l*, Inc., No. Civ.A H-02-98, 2005 WL 2405924, at *6 (S.D. Tex. Sept. 29, 2005) (rejecting argument that expert failed to account for alternative explanations because his testimony made "clear" that the expert considered alternative factors). As such, this is not a case in which an expert failed to consider alternative explanations, and OWB's reliance on *U.S. ex rel.*

*Barron v. Deloitte & Touche, LLP*, No. SA-99-CA-1093, 2008 WL 7136870, at *4 (W.D. Tex. Aug. 20, 2008) is misplaced.

To be sure, like many of OWB's other arguments, OWB's concerns go to the weight, not the admissibility, of Locke's testimony. Unquestionably, "an expert should be excluded if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison" *Boeing*, 2021 WL 3140545, at *8 (internal quotation and citations omitted). But otherwise, as is the case here, OWB's "suggestion of alternate explanations is a matter properly reserved for cross-examination and does not go to the admissibility of [Locke's] expert opinion." *Kreuzer v. City of Houston*, No. H-03-5073, 2005 WL 5977653, at *2 (S.D. Tex. Apr. 8, 2005).

OWB also argues that Locke's test for "evidence borrower lost home" yielded misleading results (Dkt. #217 at p. 9). According to OWB, evidence that a borrower lost his or her home is not evidence of OWB's non-compliance because OWB was required to evaluate certain borrowers for "a potential short sale and deed-in-lieu of foreclosure . . . which are legitimate foreclosure prevention options but also result in borrowers losing their homes" (Dkt. #217 at p. 9). Thus, evidence that a borrower lost his or her home "could be equally consistent with the conclusion that [OWB] complied with all program requirements, but the borrower did not qualify for" a loss-mitigation option that allowed the borrower to keep his or her home (Dkt. #217 at p. 9). In response, Mitchell contends that, contrary to OWB's argument, whether a borrower lost his or her home "was not used to determine whether [OWB]'s servicing for any given loan was or was not compliant" (Dkt. #227 at p. 14). Rather, Locke's tracking of OWB's ability to keep borrowers in their homes was "relevant to whether [OWB]'s services gave the government the benefit of the HAMP bargain by keeping borrowers in their homes" (Dkt. #238 at p. 4).

Again, the Court finds these grounds insufficient to warrant exclusion. While the Court agrees with OWB that evidence a borrower lost his or her home is not evidence of OWB's non-compliance, this data point was not used to determine OWB's non-compliance. Rather, as Mitchell explains, it was used to determine whether the government received the benefit of the HAMP bargain. Thus, OWB's argument for exclusion is misplaced. OWB's criticisms go to the weight to be given Locke's testimony, not the admissibility, and may be raised through vigorous cross-examination at trial.

Accordingly, the Court finds that OWB's concerns over Locke's methodology do not warrant the exclusion of his testimony. As such, the Court now turns to OWB's argument that Locke's methods were unreliably applied.

### III. Whether Locke's Methods Were Unreliably Applied

OWB's final argument is that "Locke compounded the defects in his unreliable methodology by applying that methodology in an unreliable manner" (Dkt. #217 at p. 15). OWB points to "egregious errors" in Locke's analysis that show his methodology was applied unreliably (Dkt. #217 at p. 15; Dkt. #231 at p. 5). And though OWB acknowledges that Locke amended his opinions and that his supplemental reports address many of the errors, it argues that "fixing a few anecdotal errors does nothing to address the systematic unreliability underlying his review" (Dkt. #231 at p. 4). Additionally, OWB criticizes Locke for "ignore[ing] more than 12 gigabytes of data [OWB] produced that may have altered the results of his file review" (Dkt. #217 at p. 17).

As with OWB's other arguments, the Court finds that OWB's concerns go to the weight, not the admissibility, of Locke's testimony. Indeed, in performing its gatekeeping role, "[t]he court is not to focus on the conclusions generated by the expert's methodology." *Nunn v. State Farm Mut. Auto. Ins. Co.*, No. 3:08-CV-1486, 2010 WL 2540754, at *4 (N.D. Tex. June 22, 2010).

Rather, "[t]he validity or correctness of the conclusions is for the fact finder to determine." *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565, 574 (E.D. La. 2005). Nevertheless, OWB argues Locke's testimony should be excluded because Locke's "corrections show that the unreliability of his opinion is pervasive" and his analysis still "remains replete with errors" (Dkt. #231 at p. 5). However, the Court disagrees, finding that Locke's purported errors and subsequent corrections are not so fundamental or pervasive to call into question the reliability of his methodology. *Moore v. Int'l Paint, LLC*, 547 F. App'x 513, 516 (5th Cir. 2013) ("[A] few scattered errors in an expert report are not necessarily grounds for exclusion."). Of course, OWB is free to cross-examine Locke regarding the errors, but the errors fail to justify the exclusion of Locke's testimony. *See Mahli, LLC v. Admiral Ins. Co.*, No. 1:14-CV-175, 2015 WL 4915701, at *7 (S.D. Miss. Aug. 18, 2015) ("[M]iscalculations and inaccuracies . . . go to the weight of the evidence and not its admissibility.").

Likewise, the Court finds that OWB's criticism that Locke ignored certain data does not warrant exclusion of his testimony. To be sure, "experts are permitted wide latitude in choosing what data they rely on in forming their opinions . . . ." *United States v. Seale*, 600 F.3d 473, 491 (5th Cir. 2010). Here, Locke's report thoroughly explains which data he considered and why he did so. Further, though Locke did not use the data in the text files that OWB produced, he did review the servicing data when it was part of the imaged loan files. Moreover, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. Hodge*, 933 F.3d 468, 478 (5th Cir. 2019) (internal quotation marks omitted). Thus, OWB's criticisms pertaining to Locke's focus on OWB's imaged loan files should be addressed on cross-examination.

## CONCLUSION

It is therefore **ORDERED** that Defendants' Motion to Exclude Proposed Expert Testimony of Nelson Locke (Dkt. #217) is hereby **DENIED.**

**IT IS SO ORDERED.**

**SIGNED this 26th day of April, 2022.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE